STATE OF MAINE                                    SUPERIOR COURT
HANCOCK, ss                                       ELLSWORTH

---

VLADEK FILLER
Plaintiff,

v.

HANCOCK COUNTY,
WASHINGTON COUNTY,
TRAVIS WILLEY,
DAVID DENBOW,
MICHAEL CRABTREE,
GOULDSBORO,
GUY WYCOFF,
ELLSWORTH,
CHAD WILMOT,
PAUL CAVANAUGH,
STEPHEN MCFARLAND,
MICHAEL POVICH,
CARLETTA BASSANO,
MARY KELLETT,
LINDA GLEASON,
Defendants.

---

# COMPLAINT

Thomas F. Hallett, Esq.
Timothy E. Zerillo, Esq.
David A. Weyrens, Esq.
HALLETT, ZERILLO
& WHIPPLE, P.A.
75 Market Street, Suite 502
Portland, ME 04101
(207) 775-4255

1



# TABLE OF CONTENTS

I.     NATURE OF ACTION................................................................ 5

II.    JURISDICTION, VENUE & THE PARTIES...................................... 9

III.   FACTS................................................................................... 12

      A.  Factual Overview................................................................ 12

      B.  Initial Allegations and Investigation..................................... 17

      C.  April 24, 2007 Washington County 911 and Deputy Willey's
         Recordings...................................................................... 21

      D.  Spousal Rape Investigation and Vladek Filler's Arrest.............. 26

      E.  April 11, 2007 Ellsworth Police Reports and Witness Statements... 33

      F.  Withheld April 24, 2007 Washington County 911 Audio and
         Video Recording............................................................... 38

      G.  Withheld April 24, 2007 Gouldsboro Police Records and Reports.. 44

      H.  Suppressed May 25, 2007 Videotaped Interview by DA Detective
         Stephen McFarland............................................................ 47

      I.  Fraudulent Photographic Evidence........................................ 51

      J.  Fraudulent Computer Evidence............................................ 52

      K.  Arguetta's Mistranslated and Ignored E-Mails........................ 55

      L.  Interference with Child Custody Proceedings.......................... 56

      M.  Second Trial Discovery Violations........................................ 58

      N.  Defamatory Statements (Paul Cavanaugh)............................. 59

O. Summary of Misconduct of Deputy Travis Willey, Individually, Lieutenant Denbow, Individually, Deputy Michael Crabtree, Individually, and the Washington County Sheriff's Office – Failure to Turn Over Exculpatory Evidence to the District Attorney's Office or Vladek Filler; Destruction of Exculpatory Evidence............................................................... 60

P. Misconduct of Officer Wilmot, Individually, Ellsworth and Hancock County – Failure to Produce Exculpatory Materials Regarding Events of April 11, 2007.................................... 64

Q. Summary of Misconduct of Officer McFarland – Falsification of Evidence, Withholding of Exculpatory Evidence, Fabrication of Evidence.................................................................... 65

R. Summary of Wrongful Conduct of Gouldsboro Police Chief Wycoff, Individually...................................................... 67

S. Summary of Wrongful Conduct of Michael Povich, Individually, and as Final Policy-Maker for Hancock County...................... 69

T. Summary of Misconduct of Povich Acting as Final Policy-Maker for Hancock County.......................................................... 70

U. Summary of Misconduct of Mary Kellett............................. 73

V. Summary of Misconduct of Supervisors and County Officials...... 74

W. Conflict of Interest........................................................ 76

IV.   CAUSES OF ACTION.................................................................... 78
   A. 42 U.S.C. § 1983 Claims

**COUNT ONE**: 42 U.S.C. § 1983: Denial of Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments (Defendants Travis Willey, Guy Wycoff, Chad Wilmot, Stephen McFarland, Mary Kellett, David Denbow and Michael Crabtree)................  78

**COUNT TWO**: 42 U.S.C. § 1983: Defamation; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Denied of Due Process Rights and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments (Defendants Povich, Kellett, Wycoff, Bassano,

3

Cavanaugh)...................................................................... 82

**COUNT THREE**: *Monell*/U.S.C. § 1983 Claim Against Defendant Hancock County for the Actions of the Hancock County Sheriff's Department and Hancock County District Attorney; Against the Town of Gouldsboro for the actions of the Gouldsboro Police Department; Against Washington County for the actions of the Washington County Sheriff's Office; Against the Town of Ellsworth for the Conduct of the Ellsworth Police Department................ 86

**COUNT FOUR**: Monell/U.S.C. § 1983: Intentional Creation of an Unconstitutional Policy or Custom Under Color of State Law, Denial of Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments Unconstitutional Policy or Custom (Defendants Hancock County, Washington County, Gouldsboro and Ellsworth, Povich and Bassano in their Individual Capacities................... 91

   B.  STATE TORT CLAIMS...................................................... 96

**COUNT FIVE**:  Malicious Prosecution (Nurse Linda Gleason)................. 96

**COUNT SIX**: Negligent Emotional Distress (Nurse Linda Gleason)........... 99

**COUNT SEVEN**: Defamation (Cavanaugh)....................................... 100

**COUNT EIGHT**: Negligent Infliction of Emotional Distress (Cavanaugh)... 101

V.     PRAYER FOR RELIEF................................................... 102

VI.    JURY DEMAND.......................................................... 102

4

## I.   <u>NATURE OF ACTION</u>

1.      This is a civil action brought pursuant to 42 U.S.C. § 1983, § 1988, and state tort law, seeking monetary damages for Plaintiff Vladek Filler ("Filler"), due to his wrongful arrest, prosecution, conviction, and the injuries suffered therefrom as a result of the pervasive misconduct of the Defendants in this matter.

2.      On April 26, 2007, Plaintiff was arrested and charged with gross sexual assault. In January 2009 Plaintiff was convicted of one count of Class A Gross Sexual Assault and two misdemeanor charges of assault on his then wife Ligia Arguetta Filler ("Arguetta"). The guilty verdict was overturned, and a new trial ordered, by the Trial Judge based upon prosecutorial misconduct in March 2009.

3.      On May 24-27, 2011, Plaintiff was retried on the remaining one Class A Gross Sexual Assault Count and two misdemeanor assault charges. Plaintiff was found not guilty of the Class A Gross Sexual Assault Count and one misdemeanor assault charge. He was convicted of the remaining misdemeanor charge.

4.      This lawsuit seeks to hold Defendants[1] liable for unconstitutional customs, policies, and procedures regarding the collection and production of evidence, including exculpatory evidence pursuant to 42 U.S.C. §1983 and *Monell v. Department of Social Services*, 436 U.S.C. 658 (1978). The unlawful actions of law enforcement and prosecutors documented in this lawsuit resulted from affirmative or *de facto* municipal policies, practices and customs designed and orchestrated to violate the constitutional rights of criminal suspects and defendants, or from deliberate indifference by policymaking officials or municipal Defendants who, as a matter of policy, unlawfully concealed exculpatory or impeachment evidence known as *Brady* material,

---

[1] Linda Gleason is excluded from this classification and is sued only under state tort law.

and lied to or mislead courts, criminal defense attorneys and criminal defendants in order to cover up their unlawful behavior.

5.      The custom, procedure, or usage complained of in this Complaint was so widespread and accepted by defendants that the illegal, unconstitutional, custom, procedure and usage of not producing *Brady* material to criminal defendants was even memorialized in writing. Maine, Federal and Constitutional law requires a prosecutor to seek out and directly provide all exculpatory information to a criminal defendant. *See* M.R.Crim.P. 16(a)(1)(c); *Brady v. Maryland,* 373 U.S. 83 (1963). At all times pertinent to this complaint, the Hancock County District Attorney, as a matter of policy and custom, and in violation of State, Federal, and Constitutional requirements, refused to do so. Rather, defendants were forced to attempt to obtain evidence directly from county, city and town Law Enforcement, in this case unsuccessfully.

6.      The written policy referenced above was set forth on discovery cover sheets stating:

> "Original/color photos available for your inspection upon request[2] through this office. > [] Video/Audio Tapes/CD/DVD available for your viewing/listening upon request through this office. > PLEASE NOTIFY THE LAW ENFORCEMENT AGENCY IF YOU WOULD LIKE TO OBTAIN YOUR OWN COPY OF ANY ORIGINAL/COLORPHOTOS,VIDEO/AUDIOTAPES/CD/DVD'S AT YOUR EXPENSE."

This policy was combined with law enforcement's practice of routinely excluding exculpatory evidence from written reports submitted to the District Attorney's Office. As a matter of policy, the District Attorney's Office did not review the evidence kept by law enforcement.

---

[2] "Request" meant that the defendant would be referred to the pertinent law enforcement authority to view the requested information. Only to be refused, by "the fox guarding the hen house", and sent back to the District Attorney's office. This whipsawing was a constant feature of Hancock County's discovery process.

7.     This unconstitutional custom, practice or usage had the obvious effect of the District Attorney's Office routinely: (1) not providing exculpatory evidence; and (2) charging and indicting criminal defendants without probable cause.

8.     Specifically in this case, at least three key pieces of exculpatory evidence were withheld by law enforcement[3]. The first was a 911 call made on April 24, 2007 by the alleged victim, complaining to the police that she needed help finding her cat, and making exculpatory statements and exhibiting exculpatory conduct and not mentioning any problem with her husband; made for a reason entirely other than any assault allegations against her husband. The second was a statement made by the alleged victim to authorities five (5) days after the alleged rape where she said nothing about a rape, and instead made exculpatory statements[4]. The third was testimony regarding a bruise on Arguetta's arm which at the first trial was claimed to have been caused by an assault. This was the *only* physical evidence of harm to Arguetta, and Gouldsboro Police Chief Wycoff failed to disclose that when it was shown to him three days after the alleged simple assault, Arguetta told him it had just appeared that day and that she had no idea where it came from.

9.     Materially altered evidence included a DVD of an interview with Arguetta on April 25, 2007 which was edited to exclude the exculpatory video of Nurse Linda Gleason instructing Arguetta to cry so the false rape would "seem real". An *edited* recording of an April 24, 2007 interview with Arguetta during a psychotic episode contained some, but not all, exculpatory information disclosed by Arguetta during that four hour interaction with law enforcement. The

---

[3] This does not include numerous additional items of evidence which were not timely or properly disclosed upon written request, and even after court order requiring such disclosure. Further, exculpatory medical records were never produced because they were intentionally never requested by the District Attorney's Office.

[4] A Board of Bar Overseers panel ("BBOP") specifically found three violations by Kellett at the BBOP hearing. Ms. Kellett defended against these claims contending she never received the information from law enforcement.

complete tapes and a video were apparently destroyed by Officer Willey of the Washington County Sheriff's Office.

10.     The presentation to the Grand Jury to obtain an indictment consisted largely, upon information and belief, of a five page report submitted by Defendant Stephen McFarland alleging five rapes against Filler. That report, when the DVD was eventually produced many months later, was found to contain manufactured information. This false information, and upon information and belief, false testimony reflecting the false allegations manufactured by McFarland, caused the Grand Jury to issue an indictment against the Plaintiff.

11.     The facts giving rise to this case are unusual for several reasons other than a *written discovery policy violating Federal, State, and Constitutional requirements*. For the first time in the State of Maine, a prosecutor, Defendant Mary Kellett ("Kellett"), was sanctioned for both *Brady* violations (failure to obtain and disclose), and prosecutorial misconduct arising out of Plaintiff's first criminal trial[5].

12.     District Attorney Povich ("Povich") was identified by the Board of Bar Overseers as promoting Kellett's discovery misconduct by his ratification of that conduct subsequent to a complaint by Plaintiff's attorney Daniel Pileggi about the failure to provide discovery, and violation of the law and Bar Rule requirements. Discovery misconduct continued after Povich's ratification.

13.     These practices, along with other unconstitutional conduct effectively destroyed Plaintiff emotionally and financially.  Authorities were aware that Arguetta and Plaintiff were in a bitter dispute over custody of the children. Arguetta's 17 year old daughter advised the police that Arguetta would say anything to keep her children. Police knew that Arguetta falsely accused

---

[5] The BBO findings are attached hereto as Exhibit 1. Ms. Kellett was suspended from practice for 30 days, which was then suspended. Of note, the BBO and Supreme Court Justice Ellen Gorman both noted the "*written policy*" and the *discontinuance* of that policy.

Plaintiff of sexually abusing all of the children. In fact, this was false and known to be false. A reasonable person would not have honestly believed that Plaintiff sexually assaulted his wife in this context. In fact, Filler was awarded full custody of his children by the Court well in advance of Plaintiff's first trial.

14.     Plaintiff seeks damages against Hancock County, Washington County, Ellsworth and Gouldsboro and all law enforcement individual defendants, as a result of withholding exculpatory evidence, and initiating and continuing the malicious prosecution of Plaintiff without probable cause, defamation and negligent infliction of emotional distress[6].

15.     Plaintiff is an extraordinarily intelligent and able individual, who graduated *summa cum laude* from Babson College, and was self-employed at the time of this violation, owning and operating a website with significant earning potential, a distribution business, and a bright future. As a result of these violations Plaintiff has been virtually unemployable and his businesses, his hopes and his dreams destroyed. He suffers from post-traumatic stress disorder and is emotionally and psychologically debilitated.   He also sustained damages in the form of attorney's fees, the costs of defending himself, costs for travel, medical bills, and other out-of-pocket expenses.

## II.     JURISDICTION, VENUE AND THE PARTIES

16.     Plaintiff Vladek Filler is a US citizen. At the start of the events complained of he was a resident and property owner in Gouldsboro, County of Hancock, Maine. He later relocated to Atlanta, Georgia, where he currently resides.

17.     Defendant Mary Kellett, at all times pertinent hereto, was employed as a Hancock County Assistant District Attorney. At all times material hereto, Defendant Kellett acted towards

---

[6] State tort claims made only against state tort claim defendants.

Plaintiff under color of statutes, ordinances, customs and usage of Hancock County and Maine, and acted within the scope of her employment. She is sued in her individual capacity.

18.     Defendant Hancock County, Maine is an incorporated regional governmental body responsible for supervising the Hancock County District Attorney's Office and Sheriff's Department. Hancock County District Attorney's Office is a district attorney's office within Hancock County which prosecutes individuals for crimes in Hancock County. Hancock County Sheriff's Department is the law enforcement agency for Hancock County.

19.     Defendant Washington County is an incorporated governmental municipality in the State of Maine, and is responsible for supervising the Washington County Sheriff's Department.

20.     Defendants Travis Willey, David Denbow and Michael Crabtree, at all relevant times were Deputy Sheriffs with the Washington County Sheriff's Department and were employed by Washington County. Defendants Willey, Denbow and Crabtree acted towards Plaintiff under color of statute, ordinances, customs, and usage of Maine and Washington County, and acted within the scope of their employment. They are sued in their individual capacities.

21.     Defendant Gouldsboro is a municipal corporation of the State of Maine and is a resident, for purposes hereunder, of Hancock County, Maine.

22.     Defendant Guy Wycoff was employed as the Chief of Police for the Gouldsboro Police Department. He had direct interaction with the improper investigation and prosecution of Plaintiff, and had the duty to insure that all officers were qualified to serve as police officers and to insure that officers were properly trained, supervised and disciplined. At all times material hereto, Defendant acted under color of statutes, ordinances, customs, and usage of Maine and Gouldsboro. He is sued in his individual capacity and official capacities.

23.     Defendant Ellsworth is a municipal corporation within the State of Maine and is a resident, for purposes hereunder, of Hancock County. Ellsworth was the employer of certain other defendants. Ellsworth Police Department was responsible for the hiring, retention, training, supervision, and discipline of subordinate officers, including the named defendants herein.

24.     Defendant Chad Wilmot was employed as an Ellsworth Police Department police officer at all times material hereto. Defendant was acting under color of statutes, ordinances, customs and usage of Maine and Ellsworth, and is sued in his individual capacity.

25.     Defendant Paul Cavanaugh was employed as an Assistant District Attorney by Hancock County and the Hancock County District Attorney's Office. At all times material hereto, Defendant Cavanaugh acted toward Plaintiff under color of statutes, ordinances, customs and usage. He is sued in his individual capacity.

26.     Defendant Stephen McFarland was employed by the Hancock County Sheriff's Department and/or Hancock County and/or the Hancock County District's Attorney's Office as an investigator and/or law enforcement officer at all times material hereto. Defendant McFarland was acting under color of statutes, ordinances, customs and usage and is sued in his individual capacity.

27.     Defendant Michael Povich at all times pertinent hereto was the elected District Attorney of Hancock County. At all times pertinent hereto, Defendant Povich was acting under color of statutes, ordinances, customs and usage. He is sued in his individual capacity.

28.     Defendant Carletta Bassano, at all times pertinent hereto, was the District Attorney of Hancock County from 2010 to 2014. At all times pertinent hereto, this Defendant was acting under color of statutes, ordinances, customs and usage. She is sued in her individual and official capacities.

29.     Linda Gleason is an individual with a residence located in Steuben, Maine at all times pertinent hereto.

30.     At all times relevant defendants resided in Maine, were incorporated in Maine, or had a principal place of business in Maine and acted under the color of law.

31.     This Court has jurisdiction over the Defendant because the Constitutional violations under 42 U.S.C. § 1983 and the torts alleged herein took place in this jurisdiction.

32.     Venue is proper pursuant to 14 M.R.S.A. §501.

### III.     FACTS

### A. Factual Overview

33.     Vladek Filler (hereinafter "Plaintiff" or "Filler") immigrated to the United States as a child in 1979 from Ukraine, is a long time US Citizen, a *summa cum laude,* top award winning, graduate of Babson College with a BA in Accounting, and founder and previous operator of a once profitable small business.

34.     At the time his wife Ligia Filler (now known as Isabella L. Arguetta and herein "Arguetta") falsely accused him of spousal rape and abuse, they were in the midst of separation and child custody dispute.  At the time, Plaintiff was her intimate partner for sixteen years, husband of twelve years, and a loving and caring father of their two children ages one year old and ten years old.

35.     Filler was also a caring step father to Arguetta's seventeen year old daughter Natasha Badias Barrientos who Filler raised and mentored since she was one year old, and ultimately helped by using his standing with his alma mater, Babson College, to get his step daughter accepted to Babson.

12

36.     Filler was the sole owner of a historic 1800's timber framed project house in Gouldsboro, Maine which overlooked Frenchman's Bay and the island of Bar Harbor and where the couple moved to live in May-June 2004.

37.     Filler's ex-wife Arguetta emigrated from Guatemala to Newton, Massachusetts at age seventeen. Arguetta had a history of serious mental problems, psychiatric treatment, and history of claims of sexual abuse and abandonment.

38.     Arguetta had a prior child custody dispute involving three restraining orders, numerous claims of abuse, and criminal charges against Arguetta for Assault and Battery and Assault and Battery with a Deadly Weapon (her teeth) on one Carlos Badias who sought parental rights to the daughter he had with Arguetta in 1990.

39.     In October of 1991 Arguetta began dating Vladek Filler, who was unaware of her previous hospitalization and court experiences.

40.     In 1994 Arguetta and Filler moved in together and in October of 1995 they married.

41.     They had two sons, oldest born in 1996 and youngest in 2005.  Arguetta's daughter from a prior relationship was born in 1990.

42.     In May of 2004 the family relocated to a house on coastal Maine where Filler was able to work from home and care for the children and ailing wife.

43.     In Maine, Arguetta's mental state deteriorated despite an assortment of prescribed medications growing to occupy a duffle bag with daily doses reaching some twenty-four pills.

44.     After moving to Maine in 2004, Filler developed new and aggravated an old medical problem which impaired his ability to do routine tasks, to stand, to bend, and to walk. His treatment involved numerous doctors, specialists, and physical therapists.

45.     By 2007, the marriage between Plaintiff and Arguetta had deteriorated beyond repair and the parties were in the midst of a separation initiated by Plaintiff.

46.     Plaintiff openly made plans and arrangements to relocate with the children to the state of Georgia to live with relatives.

47.     Arguetta was finishing CNA classes, getting a job through a friend, and making arrangements to move and live with her friends in Maine.

48.     As the date of Plaintiff's departure approached, on April 21, 2007 Arguetta unexpectedly took their one year old son and relocated to live with an unknown new friend at an undisclosed location in another county.

49.     In an effort to gain physical custody of the couple's ten year old son, Arguetta engaged the police and began making numerous allegations of abuse.

50.     Within days all three children were taken by DHHS and Plaintiff was arrested and charged.

51.     On July 24, 2007, after a three month investigation, DHHS dropped child protection charges and the couple's two sons were placed in Plaintiff's sole custody where they remain to this day. Arguetta was allowed one hour weekly supervised visits with a therapist's involvement.

52.     Around August 8, 2007, two weeks after the children were placed with Plaintiff, prosecutor Mary Kellett brought forth indictments on five counts of class A gross sexual assault and two counts of class D assault against Plaintiff.

53.     A criminal trial was held on January 12-15, 2009 while Arguetta and Plaintiff were engaged in a contentious custody fighting for the children in divorce proceedings.

54.     Plaintiff was found guilty of one count of gross sexual assault and two counts of misdemeanor assault, and not guilty of four counts of gross sexual assault.

14

55.     On March 2, 2009 the trial Court set aside the convictions and ordered a new trial based on Mary Kellett's prosecutorial misconduct.

56.     ADA Kellett appealed to the Law Court.

57.     Plaintiff's court appointed appellate attorney Neil L. Fishman argued that Mary Kellett conducted "a Salem witch trial" and prosecuted "unprovable" and unfounded charges while engaging in flagrant misconduct.

58.     During the criminal appeal process the final divorce hearing was held on November 16-18, 2009.  The Divorce Court found that Arguetta abused the children, knowingly made false accusations of child molestations, had publicly threatened to kill Plaintiff and a Sheriff's deputy, and proved to the Court her ability to lie and make up stories.

59.     The Divorce Court found that evidence of spousal rape of April 6, 2007 for which Plaintiff was falsely convicted did not even meet a preponderance of the evidence standard.

60.     The Divorce Court concluded the children needed "protection" from Arguetta and the children's primary residence was granted to Plaintiff in the state of Georgia where they continue to reside to this day.

61.     On May 19, 2010 oral arguments were presented in the criminal appeal before the Law Court by prosecutor Mary Kellett and attorney Neil Fishman.

62.     On September 9, 2010 the Law Court upheld the trial Court's ruling against the State, citing improper evidentiary ruling and prosecutorial misconduct.

63.     On or about October 6, 2010 prosecutor Mary Kellett announced through the Bangor Daily News that she will retry Plaintiff on the three remaining charges.

64.     On December 28, 2010 Plaintiff filed a Bar Complaint against prosecutor Mary Kellett.

65.     On May 24-27, 2011 ADA Paul Cavanaugh prosecuted Plaintiff at a second trial at which he was acquitted of the remaining count of Gross Sexual Assault and one of two class D assaults. Plaintiff was found guilty of one count of class D assault which he maintains was the result of fabricated false claims and evidence.

66.     The conviction was affirmed on appeal; however, subsequently the Court found sufficient cause to approve a Post-Conviction Review for prosecutorial misconduct and inadequate representation.

67.     On December 5, 2012 Board of Overseers Disciplinary Panel A found prosecutor Mary Kellett guilty of discovery and court order violations and violating seven Bar Rules.

68.     The Panel recommended Kellett's license to practice law be suspended and an information be filed with the Maine Supreme Judicial Court for a hearing.

69.     On July 16, 2013 a Judgment was issued by the Maine Supreme Judicial Court finding Kellett responsible for not turning over three pieces of exculpatory evidence to defense, violating a court order and seven Bar Rules. Her license suspension was suspended.

70.     On November 8, 2013 Arguetta was found in contempt of court for violating the 2009 divorce Judgment.

71.     On November 18, 2013, five months after the State was required to file a response to the Post-Conviction Review Petition, Plaintiff's new counsel Hunter Tzovarras filed a motion for a default judgment.  As of this filing the motion is still pending.

As of January 7, 2014, Plaintiff continues to maintain sole legal and physical custody of his two sons now ages eight and seventeen.

### B. Initial Allegations and Investigation

72.     On April 22, 2007 Arguetta's new friend (Linda Gleason) called Gouldsboro police to go over to Plaintiff's house and "get" the couple's ten year old son and deliver him in to Arguetta's custody.

73.     Gouldsboro Police only agreed to get involved if Arguetta was a victim of abuse. Arguetta then took the phone and claimed she was a victim of being "pushed" by Plaintiff two days earlier on April 20, 2007.

74.     Gouldsboro Police Sgt. Harry Larrabee later testified he could hear Arguetta's friend Linda Gleason *"in the background advising her"* to make claims of sexual abuse.

75.     Without ever meeting with Arguetta or her friend Gleason in person, Gouldsboro Police officers immediately drove to Plaintiff's residence and separately interviewed Plaintiff and his ten year old son. Both denied Arguetta's allegations and according to Sgt. Larrabee Plaintiff appeared to have no prior knowledge that police were coming to interview him.

76.     The ten year old reported prior incidents of witnessing his mother assaulting and punching his father, however, other than an argument, no physical contact at all took place on the night in question (April 20, 2007).

77.     The ten year old refused to be taken to his mother or live with her.

78.     Plaintiff informed Gouldsboro Police that he and Arguetta were in the middle of separation and a child custody dispute and that Arguetta was clearly attempting to gain an advantage in their child custody dispute as she employed identical tactics in another custody fight with the father of her daughter in Massachusetts.

17

79.     Plaintiff reported he never assaulted Arguetta but suffered physical violence from Arguetta including being hit and punched in the face in front of the children and that he didn't call the police because he was a man.

80.     Plaintiff reported Arguetta was on numerous medications, and had previous criminal charges for attacking the father of her first child in Massachusetts.

81.     Gouldsboro Police still issued a summons to Plaintiff for simple assault and then traveled to meet and interview Arguetta and her friend Linda Gleason in person for the first time.

82.     Once Arguetta saw the Police arriving on April 22, 207 without her ten year old son in the cruiser, she collapsed in her friend's driveway.

83.     Gouldsboro Police Department ("GPD") Officer Larrabee interviewed Arguetta and inspected her arms which showed no bruises or markings of any kind, nor did Arguetta claim to have any bruises when asked. This was two (2) days after the alleged assault.

84.     Prior to leaving, Sgt. Larrabee advised Arguetta to get a physical examination at one of two local hospitals and provide him a medical release required for his investigation.

85.     The following day, on April 23, Arguetta met with a different officer, Gouldsboro Police Chief Guy Wycoff, at Plaintiff's residence. At that time, Plaintiff was forced by Wycoff to stay out of his own house to allow Arguetta to remove multiple vehicle loads of the house's contents.

86.     At the house, Arguetta showed Wycoff a new bruise on her upper arm for which Wycoff helped Arguetta come up with a story to explain and attempt to implicate the Plaintiff in somehow causing Arguetta's new bruise more than 3 days earlier when they last saw each other.

87.     Guy Wycoff photographed Arguetta showing her bruise, Wycoff then drove down the street to speak with Plaintiff who was waiting to be allowed back in to his house.

88.     Plaintiff stood near his car with his son next to him.

89.     Plaintiff repeatedly asked GPD Chief Wycoff to interview his 10 year old son who was right next to him, but Wycoff refused to speak with him at all about what he witnessed take place between his parents on the evening of April 20, 2007. Wycoff admitted at the first trial that he did not interview the son despite the son being made available.

90.     GPD Chief Wycoff instead told Plaintiff twice to have a lawyer ready on "speed dial".

91.     GPD Sgt. Larrabee's investigation report concerning Arguetta's initial interview on April 22, 2007 noted that the bruise Arguetta showed Chief Wycoff on April 23, 2007 was not on her arm one day earlier when Larrabee examined and interviewed her.

92.     According to GPD Sgt. Larrabee, who questioned Arguetta about the alleged assault of April 20, 2007, Arguetta never said anything about a chair or being pushed onto a chair. Larrabee's report detailed a completely different claim of being pushed on April 20, 2007 than the allegations GPD Chief Wycoff put in his report to explain Arguetta's new bruise, being pushed onto a chair.

93.     At Plaintiff's second trial on May 24-27, 2011, former GPD Chief Wycoff admitted for the first time that when Arguetta showed him the bruise on April 23, 2007 *"she didn't know how exactly she got that bruise"* and didn't speculate on how she got it.

94.     Former GPD Chief Wycoff also admitted for the first time at the second trial that he found a chair in the kitchen that in his opinion could have caused the bruise but that Arguetta *"didn't say that"* to him.

95.     Asked who came up with the story, former GPD Chief Wycoff testified *"She said that she was pushed, and my conclusion that the bruise could have been by the chair."* The *"thought"* of the bruise being caused by the chair originated with GPD Chief Wycoff, but Arguetta was not able to confirm one way or another.

96.     GPD Chief Wycoff did not photograph the chair and did not know if that chair related to the bruise or not.

97.     The bruise he observed on Arguetta was on her left arm.  He never asked Plaintiff whether he was right handed or left handed and he never interviewed ten year old Nathan Filler despite having access to him. GPD Chief Wycoff testified he jointly led the investigation with Stephen McFarland and was never provided medical records or a release from Arguetta.

98.     According to Arguetta's second trial testimony, when she first noticed a bruise on her arm she "didn't know what it was" nor was she sure where she got it.

99.     Arguetta testified she did not observe any bruise or feel any swelling, pain, or injury on her arm on Friday April 20, or on Saturday April 21, or on Sunday April 22, 2007 when she was questioned and examined by Sgt. Larrabee.  Not until Monday April 23, 2007, on the 4th day after the alleged incident did she first feel swelling and pain and observed a bruise which was then photographed by GPD Chief Wycoff.

100.    On April 23, 2007 Plaintiff sought help from the Next Step Domestic Violence Project fearing for his child's safety given Arguetta's unstable and violent history.  Upon information and belief, Next Step treated Plaintiff with skepticism, would not help Plaintiff, and did not take his report of Arguetta's domestic violence and history seriously.

101.    Plaintiff filed a report with Department of Health and Human Services child protection hotline out of fear for his one year old son's safety.

102.    On the evening of April 23, 2007 Gouldsboro Police returned to Plaintiff's house to remove more of Arguetta's and her daughter's belongings.

103.   Plaintiff informed Gouldsboro Police that he was being set up and that he found a hand written premeditated "To Do" list in Spanish of steps Arguetta was taking to obtain custody of the children.

104.   Plaintiff was advised to file a Protection from Abuse complaint against Arguetta and informed Gouldsboro Police he would do so first thing the next morning (April 24, 2007).

### C. April 24, 2007 Washington County 911 and Deputy Willey's Recordings

105.   On or about 4:00 AM on April 24, 2007, Arguetta called Plaintiff telling him she loved him more than anyone in one minute, then yelled insults and blamed his mother for everything the next minute.

106.   Plaintiff only interjected to tell Arguetta he will never speak to her again and that her lie about being assaulted (on April 20th) was not going to work other than to break their ten year old son's heart as he was a witness to everything.

107.   Arguetta then told Plaintiff that even though she knows that he is a gentle person who would never hurt anything or anyone that he should now be sure and not to kill himself when he finds out what's coming at him next.

108.   As Arguetta spoke, the couple's one year old son could be heard screaming and crying in the background despite it being 4:00 AM.

109.   Plaintiff called 911 from his house in Gouldsboro and spoke to Hancock County RCC urging them to send an officer to his wife who sounded crazy, and to make sure his one year old son was safe.

110.   Hancock County RCC had a Washington County Deputy, believed to be Deputy Travis Willey, called Plaintiff's home.   Willey dismissed all concerns and misinformed Plaintiff that Arguetta was under the supervised care of a nurse.

111.    Deputy Travis Willey contacted Gouldsboro police who advised him that they found Arguetta to be mentally unstable and that Gouldsboro PD was done dealing with her.

112.    At roughly the same time, Next Step Domestic Violence Project, a women's organization, contacted DHHS's child protective services to log a complaint against Plaintiff on Arguetta's behalf as her advocates.

113.    Arguetta began calling Washington County 911 early April 24, 2007, demanding police seize her ten year old son from her husband, but primarily complaining about her missing cat.

114.    Sounding delusional and psychotic one moment in one call and calm and calculating minutes later, Arguetta initially would not give her name citing concerns that her sounding crazy would result in her losing the child custody battle to Plaintiff and his extended family.

115.    Arguetta immediately made clear her motives of winning the child custody dispute against her husband and his family, and repeatedly demanded Police immediately go back to Plaintiff's house and remove their ten year old son by force.

116.    When 911 dispatch failed to do as she demanded, she repeatedly called back becoming more demanding, with more accusations and claims against Plaintiff until finally she threatened to murder Plaintiff, and then claimed he sexually assaulted her.

117.    Arguetta told dispatch she believed the children were molested by Plaintiff and that she was going to go kill Plaintiff for what he did to the children if the Police don't immediately respond and take the ten year old child from Plaintiff's custody.

118.    Arguetta then attempted to get her seventeen year old daughter from a prior relationship, who was with Arguetta, to say she was molested by Plaintiff.

119.    Arguetta's seventeen year old daughter Natasha called 911 dispatch to report that she told her mother she was "crazy", that her brother chose to live with his father instead of her and that

22

Arguetta was going to use criminal charges to try to get Plaintiff convicted "of anything" so Nathan would have no choice but to come live with her.

120.    Natasha reported Arguetta left on foot to Plaintiff's house with her one year old toddler in hand.

121.    Arguetta was soon spotted and apprehended by Deputy Travis Willey, Deputy Crabtree, and Lieutenant Denbow running on the road barefoot "only in a bra" and pants with a child while screaming she would cut her husband in to pieces and kill Deputy Willey.

122.    Deputy Willey reported Arguetta was "flipping out" and "certifiable" and intending to "kill" her husband (Plaintiff).

123.    Restrained in the cruiser, she was screaming and kicking the door, talking to herself in English and Spanish, chanting, laughing, and crying.

124.    The full incident was video and audio tape recorded by Willey's cruiser camera.  The full tape containing exculpatory statements was later requested, subpoenaed, and court ordered but never procured, and later allegedly destroyed without production to Plaintiff.

125.    Deputy Willey also used his portable pocket recorder as he entered and exited the cruiser where Arguetta was restrained.

126.    A heavily edited one and one-half hour audio recording that was eventually turned over to defense revealed Arguetta alleged that her husband sexually molested the three children and might try to kill their ten year old son.

127.    Partial audio recording revealed Arguetta screaming:

> You can't mess with me. My last name is not Filler. My last name is Barrientos. You never mess with me. You better watch out or I'll fucking kill you. Oh yeah, my cousins, my cousins will help me. You will see, we're going to cut you in to pieces….You wanna fuck with the best?...Huh?...You're fucking with the best you mother fucker….just give him to me I'll cut him in to pieces.

128.    Arguetta was kicking and hysterically screaming at DHHS worker and Deputy Willey that: "It's about time you did your fucking job….where is Nathan?  Where is Nathan? Where. Is.  Nathan? Are you telling me he's missing?" referring to the couple's ten year old son.

129.    When Deputy Willey responded "no, he's with his father", Arguetta screamed "Go get him right now! Go get him right now or I'll fucking kill you too! GO.  GET.  HIM!"

130.    Willey responded "we're sending an officer out now, we're sending an offer to get him, we're sending an officer now".  Arguetta screamed "I'm going to fucking sue all of you…Go get my son NOW. Don't fuck with me. Don't fuck with me!...you're going to get it from me too, you're going to get it from me too you fucking asshole."  To which Deputy Willey reassured her "I believe you, I believe you."  Arguetta screamed "You've been playing games with me all night. I'm not crazy, I'm not crazy, this fucking asshole molested my kids and he's going to die because I'm going to kill him…"

131.    The video recording was not provided, however DHHS records show that Arguetta made numerous suppressed exculpatory statements while restrained in Deputy Willey's cruiser.

132.    Deputy Willey reported to DHHS by phone during the incident that Arguetta claimed she left the marital home on April 21, 2007 specifically because her husband raped her seventeen year old daughter.   This completely contradicted her two previous claims to two different Gouldsboro Police officers.  Deputy Willey's oral report was immediately noted and time stamped in DHHS narratives.

133.    Arguetta also revealed to Willy that she was somehow aware her husband was in Ellsworth courthouse filing for a protection from abuse order against her that morning.  This was noted in DHHS time stamped narratives as reported by Deputy Willey.

134.   The crucial police cruiser video and audio recording of Arguetta's unedited exculpatory statements was withheld, denied, and never provided to Plaintiff's attorney despite court order.

135.   As a result of Arguetta's allegations that Natasha, her seventeen year old daughter, was raped, Gouldsboro Police dispatched Officer Charles Bagley to Plaintiff's house, authorizing him to break the door down and save Natasha who everyone believed to be Plaintiff's rape victim.

136.   A copy of a heavily edited and non-continuous audio CD recording eventually provided to defense revealed prosecutor Kellett's office was fully aware and was notified by Deputy Willey in real time during the April 24, 2007 incident of Arguetta's false allegations.

137.   Not only was Deputy Travis Willey's full cruiser recording of Arguetta's numerous exculpatory statements withheld, but so were all the Gouldsboro Police reports from the same April 24, 2007 incident that would also show Arguetta's now third version of false accusations against Plaintiff concerning what happened that caused her to leave on April 21, 2007.

138.   On the morning of April 24, 2007 Plaintiff was not raping or killing anyone, but was at the Hancock County courthouse with his son Nathan filing a multi-page complaint seeking a Protection from Abuse Order against Arguetta on behalf of himself and the children.

139.   Natasha was alone at Arguetta's friend's house where Arguetta left her prior to running on the road.

140.   Arguetta was taken to Machias Hospital and involuntarily hospitalized for psychiatric observation and physical examination.

141.   All the children, including Arguetta's 17 year old daughter were taken by DHHS into foster care as a result of Arguetta's false abuse allegations.  Both older children denied being abused by Plaintiff, (youngest was one year old), and the DHHS concluded no abuse by Plaintiff had ever occurred.

142.    According to Deputy Travis Willey's testimony, the minute Arguetta was told Nathan was taken away from Plaintiff she calmed right down as if someone flipped a switch at a snap of the fingers.  She immediately began behaving and speaking calmly and normally.

### D. Spousal Rape Investigation and Vladek Filler's Arrest

143.    The day following her psychotic episode and involuntary hospitalization, April 25, 2007, and while in the supervised custody of caregivers, Arguetta was brought by Nurse Linda Gleason to the Hancock County District Attorney's office to give a taped interview to GPD Chief Wycoff with the assistance of Detective Stephen McFarland.

144.    The April 25, 2007 videotape of the interview, although not produced in accordance with discovery requirements, was finally provided to defense attorney Daniel Pileggi on or about January 2008, and revealed crucial evidence and violations of forensic interview protocols.

145.    At the interview, GPD Chief Wycoff allowed Arguetta's nurse/friend Linda Gleason, who has never met Plaintiff, to sit in during the entire interview, and then to submit her own "witness statements" to help corroborate Arguetta's claims.

146.    After about an hour the interview was coming to a close and GPD Chief Wycoff briefly left the room.  The video recorder was still recording as Arguetta admitted to her friend that her report of sexual abuse against her husband was her way of "fighting for the children".

147.    Arguetta was then advised by Nurse Gleason to cry during the interview to make the story of spousal rape "seem real."

148.    Arguetta, calmly put lip gloss or lip balm on, and told Linda Gleason that she didn't feel like crying, but Linda Gleason repeatedly urged her to cry stating that "it wouldn't seem real" unless Arguetta cried during the interview.

149.     Arguetta expressed some strategic concerns about claims she was making against her husband making her sound less believable.

150.     When GPD Chief Wycoff returned to the room and briefly resumed the interview Arguetta began crying hysterically.

151.     In August 2007, Kellett provided Attorney Pileggi with initial discovery which included a transcript of Arguetta's interview by GPD Chief Wycoff at the DA's office on April 25, 2007. The transcript entirely omitted the communications between Gleason and Arguetta while GPD Chief Wycoff was out of the room, including coaching Arguetta to cry and Arguetta's admissions of fighting for custody of the children.

152.     Following attorney Pileggi's requests for the video and audio records of the interview, two separate audio CD's were provided.  The first CD contained the one hour of the interview prior to Arguetta's coaching and admissions and the second CD contained the remaining fifteen minutes of the interview just after Arguetta's coaching and admissions.

153.     Months later the entire video tape was obtained directly from the Gouldsboro Police by attorney Pileggi and it showed the parts of Arguetta's admissions and coaching that were missing from both the audio CDs and the transcript provided the Hancock County District Attorney's Office.

154.     Linda Gleason's witness statement was completed a week after she was allowed to sit in at Arguetta's interview.  It was incorporated in to discovery and she was called to give false testimony at trial contradicting police and even Arguetta's own testimony.

155.     At prosecutor Kellett's October 23-24, 2012 disciplinary hearing, former GPD Chief Wycoff testified he conducted the April 25, 2007 videotaped interview at the District Attorney's

office but had nothing to do with either the audio or video recording, or the production of the transcript of the interview.

156.    Wycoff testified the audio video recording was handled by Detective Stephen McFarland who monitored and operated the recording equipment during the interview.

157.    At the disciplinary hearing attorney Pileggi testified about the contents of the two minutes of Arguetta's recording missing from discovery, stating "I believe it was crucial to the defense."

158.    On April 26, 2007, one day after the interview at the DA office, Child Protective Services ("CPS") came to interview Arguetta. On that day Arguetta received a phone call from the DA's office notifying her that her husband was being arrest for her claims of spousal rape.

159.    CPS asked Arguetta about her claims two days earlier that Plaintiff molested the children and would try to kill them which resulted in the children being placed in foster care.  Arguetta now stated that Plaintiff loved the children and would never hurt them.

160.    That same day, April 26, 2007, Plaintiff was confronted at his house and taken outside by Chief Guy Wycoff and DA Detective Stephen McFarland and told by McFarland the only chance Plaintiff had to save himself was to immediately talk to him.

161.    When Plaintiff enthusiastically agreed to talk with McFarland and Wycoff but asked for his lawyer Daniel Pileggi to be present, McFarland immediately instructed Wycoff to place Plaintiff in handcuffs and under arrest.

162.    Plaintiff was charged and arrested on a claim that he raped his wife on April 6, 2007 (twenty days earlier) because, according to Arguetta, "He was very upset that I spent money from his bank account to have my hair cut."

163.    No investigation beyond Arguetta's claims was done prior to Plaintiff's arrest.  Both Plaintiff's joint and business bank account records showed no money being withdrawn by anyone at any time on or around April 6, 2007.

164.    Both GPD Chief Wycoff and McFarland informed Plaintiff they were going to search his house and cars. When Plaintiff asked for a search warrant GPD Chief Wycoff and McFarland said they didn't need one and had full legal right to search Plaintiff's property without a warrant.

165.    GPD Chief Wycoff stated he had received "orders from his superiors" to search Plaintiff's house and that gave him full legal right to do so without a warrant.

166.    Once Plaintiff explicitly stated "I don't give you my permission to search my property", both GPD Chief Wycoff and McFarland became angered; McFarland immediately contacted his superior for instructions by phone, revoked and crossed out Plaintiff's stated $2,500 bail amount and had Plaintiff held without bail in response to Plaintiff exercising his Fourth Amendment Right.

167.    GPD Chief Wycoff, also angered, told Plaintiff that he didn't care that Arguetta's PFA order did not require Plaintiff to stay away from his house, nor that it stated that Arguetta was residing at a different undisclosed location. GPD Chief Wycoff said he would use his discretion to arrest Plaintiff if he managed to get bailed out and return to stay at his own house.

168.    Plaintiff was forced to live in a hotel for five days after posting bail (April 27–May 1 2007) until his attorney was able to confirm that GPD Chief Wycoff had no authority nor any court order to bar or arrest Plaintiff for returning to his own house.

169.    Plaintiff's mother and sister arrived from Atlanta, Georgia and were at the house during Plaintiff's arrest.

29

170.    Detective Stephen McFarland found humor in Plaintiff's mother crying and in her eastern European accent, and kept referring to Plaintiff and his mother as "Russians" in an offensive and disrespectful manner.

171.    Upon the execution of an obtained search warrant on the evening of April 26, 2007, GPD Chief Wycoff and Stephen McFarland found no evidence to substantiate Arguetta's claims; no DNA evidence and no facial or finger imprint evidence was found where it would be expected had Arguetta in fact been sexually assaulted as was claimed. Nothing that was sought or seized for analyses through the search warrant showed any evidence to support Arguetta's claims.

172.    GPD Chief Wycoff and Stephen McFarland inspected the bathroom area where the sexual assault was alleged to have happened.

173.    The area where the bizarre and physically impossible sexual assault claim was alleged to have taken place was so small, 24" X 24", that one adult could barely fit standing in that area, let alone two people bent over as was alleged.

174.    During the execution of the search warrant an official set of photographs was taken of the house's rooms and the alleged sexual assault location.

175.    GPD Chief Wycoff stood inside the bathtub to be able to photograph the alleged crime scene. One of the photos in the series showed GPD Chief Wycoff's image reflected in the mirror standing inside the bathtub taking the picture.

176.    During the execution of the search warrant Wycoff found a bag of loose rat poison hidden in a kitchen cabinet, showed it to Plaintiff's mother and sister, and jokingly suggested that Plaintiff's wife may have been poisoning him. The discovered poison was not mentioned in his report.

177.    GPD Chief Wycoff and Detective McFarland inquired about the packed boxes and belongings in the house.  Plaintiff's mother and sister explained Plaintiff and his children were in the midst of relocating to live with them the in Atlanta, Georgia area.  This was not included in GPD Chief Wycoff's or Detective McFarland's reports.

178.    The following day, April 27, 2007, a bail hearing was held before Justice Jeffrey Hjelm.

179.    Over prosecutor Kellett's objections, Plaintiff was allowed bail ($10,000 cash/$50,000 surety). Kellett requested that Justice Hjelm bar the Plaintiff from being allowed contact with his two sons who were in DHHS custody, which the Court denied, and to be placed on a strict curfew from 8pm until 6am, which was granted. In addition, Plaintiff's Fourth Amendment right to be free of unreasonable search and seizure was waived by the Court.

180.    When later Natasha, on her own initiative, requested through DHHS for the court to allow her to have contact with Plaintiff, Kellett objected stating "I haven't talked to Natasha about this".

181.    The Hancock County District attorney's office contacted the press and provided them with a Probable Cause to Arrest affidavit, allegedly by GPD Chief Wycoff.

182.    Sexually explicit allegations, quotes from women's advocates and prosecutor Mary Kellett were featured in a Bangor Daily News April 27 & 28, 2007 weekend edition front page article with Plaintiff's arrest photo and titled "Gouldsboro Husband Charged with Rape."  The article was reprinted in The Boston Globe, other newspapers, and the internet, and became a national news story.

183.    Next Step Domestic Violence Project organization's website featured the article and used false allegations against Plaintiff to request donations and help for Next Step to get certain laws passed in the Maine Legislature.

184.    GPD Chief Guy Wycoff copied the <u>Bangor Daily News</u> article based on his probable cause statements, attached it to his official police report with a hand written caption "front page", and it was provided to Plaintiff as discovery.

185.    Arguetta was provided Pro Bono legal representation by Next Step Domestic Violence Project's staff attorney Rick Doyle who represented her in civil and divorce court matters.

186.    In early May, 2007, Plaintiff was cleaning his house and placed a couple of unwanted pieces of furniture in the yard with a "for sale" sign on them as is commonly done in the area.

187.    GPD Chief Guy Wycoff came to Plaintiff's house and under the color of law warned that Plaintiff was not allowed to sell any of his belongings because they are marital property.  GPD Chief Wycoff did so despite this having nothing to do with the criminal matter, despite no divorce paperwork having been filed, no injunction in place, and despite Arguetta having pro bono legal representation in all civil matters.

188.    On May 25, 2007, GPD Chief Wycoff came to Plaintiff's residence, while his sister was present, and informed Plaintiff that he had a court order and authority to order Plaintiff out of his home while he and Arguetta entered to search for additional items.

189.    This was more than 1 month after Arguetta moved out and already removed her belonging in two visits with police escort.

190.    GPD Chief Wycoff ordered Plaintiff for the third time to vacate his own house or face immediate arrest if he did not comply and allow access and unlawful search and seizure of unspecified property.

191.    When Plaintiff requested to see the court order GPD Chief Wycoff could not produce one.

192.    Plaintiff then produced a copy of a recent Court Order explaining that GPD Chief Wycoff had to be wrong to which GPD Chief Wycoff responded "I don't want to see any Court Order" and told Plaintiff he was now going to arrest him for not immediately vacating his own house.

193.    Plaintiff and his family rushed to call attorney Daniel Pileggi who asked to speak with GPD Chief Wycoff.

194.    GPD Chief Wycoff acknowledged to Attorney Pileggi that he didn't have any court order, hadn't seen any court order, and merely relied on Arguetta's false claim that she had a court order.

195.    Only once Pileggi advised and warned Wycoff did he leave.

196.    At trial, Wycoff testified he acted after Arguetta told him she had a court order authorizing his actions when in fact no court order existed.

197.    On July 24, 2008 GPD Chief Guy Wycoff was permanently fired by Town of Gouldsboro.

### E. April 11, 2007 Ellsworth Police Reports and Witness Statements

198.    On April 11, 2007, just ten days prior to making criminal allegations against Plaintiff, Arguetta and Plaintiff both gave oral and written statements at the Ellsworth Police Department in a complaint against Stephen Fay, who turned out to be the editor of a local newspaper.

199.    Arguetta did not report to Ellsworth Police that she was allegedly raped or abused by her husband just five days earlier.  Instead Arguetta appeared at the Police station to report she witnessed her husband get pushed by Fay and was "afraid for my husband's safety" and that he should never be pushed due to his physical frailty, bad back problem, and trouble maintaining balance.

200.    Arguetta's oral and written witness statements to Ellsworth Police were made 5 days after April 6, 2007.

201.    On April 24, 2007, seeking custody of their children, Arguetta alleged that she was violently and brutally attacked and raped by her husband on April 6, 2007.

202.    The April 11, 2007 statements given to Ellsworth police contradicted numerous claims and testimony later given by Arguetta, and were exculpatory in nature.

203.    Prosecutor Mary Kellett was contacted in writing beginning on September 6, 2007 with requests from attorney Daniel Pileggi for these specific records which included Arguetta's and Plaintiff's written witness statements given to Ellsworth Police on April 11, 2007 in connection with the Stephen Fay incident.

204.    Pileggi renewed these unanswered requests on October 5, 2007, which were again ignored by Kellett.

205.    On October 12, 2007 Dan Pileggi filed a Motion for Discovery for non-compliance, again specifically listing statements Arguetta gave on April 11, 2007 to Ellsworth Police Department.

206.    At no time did ADA Kellett file an objection to the discovery motion with the court.

207.    On May 15, 2008 Ellsworth Police officer Chad Wilmot was served with a defense subpoena to appear in court on June 9, 2008 and bring all his reports and witness statements involving the April 11, 2007 Stephen Fay incident with all records of interviews of Arguetta by Ellsworth PD.

208.    Chad Wilmot then spoke with Attorney Pileggi and voluntarily agreed to comply with defense's subpoena and bring all his records to Attorney Pileggi's office.

209.    Attorney Pileggi had discussed the subpoena with prosecutor Kellett who made no objections to Pileggi, nor filed any motions or objections in response.  Instead, on or after May

34

16, 2008, Kellett directly instructed Ellsworth Police Officer Chad Wilmot not to provide the subpoenaed records to defense.

210.   Chad Wilmot complied with Kellett's instructions.

211.   Upon hearing of Kellett's misconduct, on May 29, 2008, Attorney Pileggi wrote and faxed a complaint letter to Mary Kellett's office citing prosecutorial misconduct, interference with a defense subpoena, a conflict of interest in legally advising officer Chad Wilmot, and violation of Maine Bar Rules by Kellett.

212.   Kellett received and shared the complaint letter with her superior, District Attorney Michael Povich, who according to Kellett's testimony before the Bar Panel approved and ratified her misconduct.

213.   At the June 3, 2008 discovery motion hearing Justice Anderson issued an order specifically requiring the State (prosecutor Kellett) provide all "reports concerning #1 and #3" to defense attorney Pileggi "including any audio or videotapes that may exist." Item "#3"stated as follows:

> "3.   Ellsworth Police Department investigative reports: The reports include interviews with defendant and the alleged victim, and relating to an altercation between the defendant and a representative of a local newspaper. Upon information and belief, Ms. Filler made numerous statements bearing upon Mr. Filler's physical limitations, and his lack of capacity to commit the acts for which he is charged in this action.

214.   Prosecutor Kellett did not comply with the order.

215.   Defense attorney Daniel Pileggi testified before the Bar Panel that in response to the Court Order Kellett told him only a brief EPD incident report was available and witness statements did not exist.

216.   Defense attorney Daniel Pileggi further testified:

> Mary Kellett said it was everything, I relied on her
> statements…I was repeatedly told there was nothing else, I
> trusted the State there was nothing else…I was surprised
> that prosecutor in this case intervened [to order Chad
> Wilmot not to provide his records to defense]. I was
> frustrated, this was recoverable, it is clearly discoverable,
> and this information was directly related to the defense
> case. I did not understand why it was not provided.

217.    Pileggi said he would have used Arguetta's written statements had they been provided by

Kellet because:

> The physical ability did not allow Mr. Filler to perform the
> acts Mrs. Filler was alleging and her statements to the
> police just prior to the alleged assault where not possible.

218.    As a result of Kellett's noncompliance with the Court Order and false representations,

defense was left with no reason to re-subpoena EPD Officer Chad Wilmot for January 12-15,

2009 criminal trial since Kellett assured the records defense sought from Wilmot did not exist.

219.    Months after the first criminal trial Plaintiff presented the Court Discovery Order and

obtained all witness statements and police report directly from Ellsworth Police Chief DeLeo.

These crucial and extensively requested and Court Ordered exculpatory records clearly existed

and were available.

220.    At the Bar's Disciplinary Hearing, Kellett testified that she acted on behalf of Ellsworth

Police Officer Chad Wilmot by advising him and on behalf of Ellsworth American's editor

Stephen Fay concerning the April 11, 2007 complaint filed against him which defense

subpoenaed from Wilmot.

221.    Asserting legal privilege on behalf of private citizens and legally advising officers while

representing the State of Maine was not part of prosecutor Mary Kellett's legal responsibility and

was a direct violation and a conflict of interest.

222.   On December 5, 2012 Bar's Disciplinary Panel's decision found Kellett in violations of 7

Bar Rules and recommended her license to practice law be suspended.

223.   The Panel's Decision states:

> at least two key pieces of exculpatory evidence, the 911 recording
> from April 24, 2007 (Exhibit 46) and the Ellsworth American
> witness statements (Exhibit 41), were not produced before trial. The
> seriousness of this issue cannot be overstated. The evidence
> was requested by letters, subpoena and motion. The evidence
> should have   been produced pursuant to rules, a court order, case
> law and ethical obligations. The Board's expert, George T.
> Dilworth, Esq., testified that the evidence was "critical" to  the
> defense and that Ms. Kellett had the obligation to  diligently search
> for all evidence held by the police and produce it. Ms. Kellett and
> her colleagues testified that they didn't see the relevance of one of
> the requests and therefore didn't follow up to produce it in any
> timely manner.

224.   The Panel also cited ADA Kellett's supervisor DA Michael Povich, stating:

> In addition, the testimony of Ms. Kellett at trial indicated to the
> Panel that Ms. Kellett's supervisor, the then District Attorney,
> failed to comply with M. Bar R. 3.13(a)(3) by ratifying Ms.
> Kellett's conduct and obviously disregarding Attorney Pileggi's
> ethical concerns set forth in his letter to Ms. Kellett dated May 29,
> 2008, (Exhibit 32), which Ms. Kellett testified she brought to his
> attention.

225.   Board of Overseers Judgment accepted her admission and found that:

> she violated the discovery obligations of a prosecutor under M.R.
> Crim. P. 16, Bar Rule 3.7(i)(2) and the Superior Court's June 3,
> 2008, discovery order. ADA Kellett acknowledges that she failed
> to act with reasonable diligence to provide both automatic and
> requested discovery in the form of a written statement by the
> complaining witness.

226.   Crucial exculpatory evidence was suppressed and withheld from the defense by

intentional actions and misconduct in violation of discovery rules, a court order, and in violation

of Plaintiff's Constitutional and statutory rights.

227.    Plaintiff was convicted in the first trial of the April 6, 2007 Class A Gross Sexual Assault charge as a result of this exculpatory evidence being withheld.

228.    After the first trial, Plaintiff obtained and used Arguetta's April 11, 2007 EPD statement to impeach Arguetta at the November 16-18, 2009 divorce and at the second criminal trial on May 24-27, 2011.   As a result, the divorce judge found Arguetta lacked credibility and her April 6, 2007 rape claim did not even achieve preponderance.   Still, retried by Kellett's office, Arguetta was discredited by the withheld exculpatory evidence, and Plaintiff was finally acquitted of the April 6, 2007 rape allegations.

**F.   Withheld April 24, 2007 Washington County 911 and Video/Audio Recordings**

229.    On May 29, 2007, Deputy Travis Willey hand delivered his report to Prosecutor Mary Kellett's office.   His report was stamped "Received May 29, 2007".

230.    That report was not included in the automatic discovery she provided in August 2007.

231.    When defense attorney Daniel Pileggi independently learned of the April 24, 2007 incident in Washington County as it directly related to the criminal allegations against Plaintiff, he renewed his previous discovery requests on October 5, 2007 and began a series of additional discovery requests seeking for Kellett to produce the Washington County Sheriff's records of Deputy Travis Willey and Lt. Denbow.

232.    On October 12, 2007 attorney Daniel Pileggi filed a detailed Motion for Discovery citing Kellett's non-compliance and seeking an order for production of numerous specific records, recordings, and reports.

233.    At no time did ADA Kellett file an objection to the discovery motion with the court.

234.    On or about October 24, 2007 Kellett provided only a brief five page report with partial dispatch log of the incident which was date stamped as being in Kellett's office for five months since May 29. 2007.

235.    Pileggi followed up with a request for the photographs, videotape recordings, audio recordings, tapes and logs of 911 calls, as these were referenced in Deputy Travis Willey's report of the April 24, 2007 incident.

236.    Kellett did not provide photographs or the requested video, audio, or 911 recordings.

237.    On May 15, 2008 Attorney Pileggi also subpoenaed both investigators, GPD Chief Guy Wycoff and Detective Stephen McFarland, to produce specific records such as the Gouldsboro records concerning 911 calls and notes and records related to Arguetta and her daughter Natasha "on or about April 24, 2007"; incident and field notes and records of all correspondences with Washington County Sheriff's Department "on or about April 24, 2007" regarding Arguetta and all investigative material not previously provided to defendant (Plaintiff).

238.    Neither GPD Chief Guy Wycoff, Detective Stephen McFarland, nor prosecutor Mary Kellett ever provided this clearly discoverable material that was repeatedly requested.

239.    On May 16, 2008 attorney Pileggi also subpoenaed Washington County Sheriff's Department Deputy Travis Willey, to produce "All reports, audio tape, video tape, radio log materials, photographs or other material relating to the Washington County Sheriff's Department's Interactions with Ligia Filler on or about April 24, 2007, including, but not limited to, emergency call records."

240.    The repeatedly requested and subpoenaed material was not provided by Deputy Travis Willey or prosecutor Mary Kellett.

241.    The subpoenas issued and re-issued by Attorney Pileggi are, if nothing less, documented evidence of what Pileggi was specifically and repeatedly requesting from prosecutor Mary Kellett, members of her office, and from investigators but was being ignored, denied, or misled to believe the material couldn't be provided.

242.    The June 3, 2008, court order granted defense's discovery motion and specifically ordered the State to provide all "reports concerning #1 and #3" to attorney Pileggi "including any audio or videotapes that may exist." Item "#1" stated as follows:

1.    Washington County Sheriff's incident reports dated April 24. 2007. Deputy Sheriff Travis Willey and Lieutenant Denbow interviewed the alleged victim, Ligia Filler after intervening for a "crisis evaluation," in which Ms. Filler chanted about "cutting up" the defendant while laughing and crying hysterically, swearing and kicking a door. It was reported that Ms. Filler made various statements about the facts giving rise to the charges in this matter.

243.    On July 16, 2008 attorney Pileggi's wrote to Kellett: "Mary…Please accept this reminder that I am awaiting copies of audio and visual recordings…as addressed by Justice Anderson's recent order.

244.    On September 3, 2008 attorney Pileggi e-mailed Kellett: "Mary, I am at a loss as to any nice way to handle the outstanding recordings from the Washington County, ordered by Justice Anderson…I don't see that the rules give me any choice but to seek a contempt finding, or discovery sanctions.."

245.    On September 3, 2008 prosecutor Kellett sent an e-mail to attorney Dan Pileggi stating that the court ordered April 24, 2007 "video could not be copied" for production to defense (in violation of the Court Order); that the video "doesn't really show anything"; that Kellett would only provide a CD of the audio copied "from the video" tape. She told Pileggi if he still wanted

to see the video to make his own arrangements and "go watch it". It was never made available by Washington County Sheriff's Office despite numerous subsequent efforts and subpoenas.

246.    On September 15, 2008 prosecutor Kellett provided defense with an edited non-continuous audio recording on a CD of Deputy Willey's and Arguetta's interaction on April 24, 2007. That same day Pileggi renewed his request via e-mail to Kellett for the full court ordered video tape and made attempts to make arrangements to gain access to the video.

247.    The full continuous audio or video recording from the cruiser's recorder clearly contained exculpatory evidence according to other reports, but it was never provided nor made available to defense to even view.

248.    On Dec 18, 2008 Attorney Pileggi again subpoenaed Deputy Travis Willey to produce for trial "Copies of all video recordings of Arguetta", but it was never provided.

249.    After the first trial, and on March 24, 2009, Plaintiff began contacting Michael Hinerman of Washington County RCC with FOIA requests for all dispatch and 911 records and recordings of Arguetta and her daughter Natasha from April 22-24, 2007.

250.    On May 14, 2009 Hinerman provided Plaintiff with an audio tape copy of an entire series of extremely important and exculpatory 911 phone calls made by Arguetta and her daughter Natasha on the morning of April 24, 2007.

251.    At Kellett's disciplinary hearing, attorney Daniel Pileggi testified he should have been provided these 911 recordings by Kellett and would have used them at trial because they put in "question [Arguetta's/Ligia Filler's] credibility".

252.    Prosecutor Mary Kellett was required, and ordered by the Court to produce these recordings yet never produced them to defense.

253.    December 5, 2012 Bar Panel decision in finding Kellett guilty of violating seven Bar

Rules stated:

> "With regard to the discovery issues, at least two key pieces of **exculpatory
> evidence**, the 911 recording from April 24, 2007 (Exhibit 46) and the Ellsworth
> American witness statements (Exhibit 41), were not produced before trial. The
> seriousness of this issue cannot be overstated. The evidence was requested by
> letters, subpoena and motion. The evidence should have been produced pursuant
> to rules, a court order, case law and ethical obligations. The Board's expert,
> George T. Dilworth, Esq., testified that the evidence was **"critical"** to the defense
> and that Ms. Kellett had the obligation to diligently search for all evidence held
> by the police and produce it."[7] (Emphasis Added).

254.    Beginning May 7-15, 2009 Plaintiff contacted Washington County Sheriff's Department,

and spoke with Paula Johnson, and both officers on the scene on April 24, 2007, Deputy Michael

Crabtree and Deputy Travis Willey.

255.    On May 7, 2009 Deputy Travis Willey told Plaintiff "the District attorney's office has

everything we have…I don't have any video-right now" speaking in a specific manner clearly

indicating that the video recording may still be available.  Willey indicated that no one ordered

him to provide the video to Plaintiff and that "If you need any documentation you need to

contact the district attorney's office." Willey repeatedly indicated his compliance is up to the

district attorney's office.  Asked if he would comply with another defense subpoena he stated

"probably not". Willey stated that if Plaintiff wanted to subpoena him or get any of his records it

would have to be done through prosecutor Mary Kellett's office.   Informed he will be

subpoenaed, Willey stated "Go ahead…this conversation is over."

256.    Plaintiff made requests per the court ordered for April 24, 2007 records from Washington

County Sheriff's Department Paula Johnson and Deputy Travis Willy, submitted a written FOIA

requests with Paula Johnson and also to Deputy Willy with the required copying fee for all

---

[7] http://www.maine.gov/tools/whatsnew/index.php?topic=mebar_overseers_discipline&id=464815&v=article

requested records, and had Deputy Travis Willey served with a valid subpoena to provide his records for a June 15, 2009 hearing.

257.    Plaintiff provided the requested fee for copies of the report but was still not provided the requested and court ordered records.

258.    On May 15, 2009 Plaintiff subpoenaed Deputy Travis Willey and all his records, notes, and recordings concerning Arguetta for a hearing scheduled on June 15, 2009.  Nothing was provided.

259.    On or about June 9, 2009 Deputy Travis Willey spoke with prosecutor Mary Kellett who advised him concerning Plaintiff's subpoena.

260.    After speaking with Kellett, Deputy Willey telephoned Plaintiff and stated he would not comply with the subpoena, would not provide the records, would not even appear at the hearing that he was subpoenaed to, and for the first time Willey now reported that the court ordered April 24, 2007 video recording of Arguetta's statements has now been erased.

261.    In his testimony before the Bar Panel, Deputy Travis Willey stated that almost immediately after Arguetta's April 24, 2007 public incident occurred he acted quickly to preserve all audio and video recordings and provide his report to the prosecutor's office because of their importance in a case where criminal charges were filed.

262.    At the disciplinary hearing Detective McFarland testified that Travis Willey's recording system in his cruiser was the latest high tech system, hence that it somehow could not be copied for production to defense as Kellett informed defense attorney Pileggi in a September 3, 2008 e-mail.

263.    But contrary to McFarland's testimony, Deputy Travis Willey testified that his cruiser recording system was a very low tech standard VHS tape system.

264.   Travis Willey testified before the Bar Panel that he not only located the VHS video recording he made of the lengthy incident involving Arguetta, but that he also watched the video tape although not all the way to the end, and that the only 'technical' problem related to this video recording was that the camera pointed in one direction with the audio fully intact.

265.   Travis Willey testified that the reason he personally was unable to copy the video was because he lacked access to VCR equipment.

266.   Attorney Kellett's September 3, 2008 e-mail to attorney Daniel Pileggi stated that the video tape, which she admitted was available, was previewed, and did contain the valuable full audio recording of Arguetta's statements, would not be produced to defense because it "could not be copied", which was not true.

267.   Defense attorney Daniel Pileggi was asked before the Panel whether he was provided the April 24, 2007 video and testified "No, oh no..and I tried several times."  He was eventually instructed by Kellett to contact Washington County about gaining access to the video tape and both he and his office staff did so but were not given access to the video tape by the Washington County Sheriff's Office.

268.   Pileggi recalled a form issued from Kellett's office stating that he could view the video at the Hancock County DA office but despite his specific inquiries and efforts was still "not invited to do so."

## G.  Withheld April 24, 2007 Gouldsboro Police Records and Reports

269.   On April 29, 2009 in a post-trial telephone conversation, Gouldsboro Police Sgt. James Malloy revealed to Plaintiff that April 24, 2007 discovery records, the same ones attorney Daniel Pileggi previously requested from Kellett and subpoenaed from both former Chief Guy Wycoff and from district attorney's detective McFarland, did exist and were available.

270.    Sgt. James Malloy confirmed he reviewed records that showed Gouldsboro Police Sergeant Charles Bagley's had communications with the Washington County Sheriff's Department ("WCSD") and met the WCSD Deputy on the morning of April 24, 2007. Sgt. Bagley was then instructed by the Deputy to locate and check on the children.

271.    This withheld report substantiates communications with Arguetta reporting that her 17 year old daughter Natasha was raped by Plaintiff and that was the reason she left the marital home on April 21, 2007. Sgt. Bagley was instructed to go to Plaintiff's residence and break down his door to save Arguetta's daughter who was reported as Plaintiff's rape victim and assumed by Deputy Travis Willey to still be in Plaintiff's physical custody.

272.    That third false report by Arguetta was directly exculpatory and crucial to Plaintiff's defense, but was withheld.

273.    During the telephone conversation with Plaintiff, Sgt. James Malloy voluntarily agreed to compile and fax over to Plaintiff those Gouldsboro Police reports that were available.

274.    Shortly following the conversation Sgt. James Malloy was served with a subpoena to produce all the Gouldsboro Police reports pertaining to Arguetta in April 2007 for a hearing scheduled on June 15, 2009.

275.    The Gouldsboro Police reports in questions should have been provided: as automatic discovery; after Attorney Pileggi specifically requested them from the DA's office; and after attorney Pileggi previously subpoenaed them from GPD Chief Guy Wycoff and Detective Stephen McFarland. They were withheld and never provided.

276.    Sgt. Malloy appeared at an unrelated civil matter for hearing on June 15, 2009 and told the Plaintiff that prosecutor Mary Kellett instructed him (Sgt. Malloy) not to provide Plaintiff the

requested and subpoenaed Gouldsboro Police records and not to even bring some of them to the hearing with him.

277.    Sgt. Malloy showed Plaintiff a sealed nine by twelve inch envelope which contained the Gouldsboro Police report and communications from April 24, 2007 incidents involving Arguetta, but per Kellett's orders he would not provide it unless ordered to do so by the court. The judge in the civil matter could not rule on the records release because the opposing party was not present.

278.    Requested Gouldsboro Police records were discoverable and despite being repeatedly requested and subpoenaed they were never provided.

279.    Kellett admitted to the Bar Complaint through her attorney in filings dated February 28, 2011, that when Sgt. Malloy contacted her she did legally advise him that he needn't provide the subpoenaed material to defense unless specifically court ordered to do so.

280.    At the disciplinary hearing before the Bar Panel on October 23-24, 2012, Kellett testified that Sgt. Malloy contacted her office seeking assistance in locating available reports for production to Plaintiff.

281.    Prosecutor Mary Kellett was required to provide the requested April 24, 2007 reports as they directly related to the false criminal allegations made against Plaintiff.  Kellett suppressed and refused to provide these vital police reports to defense.

282.    Sgt. Malloy agreed to voluntarily comply with Plaintiff's request and subpoena for discoverable records but again, as Kellett did with EPD Chad Wilmot and WC Deputy Travis Willey, she instructed Sgt. Malloy not to provide clearly discoverable reports which were repeatedly requested and subpoenaed and mandated for production.

283.    Other reports Sgt. Malloy promised to provide but was prevented from doing so by Kellett were related to an investigation by Gouldsboro Police of a complaint filed by Plaintiff

when he discovered certain individuals entered his house just prior to trial and illegally obtained unauthorized and clearly staged photographs of the interior which were then presented at trial by prosecutor Kellett (instead of any official police photographs taken in April 2007).These reports were also potentially exculpatory in nature.

### H. Suppressed May 25, 2007 Videotaped Interview by Detective Stephen McFarland

284.    After Arguetta's involuntary hospitalization on April 24, 2007 and her immediate interview at the Hancock County District Attorney's office on April 25, 2007. Thereafter Arguetta was then rushed to Maine Coast Memorial Hospital and involuntarily hospitalized a second time. Arguetta was placed in residential care at a women's shelter where she was monitored and counseled by women's group counselors for weeks.

285.    Following the April 25, 2007 interview Arguetta was instructed by law enforcement to come up with more examples of alleged abuse by her husband to present to the investigators.

286.    On or about May 15, 2007 the couple's two sons, over Arguetta's initial objections, were placed with Plaintiff's mother and sister who moved from Atlanta, Georgia and rented an apartment in Ellsworth, Maine to become foster parents to the two children.

287.    On May 25, 2007 Arguetta, after spending almost a month in supervised care of a women's shelter, was brought to the Ellsworth District Attorney's Office for a second video-taped interview by Detective McFarland, aware that her sons had been placed with Plaintiff's mother and sister rather than Arguetta.

288.    During the interview Arguetta made numerous exculpatory statements, explicitly discussed her child custody motives against her husband.

289.    The purpose of the second interview was to obtain more claims of non-consensual sex or abuse by Plaintiff on Arguetta.

290. McFarland's filed report was based on the May 25, 2007 interview, and was used to establish five of the seven charges presented to the Grand Jury and for which Plaintiff was prosecuted, four Gross Sexual Assault charges and one Assault charge.

291. Rather than a forensic interview to determine what might have actually happened, McFarland, from the start, advised Arguetta about what the prosecution was looking for in order for the alleged incidents to meet the legal requirement of rape.

292. Detective McFarland did not scrutinize Arguetta's claims or veracity, instead he was using leading questions, and suggesting appropriate answers in order to obtain as many accusations as possible to use against Plaintiff.

293. The May 25, 2007 recording revealed numerous admissions by Arguetta which were then misrepresented to the grand jury, to defense, to numerous judges, and ultimately a jury.

294. Admitted consensual sexual conduct between Arguetta and Plaintiff, and manipulative behavior engaged in by Arguetta was presented as criminal charges of rape against Plaintiff.

295. Allegations of Plaintiff "calmly" discussing separation and child custody were coached by Stephen McFarland and then misrepresented to establish Arguetta was being threatened, which even Arguetta didn't allege.

296. With the videotape of Arguetta's interview suppressed and withheld from the defense, her statements were misrepresented and her exculpatory admissions and evidence was omitted from McFarland's report.

297. For a year's worth of discovery hearings and hearings on Motion to Dismiss these false charges, prosecutor Mary Kellett and Detective Stephen McFarland withheld and

refused to provide the May 25, 2007 interview videotape which contained exculpatory

information, admissions, and statements.  Kellett denied the videotape even existed.

298.    On June 3, 2008 attorney Pileggi sent an email to Mary Kellett stating:

> "Mary,
> As I was preparing for trial, I noticed the following entries in Steve
> McFarland's reports:
>
> Page 26, Paragraph 1 of Discovery:
> "Officer Stephen McFarland: On May 25, 2007 at about 2:30 P.M., I
> interviewed Ligia Filler, DOB 04/14/70. This interview was audio and
> video taped."
>
> Page 163 Paragraph 6 of Discovery:
> "I [Stephen McFarland] asked Ligia if she would interpret the e-mails in to
> English for me while I recorded her English reading of them on audio
> tape."
>
> To date I have not received the noted audio and videotapes. Will you
> please make them available at your earliest convenience? Thank you.
> Dan"

299.    On June 9, 2008 Pileggi mailed a copy of his e-mail request stating:

> Dear Mary: Enclosed please find a copy of my recent email to you. As I
> received no acknowledgment I want to ensure that you received my
> request. Thank you. I look forward to hearing from you.
> Daniel A. Pileggi, Esquire"

300.    Faced with clear proof that her's and McFarland's claims about audio and video

recordings were untrue, in late June 2008 Kellett finally provided a copy of the May 25,

2007 interview videotape and January 16, 2008 e-mail translation audio recording she

and McFarland repeatedly claimed didn't exist.

301.    At the disciplinary hearing attorney Pileggi testified that he tried but was not

provided the crucial May 25, 2007 videotape of the interview until summer of 2008.  This

was evidenced by attorney Pileggi's e-mail dated June 3, 2008 and again a follow up

letter mailed to Kellett on Jun 9, 2008 explicitly proving to her that the video she claimed didn't exist in fact did exist and Pileggi again asked for its production.

302.     Arguetta, just as she claimed to Detective McFarland on May 25, 2007, testified at trial that she never said "no" or objected in any way to the sexual contact she had with her then husband, which was then perverted into allegations of Gross Sexual Assault in McFarland's report, and presented to the grand jury as such.

303.     At trial McFarland admitted that the four alleged Gross Sexual Assaults which arose for the first time in his report and interview of Arguetta on May 25, 2007, there was no compulsion or physical force.

304.     That meant that on their face, four of the five Gross Sexual Assault charges Plaintiff was charged and prosecuted for by McFarland and Kellett lacked any evidence of rape and McFarland knew it beforehand because Arguetta told him.  The videotape of Arguetta's interview was suppressed and withheld from defense until June 2008.

305.     The withheld video also revealed exculpatory medical records and reports were offered to the prosecution by Arguetta but were specifically refused by McFarland.

306.     Prior to the Filler case, the HCDA's Office was known to openly refuse to turn over available videotaped interviews of accusers to defense attorneys and being court-ordered to do so.

307.     In the 2007 case of *State vs. Raymond Currier* who was charged by Kellett with 20 counts of assault and sexual assault.  His defense attorney requested a videotaped interview of the alleged victim.

308.    Kellett told a newspaper: "We don't like to release those tapes…We want to keep close control over these."   The Court ordered Kellett to release the discoverable videotape.  Raymond Currier was fully acquitted of all 20 charges.

### I.   Fraudulent Photographic Evidence

309.    On January 12, 2009, the first day of Plaintiff's first trial, prosecutor Kellett presented never released, illegally obtained, staged photographs of Plaintiff's residence showing a different alleged *crime scene* than that in the indictments, and in discovery.

310.    These photographs were completely different from the official photographs initially taken by police on April 26, 2007 using a search warrant.

311.    On June 15, 2009, five months after the trial, Police Chief Guy Wycoff testified that none of the pictures Kellett presented were taken by him.

312.    The recent looking staged photographs presented to the jury showed a washing machine area and shower at Plaintiff's residence that was different from what was depicted in the official April 26, 2007 photographs at the time the allegations were made.

313.    The jury was falsely told that the pictures showed the 'dryer' area where Arguetta claimed she was assaulted on April 6, 2007.

314.    Kellett did not submit any official police photograph taken of the bathroom and the dryer area, and objected to pictures of the actual dryer and the extremely small area the alleged assault took place.

315.    The official photographs showed that the alleged location of the rape was simply laughable.  The prosecutor attempted to deceive the jury using false and fabricated evidence of an entirely different and staged location.

316.    These illegally obtained, staged photographs were never shared with defense prior to trial.

317.    In post-trial divorce proceedings, Arguetta testified that she did not know where those series of photographs came from or how they were obtained from Plaintiff' residence since their separation, but that they did not depict the interior the way it was prior to the separation.

318.    Kellett didn't use the official photographs and through her attorney admitted to Bar Counsel in her filed response that the photographs she did use at trial were provide to her by Arguetta.

319.    Despite the Bar Complaint and Plaintiff's objections to the staged photographs, at the second trial of May 24-27, 2011 prosecution submitted the exact same series of false and staged photographs, and obtained a ruling to bar defense counsel from asking Arguetta about who took those photographs and bar Plaintiff from testifying that the photographs were staged and did not accurately depict the area as it was in April, 2007 when the allegations (and official police photographs) were made.

320.    On August 12, 2013 at a family matter hearing Arguetta admitted she entered Plaintiff's house around 2009 and took the photographs, precisely the same ones which Kellett used at trial instead of the official police photographs.  At the time the photos were produced Arguetta would have had to break in to Plaintiff's house, which she was not allowed to enter.

### J.    Fraudulent Computer Evidence

321. In early May 2007, Plaintiff's computer, which was used for his business, was seized by Chief Guy Wycoff using a search warrant.

322. Wycoff promised to return the computer within seven days as it contained all customer accounts, special software, and credit card records Plaintiff relied on to operate his business.

323.  In June 2007 Attorney Pileggi wrote requesting for Kellett to return Plaintiff's computer so that he may operate his business.  Kellett declined and the computer was not returned to Plaintiff for five and one-half years.

324.  In September 2007, the Maine Computer Crime Lab finished its analysis and issued a report stating no pornography, no images of violence, and nothing illegal whatsoever was found in Plaintiff's computer or its browsing history.

325.  The Computer Crime Lab CD contained recovered e-mails some dating back to 2002.

326.  Recovered e-mails showed Plaintiff sent at least thirty e-mails to his ISP provider America Online, reporting unwanted "SPAM" e-mails with links to sexually explicit content which Plaintiff wanted filtered and blocked by AOL from being sent to his e-mail account.

327.  Detective McFarland ignored the Computer Crime Lab report, ignored Plaintiff's thirty emails reporting unwanted pornographic "SPAM", and instead used invalid hidden files to browse the internet from one webpage to another webpage until he managed to find violent or pornographic material that was never found, never visited, never viewed on Plaintiff's computer.

328.  Detective McFarland then printed out a stack of the most obscene and vulgar images he could find and Kellett submitted this fabricated evidence in to discovery as if it came from Plaintiff's computer.

329.  It was released by Kellett's office a week before Plaintiff's divorce hearing was tentatively scheduled to take place with his accuser wife Arguetta.

330.  Defense filed a Motion in Limine arguing the misuse of invalid files to browse the internet to compile webpages and content not found in Plaintiff's computer or its browsing history.

331. Shortly before trial, attorney Daniel Pileggi exchanged e-mails with Mary Kellett on January 9, 2009 (before trial) quoting investigator Dawn Ego of the Maine Computer Crime Lab as follows:

> There is no adult pornography on this [computer]. It is one of the cleaner computers that I have ever seen. I even checked the cookies, user typed urls, and there is nothing. With respect to redirect index.dat files, I do not know whether a user went there. There is no definitive way to tell. There is no evidence of a user viewing websites involving [pornography].

332. According to the exchanged e-mails between Kellett and Pileggi, investigator Dawn Ego wanted to speak with Kellett "directly" but Kellett refused.

333. Following an agreement to exclude McFarland's fraudulent pornographic material from trial, Maine Computer Crime Lab investigator Dawn Ego, who was going to testify against the State, was released from a defense subpoena.

334. Subsequently, over objection, Kellett elicited false testimony from Arguetta that her husband viewed violence and pornography on the computer. Kellett knew the testimony was contradicted by the case record and Arguetta's own April 25, 2007 videotaped and transcribed claims explicitly stating *"I don't know what kind of websites he's looking in the computer. I don't know."*

335. The trial record showed Kellett telling Justice Cuddy what Arguetta's new testimony was going to be despite Arguetta's reports stating the opposite in the discovery.

336. Arguetta explicitly denied knowing what websites her husband visited and Computer Crime Lab investigator's report and attempts to directly (and through Attorney Pileggi) advise Kellett and McFarland that they were misusing the computer files from a computer that was one of the cleaner ones she's ever seen. Instead, McFarland fabricated pornographic content and

Kellett ignored the facts and elicited false testimony from Arguetta when Dawn Ego was released from subpoena and wasn't present to testify against the State's own prosecutors.

### K. Arguetta's Mistranslated and Ignored E-mails

337.   The Computer Crime Lab recovered numerous e-mails written by Arguetta in Spanish from the hard drive of the confiscated computer.

338.   Det. McFarland requested the accuser, Arguetta, to review and decide which of her own e-mails McFarland and Kellett should look at and which ones should be ignored without translating them in to English.

339.   Det. McFarland then asked Arguetta herself to translate the few selected e-mails she chose from Spanish to English which McFarland then provided in discovery.

340.   McFarland documented having Arguetta choose and translate her e-mails and read them while being audio recorded at the DA's office on January 17, 2008.  The few e-mails submitted to discovery were mistranslated and omitted revealing parts and were provided to Plaintiff 1 week prior to a tentatively scheduled final divorce hearing with Arguetta.

341.   Kellett objected to Arguetta's e-mail to Plaintiff asking for his forgiveness and discussing her mental problems and psychiatric treatment.  The bulk of the e-mails left out of translation by the prosecutor showed evidence which undermined allegations made against Plaintiff, and were not made available through discovery.

342.   A recovered e-mail sent by Arguetta on May 2, 2004, revealed a significantly different reality than what Arguetta reported to investigators about herself and her husband. That email stated in pertinent part:

> Vladek,
> The purpose of this e-mail is to tell you how sorry I am for the pain I cause you. I have been thinking and searching into my heart and I come across with all my traumas, […] I have received a biting from life, I'm talking about being rejected,

abandoned, neglected, humiliated, sexually assaulted and ignored. My wounds are very deep, I thought I already had conquered these ghosts, obviously not. […] There must be so many other things I do without realizing it. It's like having bad breath, it's unpleasant for others to be close to you and you don't even realize you stink. But this is what traumas do to people. We react in a certain way because of some action that has wounded us for life. Vladek, I'm sick […] I been to a psychiatrist (a good one) I'm sick from the soul; and no pill and no psychiatrist can help me, only God can help me.[…] Thank you for your beautiful heart and thank you for loving me.[…]I value you, you are the most important part in my life. […] if you are with me, as long as we are together, it doesn't matter where that is my home, because you are my home. I need to heel, for myself, for you, for my kids.

I need help to get out of this hole. I feel like I'm just waiting for the dirt to fall on me so that I can be buried. This is not living. Once again, I'm not looking for your sorrow, I'm not playing the victim game. All these things I write to you are very difficult for me to talk about, and it took me about 3 hours to write it, but I want to be honest with you, you are my husband and I love you, and once again I'm sorry for not showing you enough how much I value you, I'm sorry for not trusting you enough.

I miss you, but I have Nathan here at home and he is a piece of you and that comforts me. He is such a blessing to our lives.

I kiss you my beloved and please know that I love you.

Yours,

ligia

343.   This email was excluded at trial on Kellett's objection.

## L.   Interference with Child Custody Proceedings

344.   In September 2008, Kellett was contacted by court appointed Guardian Ad Litem John R. Lorenz, PhD. who was retained by Arguetta and appointed by the divorce Court to issue a report and recommendation concerning parental rights and the best interest of the couple's two children.

345.   Prior to speaking with Kellett, GAL John Lorenz interviewed Plaintiff and Arguetta and reviewed Arguetta's history, privileged records of psychiatric treatment, criminal charges against Arguetta for attacking her past boyfriend and interviewed numerous witnesses.

346.   Plaintiff provided GAL with many shocking documents and submitted to some 8 hours of interviews by GAL John Lorenz.

347.  Dr. Lorenz conducted a thorough independent investigation and after reviewing records and speaking with DHHS investigators questioned Arguetta's credibility and became puzzled by the criminal charges against Plaintiff.

348.  Dr. Lorenz sought to gain a better understanding by speaking with prosecutor Mary Kellett, and also hoped to gain a better understanding of the evidence which Kellett was relying on to justify her prosecution of Plaintiff.

349.  After interviewing Mary Kellett, Dr. Lorenz stated that Kellett expressed her strong beliefs that women do not lie about sex crimes.

350. Kellett's express opinion implied that she believed every man accused by a woman of a sex crime is guilty.

351. Dr. Lorenz, a highly reputable and experienced PhD. psychologist and GAL attempted to express his doubts to Kellett and explain to her that based on his professional experience women do make false allegations of sexual assault, and more so during the course of a divorce and child custody dispute.

352. In response, Kellett openly advocated for Arguetta and for GAL John Lorenz to grant her parental rights through his recommendation to the Court.

353. To prejudice the GAL report and recommendation Kellett flagrantly lied to Lorenz stating that she had as evidence a journal Arguetta kept detailing sexual abuse by Plaintiff which she intended to introduce at trial.

354. Upon learning of this claim GAL John Lorenz was given pause and informed Plaintiff's attorney Pileggi that Kellett reported there was a journal detailing sexual violence and abuse.

355. Pileggi informed Plaintiff and made an immediate request for a copy of the journal from Kellett's office. Pileggi also met with Kellett's assistant Stephen McFarland shortly after the request.

356. At the meeting Detective McFarland admitted to attorney Pileggi that Kellett's claim was false as there was no journal in State's evidence.

357. Kellett fabricated a claim of having evidence to secure a conviction against Plaintiff in order to deceive GAL John Lorenz, an appointed official of the court, to use his authority to deprive Plaintiff of his children and grant all parental right in the divorce to Arguetta.

358. At that time, and since April 2007 until the present Arguetta had not been allowed unsupervised contact with the children following DHHS investigation and Findings of child abuse. Both children have been in Plaintiff's sole custody since July 24, 2007 until the present.

## M. Second Trial Discovery Violations

359. Plaintiff's second defense attorney Stephen Smith drafted a motion for discovery non-compliance, but did not file it after being assured by ADA Cavanaugh, who tried the second trial because Kellett had pending BBO proceedings, that everything was provided. That was not accurate as April 24, 2007 exculpatory recordings from Washington County as well as Gouldsboro Police records which Sgt. Malloy said existed were never provided.

360. On May 24-27, 2011 Plaintiff was tried for the second time.

361. When Arguetta testified she recalled being *"pushed"* out of the bathroom and no other physical contact taking place on April 20, 2007, Cavanaugh, over objection, was allowed to present Arguetta with a photograph Chief Wycoff took and allowed to ask her to speculate and "explain" how she got the bruise in the picture.

362.   Arguetta testified she "didn't know what it was" when it first appeared three days after separation.  That when she returned to the house with Wycoff, the chair was the only thing she could think of.

363.   Former Gouldsboro Police Chief Guy Wycoff and Sgt. Harry Larrabee made stunning admissions concerning Arguetta's bruise, and the fact that no one knew how she got it, and it was Wycoff that suggested it was from being pushed into a chair, however a photograph of a bruise with elicited speculation was already allowed into evidence without foundation to be unfairly used against Plaintiff.

### N.  Defamatory Statements
### (Cavanaugh)

364.   On or about January 17, 2014, ADA Paul Cavanaugh announced his candidacy for the district attorney of Hancock and Washington Counties.

365.   On February 19, 2014, Cavanaugh gave a public campaign speech where he publicly stated:

> "Those two pieces of evidence that were so important and fundamental in the first trial were never used in the second trial—they did not have anything to do with the second trial."

366.   The Bar Judgment against Kellett specifically cited three pieces of exculpatory evidence that were not provided to Plaintiff.  One item, Deputy Travis Willey's video and audio recording of Arguetta was withheld, then explicitly denied to Plaintiff, and then allegedly destroyed without production.  The fourth set of evidence, the existing but withheld Gouldsboro Police Reports were not investigated by Bar Counsel, but clearly existed according to Gouldsboro Sgt. James Malloy and were blocked from production by Kellett.

367.   Cavanaugh continued to victimize and blame Plaintiff through his public speech stating:

> Mr. Filler has now filed what we call a Post-Conviction Review, a PCR, where he's saying even that conviction should now be thrown out because his defense attorneys weren't competent. So one thing we can be clear of is that it was not Mr. Filler's fault; it was his wife's fault, and then it was the prosecution's fault, and now it's the defense attorney's fault that he had to do time for assaulting his wife.

368.   Cavanaugh publicly attacked Plaintiff and made false public statements about the facts and nature of the prosecutorial misconduct and even the pending issues of the Post-Conviction Review against his office. To buttress his false claims, Cavanaugh grossly misrepresented the ongoing positive relationship Plaintiff has with all his attorneys.

369.   Cavanaugh's public speech was videotaped and published on the internet.

O. **Summary of Misconduct of Deputy Travis Willey, Individually, Lieutenant Denbow, Individually, Deputy Michael Crabtree, Individually, and the Washington County Sheriff's Office – Failure to Turn Over Exculpatory Evidence to the District Attorney's Office Or Vladek Filler; Destruction of Exculpatory Evidence**

370.   Willey, on April 24, 2007 made contact with Arguetta as she ran on a roadway clothed only in her bra and pants, carrying their one-year-old. He stopped his cruiser and engaged Arguetta. Lt. Denbow was also present during much, if not all, of the interaction with Arguetta.

373.   Willey's cruiser had a video and audio recorder, which was activated throughout the entire episode.

374.   Willey had a portable "pocket" audio recorder which was on during the episode.

375.   On October 31, 2007, defense counsel Attorney Pileggi specifically requested turnover of "several [WCSO] 911 audiotapes", "along with photographs, audio or videotapes" from the April 24, 2007 incidents.

376.   On November 27, 2007 ADA Kellett called Pileggi and told him that he needed to contact the law enforcement agencies directly to obtain photos and/or recordings.

377.   The specifically requested information was refused to be provided by Willey and/or the

Washington County Sheriff's Office.

378. On May 15, 2008, Pileggi subpoenaed Willey to produce the above requested information. Willey did not produce it.

379. On August 1, 2008, Kellett had her office call Willey to inquire about the existence of the materials she had requested in May or June 2008. She also requested that the investigator for the DA's office do so as well.

380. On August 25, 2008, Deputy Willey provided an edited pocket recorder copy of the April 24, 2007 "interview" of Arguetta. He did not provide the cruiser videotape, audiotape, photographs, nor any of Arguetta's several WCSO 911 calls as previously requested.

381. Apparently Kellett was advised that discovery in addition to the edited recording existed, because on September 3, 2008 she instructed defense counsel to contact Willey to obtain further discovery from Willey. When defense counsel attempted to obtain the videotapes and additional discovery from Willey by contacting Willey's office, it was unsuccessful.

382. In May 2009, after plaintiff's first criminal trial, Willey told Vladek Filler during a taped telephone conversation that the videotape of the April 24, 2007 events was still available but not in his possession "right now."

383. Shortly thereafter, on June 9, 2009 Willey informed Filler that both the videotape of the April 24, 2007 events, as well as the audiotape, had been destroyed

384. In October 2012, for the first time, Willey, at Kellett's Board of Bar Overseer's hearing, acknowledged that he had known the videotape was important, that he had located and preserved it, had viewed the video, and that it included full audio of the of the entire episode. There were also photographs taken and referenced in his report and never produced. Despite apparent preservation of the evidence first acknowledged in October 2012, it was never produced.

385.   The heavily edited ninety minute pocket recording (ninety minutes of a four hour incident) contained some exculpatory information, but did not include Arguetta's false claims that she had left the marital home on April 21, 2007 because plaintiff had raped Arguetta's seventeen year old daughter.

386.   Arguetta's allegations that plaintiff raped her seventeen year old daughter Natasha were excluded from all pertinent police reports.

387.   None of the requested WCSO 911 calls were ever timely produced. Had they been, those calls would have revealed that: (1) Arguetta called 911 on April 24, 2007 and complained about her missing cat; and (2) that Arguetta called 911 on April 24, 2007 alleging that plaintiff had sexually molested their 1 and 10 year olds, and then tried to get Natasha to say that she had been molested by Filler as well. Natasha apparently refused.

388.   Natasha then called 911 to report that her mother was crazy and that Arguetta was attempting to use criminal charges to get plaintiff "convicted of anything" so that their ten year old would have to live with Arguetta.

389.   During one 911 call Arguetta threatened to murder plaintiff if law enforcement didn't immediately remove their ten year old from plaintiff's custody.

390.   DHHS records reveal that Arguetta made numerous other exculpatory statements while restrained in Willey's car. These statements were apparently reported by Willey to DHHS, but were hidden by Willey from the plaintiff.

391.   Nor was this exculpatory information provided to the D.A.'s office, despite specific requests to do so, and a court order.

392.   At all times pertinent hereto, Officer Willey and the WCSO were aware that exculpatory evidence was constitutionally required to be provided to the defense in a criminal matter.

393.    At all times pertinent hereto, Willey and the WCSO were aware of the exculpatory nature of the withheld information, and that withholding such information was a violation of a clearly established constitutional requirement that such evidence be provided to the defense.

394.    Plaintiff's defense counsel in the criminal matter made demand to Willey and the WCSO for the turnover of the previously requested materials, which Willey and WCSO refused to provide.

395.    Upon information and belief, rather than provide such pertinent exculpatory materials, Willey and the WCSO instead claimed to have partially destroyed such evidence in violation of a clearly established constitutional requirement that such evidence be preserved and made available to the defense, as required by due process.

396.    Upon information and belief, Lt. Denbow and Deputy Michael Crabtree were also present during the April 24, 2007 exchange with Arguetta. Despite a constitutional requirement that all exculpatory information, reports, notes or other evidence be recorded and provided, Lt. Denbow and Deputy Crabtree provided no reports of any kind, handwritten or otherwise. Lt. Denbow and Deputy Crabtree had a duty to memorialize such exculpatory information and provide it to Vladek Filler.

397.    Lt. Denbow and Deputy Crabtree violated a known constitutional obligation to provide such information.

398.    At all times pertinent hereto, law enforcement had a duty to preserve all exculpatory evidence obtained during an investigation. Deputy Willey, Lt. Denbow, and Deputy Crabtree failed to note, or preserve their handwritten notes which contained exculpatory information regarding the April 24, 2007 incident. Officer Willey then failed to include the exculpatory information in his typed police report. These were a violation of a clearly established

constitutional right.

399.    The fact of these violations was not discovered by Plaintiff until 2012.

**P.   Misconduct of Officer Wilmot, Individually, Ellsworth and Hancock County –
Failure to Produce Exculpatory Materials Regarding Events of April 11, 2007**

400.    In April 2007 a dispute arose between Vladek Filler and Stephen Fay, editor of the
Ellsworth American.

401.    On April 11, 2007 Arguetta and Filler gave oral and written statements to the Ellsworth
Police Department, in a complaint against Stephen Fay.

402.    At that time Arguetta did not mention being forcibly raped five days earlier by Filler on
April 6, 2007. Rather, she stated that she observed Stephen Fay push Filler, and that she feared
for Filler's safety because he suffered from physical frailty, a bad back, and balance problems.

403.    On September 6, 2007, Pileggi made specific demand for reports and witness statements
from the April 11, 2007 interview with the Ellsworth Police Department. Those requests were
renewed on October 5, 2007.

404.    On May 15, 2008 Officer Chad Wilmot of the Ellsworth Police Department was served a
subpoena for production of the April 11, 2007 records for the June 2008 trial of Vladek Filler.

405.    That information had never been provided to the DA's office. Without reviewing the
information, ADA Kellett advised Wilmot not to produce the report and statements.

406.    On June 3, 2008, Justice Anderson ordered that the April 11, 2007 report and written
statements be provided to defense counsel.

407.    Subsequently, ADA Kellett produced to Pileggi only a brief Ellsworth Police
Department incident report, and advised that the written statements did not exist.

408.    Upon information and belief, Wilmot and Ellsworth Police Department wrongfully
withheld the exculpatory April 11, 2007 written statements.

409.    Months after Filler's first trial and convictions, Filler presented the June 3, 2008 Court Order to Ellsworth Police Department Chief DeLeo and the April 11, 2007 witness statements were produced.

410.    Officer Wilmot was aware of the exculpatory nature of Arguetta's April 11, 2007 written statement and that a well-recognized constitutional right required production.

411.    Wilmot improperly failed to turn over the material to the District Attorney's Office.

### Q. Summary of Wrongful Conduct of Officer McFarland – Falsification of Evidence, Withholding of Exculpatory Evidence, Fabrication of Evidence

412.    Stephen McFarland, at all times pertinent hereto, was an employee of Washington and Hancock counties pursuant to 30-A M.R.S.A. §§ 290 and 501, having been appointed as a full time investigator and approved by the County commissioners.

413.    At all pertinent times hereto McFarland was the County investigator assigned to the Vladek Filler matters.

414.    On April 25, 2007 Gouldsboro Police Department Chief Wycoff conducted a videotaped interview of Arguetta at the District Attorney's office. According to Wycoff, he had nothing to do with the actual videotaping, before, during, or after, and only was responsible for the interview.

415.    Upon information and belief, investigator McFarland was responsible for the videotaping of that interview.

416.    At the interview, a third party was allowed to sit in, Nurse Linda Gleason. During a break in the interview, but while the video recording was still running, Gleason told Arguetta when they were alone that Arguetta needed to cry to make the rape "seem real". Although Arguetta told Gleason she didn't feel like it, Arguetta nevertheless burst into tears when Wycoff returned to continue the interview.

417.   When the videotape was produced for discovery, upon information and belief, McFarland had edited out the portion of the video where Gleason coached Arguetta. This portion was also edited out of the transcript. Instead, two CD's were provided, one containing the interview before the break, and the other after the break.

418.   McFarland, in editing out exculpatory information, violated a clearly established constitutional right of defendant Filler.

419.   On May 25, 2007 McFarland interviewed Arguetta. That interview was videotaped.

420.   Five of the seven indicted charges based on McFarland's false notes from the May 25, 2007 interview were presented to the Grand Jury.

421.   Upon information and belief, McFarland did not advise Kellett that the interview had been videotaped. The May 25, 2007 videotape was not provided, despite many requests by Pileggi, until Pileggi proved to Kellett that it existed by highlighting McFarland's report reflecting both video and audio recording.

422.   In July 2008 the May 25, 2007 interview video was produced. It revealed coaching by McFarland for Arguetta not to disclose exculpatory medical evidence. The video also revealed that on four of the five alleged rapes there had been no compulsion, threat, or force and that those four counts had been manufactured by McFarland.

423.   Filler was found not guilty of those four counts at the first trial in January, 2009.

424.   McFarland, violating all proper investigatory protocols, also advised Arguetta not to provide him with exculpatory emails on her computer, but only inculpatory emails.

425.   In April 2008, Pileggi subpoenaed McFarland to produce the April 24, 2007 videotape, photographs, and 911 call tapes from the Washington County Sheriff's Office.

426.   Although McFarland was in charge of gathering evidence he failed and refused to turn

over the requested evidence, ultimately determined to be exculpatory.

427.    Upon information and belief, McFarland also falsely claimed that he located pornography on Filler's computer.

428.    This manufactured evidence was excluded from both trials because both crime lab, and independent, computer experts (for prosecution and defense) determined the pornography was not in fact from Filler's computer.

429.    Upon information and belief, McFarland sanctioned Arguetta allegedly entering Filler's home, "staging" scenes and photographing those "staged" scenes. These photographs were used at trial, and were different than photographs taken by police when they executed a search warrant on the home, the only time they were legally able to enter the home.

430.    Those photographs were taken in violation of established constitutional Fourth Amendment rights.

### R.  Summary of Wrongful Conduct of Gouldsboro Police Chief Wycoff, Individually

431.    Wycoff first met with Arguetta on April 23, 2007, the day after she reported being "pushed" by Filler two days earlier.

432.    Wycoff was with Arguetta at Filler's house so that Arguetta could move her belongings out of the residence.

433.    On April 23, 2007, Arguetta showed Wycoff a "new" bruise on her upper arm. Wycoff photographed the bruise, submitting it as evidence of the alleged assault three days earlier.

434.    Wycoff did not include in any report that Arguetta said she did not know how she got the bruise, and did not speculate how she got it, despite the fact that she did make those statements.

435.    During the second criminal trial, and for the first time, Wycoff disclosed that Arguetta didn't know how she got the bruise, nor speculate how she got it, on April 23, 2007.

436.    That information was exculpatory and withheld in violation of a clearly established constitutional right.

437.    On April 25, 2007 Wycoff conducted an interview of Arguetta. Arguetta had just suffered a psychotic episode and involuntary hospitalization within hours of the interview. At the time of the interview Arguetta was supervised by mental health caregivers. She was involuntarily hospitalized immediately thereafter. No evidence of the second involuntary hospitalization was ever provided before either trial.

438.    Upon information and belief, Wycoff knew that the interview was audio and video recorded.

439.    Wycoff improperly allowed a third party to remain in the interview room during the conduct of the interview.

440.    Wycoff impermissibly permitted the third party, Nurse Linda Gleason, to make "witness" statements of her own.

441.    Upon information and belief, when Wycoff briefly left the interview room, he was aware that Arguetta was coached by Gleason to cry during the interview so it "would seem real".

442.    Thereafter Wycoff continued the interview.

443.    Upon information and belief, Wycoff was aware that the video of the interview was edited to exclude the coaching of Arguetta by Gleason.

444.    Wycoff did not mention in his report that Arguetta was coached by Gleason.

445.    Wycoff, upon information and belief, failed to turn over known exculpatory information to the DA's office or defendant Filler, thereby violating clearly established constitutional and due process requirements.

**S.   Summary of Wrongful Conduct of Michael Povich, Individually,
and as Final Policymaker for Hancock County**

446.   Michael Povich was the District Attorney for Hancock County at all pertinent times up to

2010 when he retired from that position.

447.    At all times pertinent hereto Michael Povich was acting in his individual capacity, and as

an administrator or investigator with respect to managing the transfer of information from law

enforcement to the District Attorney's office. Povich had been the only acting District Attorney

since 1975.

448.    Upon information and belief, Povich approved of a system whereby criminal defendants

were required to attempt to obtain discovery directly through specific law enforcement officers.

449.    Defendants were informed of this obligation by a note from the District Attorney's office

stating in pertinent part:

> PLEASE NOTIFY THE LAW ENFORCEMENT AGENCY IF
> YOU WOULD LIKE TO OBTAIN YOUR OWN COPY OF ANY
> ORIGINAL COLOR PHOTOS,
> VIDEO/AUDIOTAPES/CDS/DVDS AT YOUR EXPENSE.

450.    It was the further administrative, and/or investigative policy of Povich that only police

reports were provided to the District Attorney's office in criminal cases, not videos, photos,

audiotapes or CDs/DVDs. Law enforcement was advised only to provide their written reports.

451.    Upon information and belief, Povich approved of this system because it minimized the

amount of information provided by law enforcement, and eliminated work by the DA's office

associated with obtaining discovery.

452.    Upon information and belief, Povich, in fact, in 2007, instructed law enforcement to

destroy all field notes going forward, and not provide them to the DA's office, as part of

administrative proceedings regarding collection of investigatory information.

453.    Povich's instruction to law enforcement to destroy field notes was outside of any

prosecutorial function for which he would be protected by absolute prosecutorial immunity.

454.    Such an administrative and/or investigative process violates clearly established Constitutional, statutory, and due process rights of defendants in criminal cases.

455.    It is the obligation of the District Attorney, not law enforcement, to provide discovery to the criminal defendant.

456.    Upon   information   and   belief,   one   of   the   ulterior   purposes   of   the administrative/investigative processes as set forth above was to limit the information made accessible to criminal defendants.

457.    Upon information and belief, on April 27, 2007, Povich released false information concerning Filler to the Bangor Daily News.

458.    Povich acted with deliberate disregard as to the clearly established constitutional, statutory, and due process rights of criminal defendants, including Vladek Filler.

459.    Povich acted under the color of state law in violating plaintiff's constitutional rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference.

### T.  Summary of Misconduct of Povich Acting as Final Policymaker for Hancock County

460.    At all times pertinent hereto, Povich was acting as the final policymaker for Hancock County District Attorney's Office for purposes of training and discovery collection and administration.

461.    As District Attorney, Povich was an Officer of Hancock County.

462.    There was no direct supervisory control over Povich by any State authority for performance of Povich's duties as District Attorney.

463.    The Maine Attorney General had only the right to "consult with" and "advise" Povich, but no direct supervisory control over Povich's District Attorney duties.

464.    There is no constitutional office of District Attorney contained in the Maine State Constitution.

465.    All necessary prosecution expenses are paid for by the County, including training expenses for the District Attorney and staff.

466.    Povich as District Attorney was required to account for all funds collected by the District Attorney's office, to the County Commissioners.

467.    As District Attorney, Povich was required to provide legal services without fee representing the county in civil matters.

468.    Upon information and belief Povich first represented Hancock County as the County Attorney beginning in 1973 as a very young attorney.

469.    In 1975 he became the first full-time elected District Attorney for Hancock County.

470.    He was the Hancock County District Attorney for the next 35 years, choosing not to run for re-election in 2010.

471.    It was Povich's practice over the years to hire recent law school graduates, or other attorneys with little or no experience in criminal law practice.

472.    Upon information and belief, through 2007 Povich hired only two attorneys with prior prosecutorial experience.

473.    Upon information and belief it was Povich's practice to hire inexperienced attorneys in part so that they would defer to his prosecutorial methodologies.

474.    At all times pertinent hereto, Hancock County was responsible for providing necessary training and training support in the prosecution of criminal matters.

475.    At all times pertinent hereto Hancock County oversaw the expenditure of any funds for training the District Attorney and his staff in matters which might aid in the prosecution of

criminal matters.

476.     Upon information and belief, Hancock County provided minimal funding for the training of the District Attorney and staff for the years 2005 through 2009.

477.     Upon information and belief, it was Hancock County's policy, through its Commissioners and its District Attorney as chief policymakers with respect to training practices for the District Attorney's Office and staff not to provide training services of any significance.

478.     The process of discovery in criminal practices has evolved over time.

479.     The U.S. Supreme Court has mandated that broad discovery be provided to criminal defendants, particularly during the 1980's and 1990's.

480.     In particular, the U.S. Supreme Court has required that the District Attorney's offices are constitutionally required to gather discovery from all available law enforcement sources known to the prosecutor so that all discoverable information, including all "*Brady*" or "exculpatory" information will be timely provided.

481.     Povich was the ultimate authority for the District Attorney's office. He would frequently tell new Assistant District Attorneys: "Don't listen to the judge. Don't let the judge tell you what you can and cannot do. You are in trouble with me if you do that. I am the one that tells you what you can and cannot do".

482.     Upon information and belief, during the 1980's discovery requests or motions made by the defense bar were unusual in Hancock County. If discovery requests or motions were filed, it was perceived by Povich as "harassment" by defense counsel.

483.     Povich provided as little discovery as was possible and that practice continued up to and including 2007 – 2010. It was Hancock County's policy and custom to simply ignore defense counsel's discovery requests.

484.    It was the policy and custom established by final policy decision makers that only investigative police reports would be filed with the District Attorney's Office.

485.    The Hancock County District Attorney's Office at all pertinent times did not have a "discovery clerk" or other staff sufficient to handle discovery matters.

486.    All investigative videotapes, audiotapes, and photographs were left with law enforcement, and not reviewed by Hancock County District Attorney staff.

487.    Even court orders requiring discovery were, per policy or custom established by policymakers, to be largely ignored by the District Attorney's office.

488.    Upon information and belief, this policy and/or custom frequently caused exculpatory evidence to be withheld from criminal defendants, and this was well known to Povich. In fact, this was, in part, the intent of not producing full discovery.

489.    Povich, as final policymaker, had an unconstitutional policy or custom of not gathering investigative information from law enforcement authorities in Hancock and Washington Counties.

490.    Povich, as final policymaker of Hancock County, had in place a policy or custom requiring that criminal defendants obtain discovery in criminal cases from law enforcement rather than from the District Attorney's office.

## U. **Summary of Misconduct of Mary Kellett**

491.    Upon information and belief, on April 27, 2007, as part of an ongoing conspiracy, Kellett released false information to the Bangor Daily News.

492.    That information, alleged to be an Affidavit in Support of Arrest Warrant by Chief Wycoff, was false and prejudicial, inflamed the populace of Hancock County, defamed Filler,

and was made to deprive him of established Constitutional rights including his right to a fair trial.

493.    On January 16, 2008, Kellett made a statement to the Bangor Daily News that Filler had engaged in "…sexual punishments [of his wife] it was punitive and angry".

494.    This false prejudicial statement inflamed the populace of Hancock County and was made to deprive Filler of established Constitutional rights to due process and to a fair trial.

495.    On or about April 25, 2007, and prior to indictment of Filler on August 8, 2007, Kellett engaged in or supported and approved of, the falsification of an April 25, 2007 videotape interview of Arguetta by Wycoff. Kellett was acting in an investigative capacity.

496.    On or about May 15, 2008, Kellett rendered legal advice to Ellsworth Police Officer Chad Wilmot not to produce documents pursuant to a lawful subpoena issued by Filler's attorney. Ellsworth police were not involved in any way regarding the prosecution of Filler. Kellett was not legal counsel for the Ellsworth Police Department.

497.    A subpoena was issued by Pileggi to Gouldsboro Sargent James Malloy to produce certain exculpatory records. The subpoena was for an unrelated civil matter hearing on June 15, 2009. Kellett provided legal advice to Malloy that he not provide the subpoenaed documents. Upon information and belief, Kellett was not counsel to Gouldsboro Police Department.

498.    Upon information and belief, Kellett, while engaging in the investigation of Filler, together with police, conspired to withhold exculpatory information, and falsified evidence, so that Filler could be wrongfully charged and wrongfully convicted of sexual assault.

### V.  Summary of Misconduct of Supervisors and County Officials

499.    At no time did prosecutor Mary Kellett's superiors or the County officials take action to discipline, sanction, dismiss, demote, or penalize Kellett for misconduct in any way despite 3

separate Court Findings and Board of Overseers Sanctions against Kellett for violations and misconduct against Plaintiff.

500.   Kellett's supervisor and elected county official DA Michael Povich openly supported some of Kellett's violations and was also cited by the Board of Overseers for violating Bar Rules in his approval of Kellett's and Law Enforcements misconduct and suppression of exculpatory evidence critical to Plaintiff's criminal defense.

501.   Kellett's subsequent supervisor, DA Carleta Bassano publicly supported Kellett throughout the disciplinary actions and Final Hearing where Kellett admitted she engaged in misconduct and violated Plaintiff's Constitutional Rights.  DA Bassano, in response to the Bar's Judgment against Kellett told a newspaper on July 15, 2013 that:

> "I have full confidence in Mary [Kellett], her judgment and the performance of her responsibilities."

502.   Maine Supreme Court Justice Ellen Gorman, in accepting Kellett's guilty plea deal with Board of Overseers and in sanctioning her for misconduct stated on record:

> "This is a serious sanction...It is a sanction that will continue to follow Ms. Kellett for the rest of her life. Should she decide or be asked to leave the prosecutor's office, it would hamper, if not completely preclude, her ability to find practice outside of a prosecutor's office."

503.   Despite Kellett's misconduct and ultimate sanctions Kellett continued to be supported and publicly praised by her supervisor Carleta Bassano.

504.   Despite three different court Findings and Kellett's own admission that she committed misconduct against Plaintiff, neither her immediate supervisors nor Hancock County officials ever took any actions to remove, sanction, suspend, or demote Kellett.

505.   Despite extensive local, national, and international publicity and outrage over the misconduct committed against Plaintiff and public's demands and petitions urging supervisors

and county officials to discipline Kellett's actions, she and the rest of the cast of characters (with exception to fired chief Guy Wycoff) were allowed to continue, were praised, and some were even promoted.

506.   At no time did former Chief Guy Wycoff's superiors or district attorney, or town of Gouldsboro, or municipal officials take action to discipline, sanction, dismiss, demote, or penalize Wycoff's lack of training, incompetence, abusive acts, evidence and witness mishandling, or misconduct against Plaintiff.

507.   At no time did Detective Stephen McFarland's superiors or County officials take action to discipline, sanction, dismiss, demote, or penalize McFarland's lack of training, incompetence, abusive acts, evidence and witness mishandling, or misconduct against Plaintiff.

508.   At no time did Washington County Deputy (now Lieutenant) Travis Willey's direct superiors or the municipal officials take action to discipline, sanction, dismiss, demote, or penalize Willey for lack of training, incompetence, abusive acts, evidence and witness mishandling, or misconduct against Plaintiff.

## W. Conflict of Interest

509.   Next Step Domestic Violence Project ("Next Step") is an organization largely funded by the federal Violence Against Women Act.

510.   Next Step received conflicting reports and was asked for help from both Arguetta (a woman) and Plaintiff(a man) but decided to help, legally represent, and lobby law enforcement and DHHS on Arguetta's behalf against Plaintiff (and their children's best interests).  This was despite serious accusations, which were substantiated, that Arguetta abused the child and engaged in domestic violence.

511.    The board members of Next Step were some of the same people who under the color of law were also criminally investigating and criminally prosecuting Plaintiff while Next Step was legally representing Arguetta and prosecuting Plaintiff in civil and family matters.

512.    Members of the district attorney's office and law enforcement agencies investigating the case either held a duel role or had direct or indirect conflict of interest in the case against Plaintiff.

513.    The Hancock County District Attorney's Office received funding from the federal Violence Against Women Act with direct involvement of Next Step Domestic Violence Project.

514.    ADA Mary Kellett, ADA Bill Entwisle, Detective McFarland, district attorney's victim/witness advocate Ken Mitchell, Washington County Sheriff's Deputy Travis Willey, and Washington County Sheriff Donnie Smith, are just a few individuals who are known to have been on the Next Step's board or were closely involved with Next Step financially or professionally.

515.    Arguetta was coached and manipulated during interviews by investigators. Testimony was given at trial that Arguetta was taken to a "women's organization" (Next Step) as she "needed to understand what was happening" in her split up with her husband.

516.    While some of Next Step's board members were prosecuting Plaintiff under the color of law, Next Step was counseling, coaching, legally advising, legally representing, and defending Arguetta *pro bono* in civil court actions involving Plaintiff and their children.

517.    In 2007-2008, Next Step, while representing Arguetta in court, was publicizing the case and allegations against Plaintiff on their website asking for donations and support to get new laws passed in Maine. The interests of this organization, financial and political, were directly

commingled with some members of its board who were acting against Plaintiff under the color of law at the same time.

518.   The lead investigator in the Filler case, Detective McFarland, was originally hired as a DA Detective and assistant to Mary Kellett by a direct Violence Against Women Act grant which Mary Kellett and Next Step's director Lorie Fogelman obtained to hire McFarland.  Stated differently, the lead investigator in the case against Plaintiff was originally hired and had his salary paid for by the women's domestic violence grant with the intent to obtain more convictions for allegations of abuse made by women.

519.   In an October 2013 video posted on YouTube commemorating Next Step's 20th anniversary, the entire staff of the Hancock County District Attorney's office, prosecutor Mary Kellett, Detective McFarland, Arguetta's victim/witness advocate Ken Mitchell, Washington County Sheriff Donnie Smith, Arguetta's *pro bono* women's group lawyer Rick Doyle can all be seen praising Next Step.  Many of these officials were directly involved in the case against Plaintiff and proudly state they were also board members of the Next Step organization.

## IV.   CAUSES OF ACTION

### A.   42 U.S.C. § 1983 CLAIMS

#### COUNT ONE
**42 U.S.C. § 1983: Denial of Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments**

**(Defendants Travis Willey, Guy Wycoff, Chad Wilmot, Stephen McFarland, Mary Kellett, David Denbow and Michael Crabtree)**

520.   The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

521.   At all times pertinent hereto, Kellett was acting individually in her capacity as an investigator, administrator, or in rendering legal advice to police officers.

522.   Kellett assumed the role of legal counsel to three law enforcement officers, Willey, Wycoff and Malloy, and advised them not to comply with lawful defense (Plaintiff in this matter) subpoenas in direct violation of her constitutional obligations for which she has no prosecutorial immunity.

523.   At all times pertinent hereto, any advice rendered by Kellett to Willey, Wycoff, and Malloy was not provided in any prosecutorial capacity.

524.   In addition to Kellett giving improper legal advice to officers and in conflict of interest, Kellett acted under the color of law to assert a legal privilege on behalf of law enforcement officers, and editor of a local newspaper (Fay), and Arguetta in order to prevent Plaintiff's access to exculpatory discovery evidence and reports.

525.   No probable cause existed on April 26, 2007 for the arrest of Vladek Filler on charges of gross sexual assault of his wife on April 6, 2007.

526.   Further, no probable cause existed on August 8, 2007, when Filler was indicted on five counts of Gross Sexual Assault and one Count of Assault.

527.   Aware that there was no probable cause, and with actual malice, defendants, individually, and with each other conspired, prior to arrest and prior to indictment, to maliciously prosecute Vladek Filler for Gross Sexual Assault. In order to falsely implicate Filler, defendants withheld exculpatory evidence, including that Arguetta had falsely claimed Filler has sexually molested his one year old son and ten year old son, as well as Arguetta's seventeen year old daughter. They falsified police reports by failing to include exculpatory evidence in those reports; they allegedly destroyed exculpatory audio and video recordings; they redacted exculpatory evidence from audio and video recordings; they refused to provide additional exculpatory evidence; they refused to provide court-ordered evidence to Filler; they manufactured evidence of pornography;

upon information and belief, they sanctioned Arguetta entering Filler's personal residence to obtain evidence in violation of Fourth Amendment rights; and they instructed witnesses to hide exculpatory evidence; and withheld known exculpatory medical information.

528.   They knew that the Hancock County District Attorney's office and the Court would rely on their improper actions in initiating and continuing Filler's prosecution, placing him on house arrest pending trial, and at trial itself.

529.   On April 26, 2007, McFarland and Wycoff wrongfully arrested Filler and held Filler without bail, thereby violating Filler's Fourth Amendment rights.

530.   Thereafter, Filler's Fourth Amendment rights continued to be violated as a direct result of Defendants' conduct when his liberty rights were restricted by house arrest from 6pm to 8am daily, he was subjected to two criminal trials, and his house was subject to a bail lien for over four years. In addition, the bail conditions unconstitutionally required a waiver of Filler's Fourth Amendment right to search and seizure based upon probable cause. Filler's liberty rights were also further violated by restrictions on contact with his children.

531.   Defendants continued to cause Fourth Amendment deprivations through Filler's second criminal trial.

532.   Defendant Wycoff violated Filler's Fourth Amendment rights by refusing to allow Filler to reside at Filler's residence for a period of five days following Filler's release on bail. This deprivation of liberty and property occurred under color of State law.

533.   Defendants utilized and presented false evidence, and excluded known exculpatory evidence, in obtaining legal process, an indictment before a grand jury, after which house arrest and other Fourth Amendment violations continued unabated.

534.    By virtue of the foregoing, Willey, Wilmot, Wycoff, McFarland, and Kellett, with actual malice, initiated and continued, or caused the initiation or continuation of criminal proceedings against Plaintiff for which they knew or should have known there was no probable cause, and for which in fact there was no probable cause, and thereby caused Plaintiff deprivation of his liberty interests. Such proceedings ultimately terminated in the Plaintiff's favor.

535.    Defendants' conduct, individually and committed in concert with and in aid of each other, and/or in concert or conspiring with others named and unnamed, operated to deprive Plaintiff of his rights under the Constitution and the Laws of the United States:

      (a)    Not to be arrested, indicted, prosecuted, detained, convicted, or imprisoned upon false, fabricated, manufactured, misleading, or inherently unbelievable "evidence" in violation of the Due Process and Fair Trial Clauses of the Fifth, Fourth, and Fourteenth Amendments to the United States Constitution;

      (b)    Not to be deprived of his liberty, and any liberty-related interests, absent probable cause to believe he has committed a crime, in violation of the Fourth and Fourteenth Amendments to the United States Constitution; and

      (c)    To timely disclosure of all material evidence favorable to the defense pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and the Due Process and Fair Trial Clauses of the Fifth, Sixth, and Fourteenth Amendments to the United States Constitution.

536.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution, his loss of liberty, his wrongful conviction, and other injuries and damages.

537.    The violations of Plaintiff's rights amounted to Constitutional Torts and were effected by actions taken under color of state law, and within the scope of the Defendants employment and authority.

538.    Defendants committed the violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's Constitutional rights or to the effect of such misconduct upon Plaintiff's Constitutional rights.

539.    Plaintiff was subjected to wrongful conviction, loss of liberty, costs, expenses and legal fees, pain and suffering, emotional distress, psychological injury, medical and counseling expense, loss of reputation, loss of employment opportunities, business loss, and loss of income past and future.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and exemplary damages, attorney's fees, costs, and such other relief that this Court deems just and equitable.

### COUNT TWO
**42 U.S.C. § 1983: Defamation; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Denied of Due Process Rights and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments.**
**(Povich, Kellett, Wycoff, Bassano, Cavanaugh)**

540.    The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

541.    On April 27, 2007, Povich and Kellett provided to the press a copy of an alleged "Affidavit in Support of Arrest Warrant" by Chief Wycoff of the Gouldsboro Police Department, for the arrest of Filler, upon information and belief with the knowledge of Wycoff.

542.    No arrest warrant issued on April 26, 2007 at the time Filler was arrested by Wycoff.

543.    Nevertheless, the alleged affidavit provided to the press included false information including that Filler had forced non-consensual anal sex with his wife on April 6, 2007, and that Arguetta kept a diary of Filler's additional assaultive behavior.

544.    Povich and Kellett, at the same time, also released Filler's "mug shot" to the press, and on April 28-29, 2007, the Bangor Daily News (weekend edition) featured a front page story, including Filler's mug shot, and containing the false allegations of rape submitted to the press by Povich, Kellett, and Wycoff within 24 hours of Filler's arrest.

545.    This information was then prominently and repeatedly displayed on television and in the newspapers.

546.    This false and prejudicial information provided to the press was designed to, and did influence the populace of Hancock County against Filler, thereby defaming him, and resulting in deprivation of his rights to a fair trial, and causing the jury to convict rather than acquit him.

547.    Defendants, by labeling the information as "Affidavit in Support of Arrest Warrant" sought to cloak the false information with the authority of a magistrate or judge, when in fact no arrest warrant was ever signed.

548.    In September 2008, Kellett falsely advised Guardian ad Litem John Lorenz that she, Kellett, was in possession of a journal which detailed Plaintiff's abuse of Arguetta. This information was false and known to be false by Kellett. The false statements defamed Plaintiff, and were made in an attempt to deprive Plaintiff of a fair trial and to deprive Plaintiff of his liberty interests in his relationship with his minor children. In fact, there was no such "diary of sexual assaults" and never had been. This false claim was published in order to prejudice the public against the Plaintiff and deprive him of a fair trial.

549.    On January 16, 2009, Kellett was quoted in the Bangor Daily News, one of Maine's largest newspapers, that Plaintiff had engaged in "...sexual punishment [of his wife]...it was punitive and angry." Kellett made other false and injurious statements about Filler in the press.

550.    This information was prominently displayed on television and in the written press.

83

551.    Bassano, on several occasions, published statements to and through the press supporting Kellett's conduct throughout the Filler litigation, and contending that Kellett did nothing wrong and should not have been punished by the Board of Bar Overseers.

552.    Cavanaugh published statements to and through the press supporting Kellett's conduct throughout the Filler litigation, and contending that Kellett did nothing wrong and should not have been punished by the Board of Bar Overseers.

553.    Cavanaugh made statements to that effect on February 19, 2014 that:

> (1) The Board of Bar Overseers Order regarding Kellett was only about two pieced of evidence;
>
> (2) Mary Kellett had done nothing wrong;
>
> (3) Filler got away with criminal conduct against his wife because there was an evidentiary mistake;
>
> (4) The two pieces of evidence that were so important that Kellett was sanctioned were never used in the second trial; and
>
> (5) That Filler improperly blamed everyone [including Kellett] but himself.

554.    At the time the February 19, 2014 statements were made there was a Post-Conviction Review hearing pending in Hancock County.

555.    In sum, Povich and Kellett released false and defamatory information concerning Filler to the Bangor Daily News; Kellett, Cavanaugh, and Bassano made false and defamatory public statements to the press, and Kellett made malicious false statements to the GAL John Lorenz – all of which was outside of their prosecutorial roll or capacity.

556.    These false and prejudicial statements inflamed the populace of Hancock County and surrounding areas, and even a national audience against Filler, and were made to deprive Filler

of his constitutional rights to a fair trial, fair post-trial proceedings, including sentencing, and ultimately a new trial.

557.    As a result of these false statements, Plaintiff was subjected to further public ridicule, increased loss of reputation, loss of business, and earnings, and emotional and physical distress.

558.    Specifically, Plaintiff was unable to obtain gainful employment because of the allegations of sexual misconduct, and the public disgust resulting from the allegations. In addition, Plaintiff's then business, an online business, had to be discontinued because of constant attacks on his character as operator of the business resulting from the defamatory statements.

559.    The statements made were with actual malice to cause the initiation or continuation of criminal proceedings against Plaintiff for which they knew or should have known there was no probable cause, and for which in fact there was no probable cause, and thereby caused deprivation of Plaintiff's Fourth Amendment Liberty interests. Such proceedings ultimately terminated in Plaintiff's favor.

560.    The foregoing violations of Plaintiff's federal constitutional rights by the Defendants and their co-conspirators and accomplices, known and unknown, directly, substantially, proximately, and foreseeably caused the initiation and continuation of Plaintiff's criminal prosecution , his loss of liberty, his wrongful conviction, and other injuries and damages.

561.    The violations of Plaintiff's rights amounted to Constitutional Torts and were effected by actions taken under color of state law, and within the scope of the Defendants employment and authority.

562.    Defendants committed the violations of Plaintiff's rights knowingly, intentionally, willfully, recklessly, and/or with deliberate indifference to Plaintiff's Constitutional rights or to the effect of such misconduct upon Plaintiff's Constitutional rights.

563.    Plaintiff was subjected to wrongful conviction, loss of liberty, costs, expenses and legal fees, pain and suffering, emotional distress, psychological injury, counseling and medical costs, loss of reputation, business loss, and loss of income past and future.

WHEREFORE, Plaintiff demands judgment in the form of compensory and exemplary damages, attorney's fees, costs, and such other and further relief as this Court deems just and equitable.

## COUNT THREE
### *Monell*/42 U.S.C. § 1983 Claim Against Defendant Hancock County For The Actions of the Hancock County Sheriff's Department and Hancock County District Attorney; Against the Town of Gouldsboro for the Actions of the Gouldsboro Police Department; Against Washington County for the actions of the Washington County Sheriff's Department; Against the Town of Ellsworth for the Conduct of The Ellsworth Police Department

564.    The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

565.    At all times pertinent hereto, Hancock County had a duty to properly supervise and train its Assistant District Attorneys.

566.    Hancock County, through its primary policymaker Povich, was on notice that *Brady* violations occurred with alarming frequency prior to 2007.

567.    In fact, prior to 2007, Povich believed that discovery requests and/or motions by defense counsel should be viewed as harassment, and upon information and belief initiated or accepted a policy which largely ignored both discovery requests and discovery orders.

568.    Prior to 2007 Povich knew that Assistant District Attorneys frequently failed and refused to provide criminal defendants with exculpatory evidence.

569.    Prior to 2007 the Hancock County District Attorney's office had been periodically sanctioned for the failure to provide discovery, including the dismissal of many criminal cases for failure to properly provide discovery.

570.    Upon information and belief, prior to 2007, the Hancock County District Attorney's

office had been required by Court order in a number of cases to turn over exculpatory evidence wrongfully withheld to criminal defendants.

571.    The aforesaid policies, procedures, regulations, practices, and/or customs of Defendants and/or their employees were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants of Plaintiff's rights under the Constitution and laws of the United States.

572.    The foregoing violations of Plaintiff's federal constitutional rights and injuries were directly, substantially, proximately, and foreseeably caused by conduct, chargeable to Defendants, amounting to deliberate indifference to the constitutional rights of persons, including Plaintiff, who are investigated, arrested, or prosecuted for alleged criminal activities.

573.    Prior to Plaintiff's arrest, final policymaking officials at the municipal Defendants, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the right of all criminal suspects to due process and a fair trial, implemented plainly inadequate policies, procedures, regulations, practices, customs, training, supervision, and discipline concerning:

    (a) The determination of probable cause to make an arrest; and

    (b) The continuing duty of police investigators to preserve and make timely disclosure to the District Attorney, during criminal investigations and prosecutions, of all material evidence or information ("*Brady*" material) favorable to a person suspected, accused or convicted of criminal conduct, including, but not limited to, evidence of innocence, evidence that an identifying or prosecution witness is unreliable or lacks general credibility, evidence that a prosecution witness has made inconsistent statements about material facts, and evidence that a prosecution witness has a motive, bias or interest affecting his credibility or has been pressured or coerced, so that the District Attorney could comply with her constitutional obligation to disclose such information to the defense under *Brady*.

574.    Upon information and belief, with respect to (a) in the preceding paragraph, prior to Plaintiff's arrest in 2007 the Hancock County District Attorney's office ("HCDA") received little or no training in assessing probable cause in domestic violence cases.

575.    In fact, the policy for assessing probable cause in any criminal case relied upon the utilization of incomplete, inadequate, and inaccurate investigative information in arriving at charging decisions.

576.    These problems were exacerbated in domestic violence claims because of incentive programs of which Hancock County was aware to increase the number of domestic violence criminal complaints and/or indictments. Those incentives included, but were not limited to, federal funding of the HCDA's office and pertinent law enforcement authorities pursuant to the Violence Against Women's Act dependent upon aggressive "handling" of domestic violence cases; and federal funding under the Violence Against Women's Act which paid for two (2) positions at the HCDA's office, Detective McFarland and a Victim-Witness Advocate position.

577.    At all times pertinent hereto, Hancock County knew, or should have known, that incentives and/or specific focus on a certain type of criminal conduct would create an environment where prosecutors and law enforcement would initiate criminal domestic violence charges on less than probable cause.

578.    Further, Hancock County knew, or should have known, that certain prosecutors were personally involved in the domestic violence movement and in particular members of the Board of Directors of Next Step[8], including Kellett and McFarland. This additional incentive to err on the side of overzealous prosecution also gave rise to an incentive to improperly and without probable cause institute criminal proceedings, and or continue criminal proceedings.

---

[8] Next Step is a domestic violence assistance program which cared for Arguetta for more than a month following her hospitalization on April 24, 2007.

579.   At all times pertinent hereto Hancock County had a duty to adequately train Hancock County prosecutors with respect to investigative information gathering and review for criminal procedure charging purposes.

580.   Hancock County breached that duty by failing to allocate sufficient funding and/or training requirements to ensure that criminal charges, particularly domestic violence criminal charges, would be initiated in an unbiased and fair manner and only after adequate investigation and information review.

581.   Proper training would have ensured that prosecutors would have been alerted to possible bias resulting from incentives and personal involvement arising out of domestic violence, and ensured that fair charging decisions made only on a reasonable review of all the evidence and probable cause.

582.   As a direct, substantial, proximate and foreseeable result of Hancock County's failure to properly train its prosecutors, Plaintiff was improperly charged with gross sexual assault charges and simple assault charges.

583.   With respect to "b" in the preceding paragraph (¶ 568), prior to Plaintiff's arrest and the initiation of his prosecution, in 2007, upon information and belief, the Defendants provided no training at all. In fact, any training received was contrary to established constitutional and statutory requirements.

584.   The aforesaid deliberate or *de facto* policies, procedures, regulations, practices, and/or customs (including the failure to properly instruct, train, supervise, and/or discipline employees with regard thereto) were implemented or tolerated by policymaking officials for the Defendants, including, but not limited to, the District Attorney, sheriffs and police chiefs who knew (or should have known):

89

(a)     to a moral certainty that such policies, procedures, regulations, practices and/or customs concern issues that regularly arise in the investigation and prosecution of criminal cases;

(b)     that such issues either present police employees and assistant district attorneys with difficult choices of the sort that instruction, training, and/or supervision will make less difficult or that the need for further instruction, training, supervision, and/or discipline was demonstrated by a history of police employees/assistant district attorneys mishandling such situations as well as the incentives that police employees/assistant district attorneys have to make the wrong choice;  and

(c)     that the wrong choice by such employees concerning such issues will frequently cause the deprivation of the constitutional rights of criminal suspects or defendants and cause them constitutional injury.

585.    The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

(a)     the Prosecutorial District 7 District Attorney's office policy, custom, or practice so widespread as to practically have the effect   of law not to collect, or obtain discoverable information from law  enforcement officers;

(b)     numerous decisions of the United States Supreme Court, the United States Court of Appeals for the First Circuit, and the Maine Supreme Judicial Court of Appeals discussing the difficult issues that regularly arise under *Brady*, as well as the probable cause requirement of the Fourth Amendment; and

(c)     the inherent obviousness of the need to train, supervise and discipline police officers in such obligations to counteract the pressure on officers/assistant district attorneys and the powerful incentives they have to obtain arrests and convictions, particularly in the face of countervailing policies and customs.

586.    Under the principles of municipal liability for federal civil rights violations, the County District Attorney, Sheriffs and the Police Chiefs have final responsibility for training, instructing, supervising, and disciplining law enforcement/district attorney personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements

governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

587.   The District Attorney, County Sheriffs, and Town Police Chiefs personally and/or through their authorized delegates, at all relevant times had final authority, and constitute County and City policymakers for whom the municipal Defendants are liable, with respect to compliance by Defendants' employees with the above-mentioned constitutional requirements.

588.   During all times material to this Complaint, the District Attorney, County Sheriffs, and Ellsworth and Gouldsboro Police Chiefs owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by their subordinates or themselves violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

589.   By virtue of the foregoing, Defendants Hancock County, Washington County, Ellsworth and Gouldsboro are liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

590.   Had proper training been in place, it is likely that the constitutional violations alleged in this complaint would not have occurred.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and exemplary damages, attorney's fees, costs, and further relief as this Court deems just and equitable.

### COUNT FOUR
*Monell*, 42 U.S.C. § 1983: Intentional Creation of an Unconstitutional Policy or Custom Under Color of State Law, Denial of Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments; Unconstitutional Policy or Custom
(Defendants Hancock County, Washington County, Gouldsboro and Ellsworth, Povich and Bassano in their Individual Capacities)

91

591.   The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

592.   Policymakers of the above-stated Defendants entered into an agreement whereby production of discoverable materials to defendants would be routinely limited. This agreement was memorialized in writing on the Prosecutorial District Seven District Attorney's Discovery Sheet as previously set forth.

593.   In essence, because the District Attorney and law enforcement believed constitutional criminal discovery obligations to be "harassment" and unwieldy, it was agreed by final policy-makers for municipal defendants that law enforcement Defendants would submit only limited police reports to the District Attorney's office, frequently omitting critical and/or exculpatory evidence.

594.   At all times pertinent hereto, Hancock County had a duty to properly supervise and train its Assistant District Attorneys. Hancock County owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline sufficient to prevent or deter conduct by their subordinates or themselves violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

595.   Hancock County, through its primary policymaker Povich, was on notice that *Brady* violations occurred with alarming frequency prior to 2007.

596.   In fact, prior to 2007, Povich believed that discovery requests and/or motions by defense counsel should be viewed as harassment.

597.   Prior to 2007 Povich was aware that Assistant District Attorneys frequently failed and refused to provide criminal defendants with exculpatory evidence. In fact, Povich sanctioned,

and ratified, the failure of the District Attorney's Office to provide constitutionally required discovery.

598.    Prior to 2007 the Hancock County District Attorney's office had been periodically sanctioned for the failure to provide exculpatory evidence, including dismissals of many criminal cases and failure to properly provide discovery.

599.    Upon information and belief, prior to 2007, the Hancock County District Attorney's office had been required in numerous cases to turn over by court order exculpatory evidence wrongfully withheld to criminal defendant.

600.    Law enforcement Defendants would keep all electronically recorded victim or witness statements, videos, and photographs of any alleged crime scene, or other "hard" evidence.

601.    Criminal defendants were then required to obtain such discovery from law enforcement, who were (1) both difficult to reach; (2) lacked incentive to provide the necessary discovery, including exculpatory evidence; and (3) in many instances Defendants or their counsel were simply referred back to the District Attorney's Office to obtain discovery, making it impossible to obtain discovery absent court order.

602.    This practice, of course, also had the effect of the District Attorney's office lacking information to make meaningful charging decisions, or to meet their discovery obligations.

603.    Upon information and belief, this process caused: (1) consistent *Brady* violations and (2) allowed "free-wheeling" charging in the District Attorney's office, or charges frequently instituted without probable cause.

604.    This intentional and unconstitutional policy or custom, in significant part established or ratified by District Attorneys Povich and Bassano, was known to cause constitutional violations.

93

In fact, prior to 2007, upon information and belief, cases were frequently dismissed against the State as a result of failure to provide discovery as a discovery sanction.

605.   The fact that there were numerous dismissal sanctions for discovery violations was known by all pertinent policymakers.

606.   This intentional pattern of misconduct created a pattern of constitutional violations.  Even numerous discovery sanctions against DA Povich and DA Bassano's office did not result in a meaningful change of policy or end the "pattern of misconduct leading up to and continuing throughout the violations of Plaintiff's constitutional rights by defendants.

607.   The municipal Defendants, through their final policymakers, with actual malice, initiated and continued, or caused the initiation or continuation of criminal proceedings against Plaintiff.

608.   The municipal Defendants' policymakers, with deliberate indifference to the constitutional rights of individuals suspected or accused of criminal activity, to the risk of arresting, prosecuting, and convicting innocent people, and to the right of all criminal suspects and defendants to due process and a fair trial, implemented plainly unconstitutional, improper policies, procedures, regulations, practices, and/or customs.

609.   The aforementioned policymaking officials had the knowledge and the notice alleged in the preceding paragraph based upon, among other circumstances:

> (d)   the Prosecutorial District 7 District Attorney's office of a    policy, custom, or practices so widespread as to practically have the effect of law not to properly collect, or obtain discoverable information from law enforcement officers;
>
> (e)   numerous decisions of the United States Supreme Court, the United States Court of Appeals for the First Circuit, the Maine Supreme Judicial Court of Appeals, discussing the difficult issues that regularly arise under *Brady*, as well as the probable cause requirement of the Fourth Amendment; and

(f)   the inherent obviousness of the need to train, supervise and discipline police officers and assistant district attorney, in such obligations to counteract the pressure and the powerful incentives they have to obtain arrests and convictions.

610.   Under the principles of municipal liability for federal civil rights violations, the municipal Defendants have final responsibility for training, instructing, supervising, and disciplining law enforcement personnel with respect to the investigation and prosecution of criminal matters, including constitutional requirements governing the interrogation of witnesses, the initiation of criminal prosecutions, and the disclosure of *Brady* material.

611.   The aforesaid policies, procedures, regulations, practices, and/or customs of municipal Defendants and/or their employees were collectively and individually a substantial factor in bringing about the aforesaid violations by the Individual Police Defendants and Prosecutor Kellett of Plaintiff's rights under the Constitution, laws of the United States, and the State of Maine.

612.   By virtue of the foregoing, Defendants Hancock County, Washington County, Ellsworth and Gouldsboro are liable for having substantially caused the foregoing violations of Plaintiff's constitutional rights and his constitutional injuries.

613.   The County Sheriffs, Police Chiefs, and District Attorney personally and/or through their authorized delegates, at all relevant times had final authority, and constitute County and City policymakers for whom the Counties and Ellsworth and Gouldsboro are liable, with respect to compliance by Defendants' employees with the above-mentioned constitutional requirements.

614.   During all times material to this Complaint, the County Sheriffs, Ellsworth and Gouldsboro Police Chiefs, and the District Attorney owed a duty to the public at large and to Plaintiff, which they knowingly and intentionally breached, or to which they were deliberately indifferent, to implement policies, procedures, customs, practices, training and discipline

sufficient to prevent or deter conduct by their subordinates or themselves violating the aforementioned constitutional rights of criminal suspects or defendants and of other members of the public.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and exemplary damages, attorney's fees, costs, and further relief as this Court deems just and equitable.

### B.   STATE TORT CLAIMS

### COUNT FIVE
### Malicious Prosecution
### (Nurse Linda Gleason)

615.   The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

616.   Linda Gleason at all pertinent times hereto was a registered nurse working at the Maine Coast Memorial Hospital and Mount Desert Island Hospital. She also taught a nursing course at Sumner High School Adult Education.

617.   Gleason, in 2007 was unmarried and residing alone in a new three bedroom house in Steuben, Maine.

618.   Upon information and belief, Gleason met Arguetta when Arguetta took Gleason's adult education certified nursing aid class, beginning in January 2007.

619.   Upon information and belief, Arguetta and Gleason developed a close relationship over the next several months.

620.   Upon information and belief, Arguetta informed Gleason that Plaintiff intended to leave Arguetta and move back to his family's home in Georgia and take his two sons with him.

621.   Upon information and belief, Gleason and Arguetta conspired to concoct a plan which would allow Arguetta to keep custody of her two sons.

622.   Upon information and belief, the plan included Arguetta and her children residing at Gleason's home in Steuben.

623.   On April 21, 2007, Arguetta in fact moved into Gleason's Steuben home, along with her daughter and one year old son. Arguetta has continued to reside there. This move was part of the plan, and was in place prior to April 21, 2007.

624.   Upon information and belief, it was agreed between Gleason and Arguetta that Arguetta would falsely accuse Plaintiff of simple assault and gross sexual assault.

625.   The purpose of this was to promote Arguetta obtaining custody of the children, to subject Filler to false and malicious prosecution, and preclude him from maintaining a relationship of any kind with his children.

626.   Upon information and belief, Gleason was the first one to promote that Arguetta should tell the police she had been sexually assaulted by Plaintiff.

627.   On April 22, 2007, Gleason was present when Arguetta was questioned by police. At that time Gleason was aware that Arguetta was mentally unsound.

628.   On April 24, 2007, Gleason gave a statement to Willey.

629.   On April 25, 2007, Gleason made arrangements to pick Arguetta up at the Next Steps facility (a women's shelter) following Arguetta's involuntary psychiatric hospitalization on April 24, 2007 as a result of a psychotic episode.

630.   Gleason picked up Arguetta at Next Steps so that she could be interviewed by Gouldsboro Police Chief Wycoff.

631.   Gleason was present throughout the interview, and during a break coached Arguetta on what and how to tell the police about the false allegations of rape. Specifically, Gleason told Arguetta she needed to cry if the alleged rape was to "seem real".

632.    Immediately after the interview, Gleason took Arguetta to the Ellsworth hospital for unknown reasons, presumably psychiatric in nature.

633.    Gleason knew that Arguetta did not eat or sleep between April 21, 2007 and April 24, 2007, and that when Gleason left Arguetta the morning of April 24, 2007 to go to work, Arguetta was in a state of total confusion, and was rambling in a paranoid fashion. Gleason was aware that Arguetta was suffering a psychotic episode brought about in part because Arguetta could not tolerate the thought of Plaintiff getting custody of the children.

634.    At all times pertinent hereto, upon information and belief, Gleason was aware that Filler had at no time sexually assaulted Arguetta, and that the sexual assaults were a total fabrication.

635.    Nevertheless, Gleason filed a police report including false information on April 29, 2007.

636.    After the arrest of Plaintiff on April 26, 2007, upon information and belief, Gleason wrote comments on the internet to stories linked to newspaper articles related to the alleged events, and which were designed to spread false information and to incite hatred and ridicule in the community against Plaintiff.

637.    Prior to the first trial in January 2009, upon information and belief, Gleason accessed Filler's private and protected medical records by sending a medical request from the Ellsworth Hospital where, upon information and belief, Gleason worked part time.

638.    At Plaintiff's first criminal trial, Gleason falsely testified that she saw a bruise on Arguetta's arm when Arguetta moved into Gleason's home on April 21, 2007.

639.    Gleason also lied that she had not "coached" Arguetta during the April 25, 2007 Wycoff interview.

640.    Gleason took these actions knowingly, lacking probable cause to believe the allegations of gross sexual assault or allegations of simple assault.

641.    Gleason conspired with Arguetta to promote the false allegations for the purpose of having Plaintiff charged criminally, and convicted.

642.    Such conduct was taken with malice. Such conduct was taken with the intent to have a criminal prosecution against the Plaintiff initiated and continued. Such a criminal prosecution was in fact initiated and continued for a period of four years.

643.    Plaintiff ultimately obtained favorable results on the five counts of gross sexual assault, and one count of assault by being found not guilty on each of these charges.

644.    As a direct, substantial, proximate, and foreseeable result of defendant Gleason's malicious conduct, criminal charges were initiated and continued against the Plaintiff.

645.    At all times pertinent hereto, Gleason: (1) lacked probable cause to believe Plaintiff sexually assaulted Arguetta and (2) had an improper purpose in seeking criminal charges, namely to gain custody of Arguetta's children for Arguetta.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and exemplary damages, attorney's fees, costs, and further relief as this Court deems just and equitable.

## COUNT SIX
### Negligent Infliction of Emotional Distress
### (Nurse Linda Gleason)

646.    The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

647.    At all times pertinent hereto Gleason took a "no holds barred" approach to facilitating Arguetta seeking custody of her two minor sons.

648.    This included pushing for criminal convictions even after custody went to the Plaintiff so that Plaintiff would go to jail, thereby losing custody.

649.    At all times pertinent hereto Gleason knew there was no basis for the criminal charges against Plaintiff.

650.    Gleason knew or should have known that such conduct would cause emotional distress so extreme that no person could be expected to endure it.

651.    Gleason's negligent conduct continued up to the second trial in 2011.

652.    As a direct, substantial, proximate and foreseeable result of defendant Gleason's conduct, Plaintiff suffered emotional distress so extreme that no reasonable person could be expected to endure it.

653.    Plaintiff has suffered emotional distress, psychological injury, physical distress, lost business, lost earnings past and future, legal fees, costs and other financial loss.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and exemplary damages, attorney's fees, costs, counseling costs, and further relief as this Court deems just and equitable.

## COUNT SEVEN
### Defamation
**(Cavanaugh)**

654.    The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

655.    During a public speech on February 19, 2014, given while Cavanaugh was then running for District Seven District Attorney, Cavanaugh made false statements about Plaintiff and Kellett.

656.    These statements were made entirely for Cavanaugh's personal gain and were not stated within the scope of his employment as Assistant District Attorney or indeed in any prosecutorial capacity.

657.    The statements were false and Cavanaugh knew, or should have known them to be false.

658.    The false statements included:

(1)    That the Board of Bar Overseers Order regarding Mary Kellett was only about two pieces of evidence;

(2)     That Mary Kellett had done nothing wrong;

(3)     That Filler got away with criminal conduct against his wife because there was an evidentiary mistake; and

(4)     The two pieces of evidence that were so important that Kellett was sanctioned were never used in the second trial.

659.   These statements were made before a large group of potential voters.

660.   These statements were made with malice, and/or were *per se* defamatory.

661.   As a direct, substantial, proximate and foreseeable cause of the above statements, Plaintiff was subjected to public scorn and ridicule, suffered harm to his reputation, business, future earning capacity, emotional distress, psychological injury, and physical distress.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and punitive damages, legal fees, costs and such other and further relief that this Court deems just and equitable.

### COUNT EIGHT
### <u>Negligent Infliction of Emotional Distress;</u>
### (Cavanaugh)

662.   The Plaintiff incorporates all previously alleged paragraphs as if alleged herein.

663.   At all times pertinent hereto, Cavanaugh knew or should have known that by publicly stating that Plaintiff was in fact guilty, but only got off on a technicality, and that Mary Kellett had done nothing wrong despite an Order of State Supreme Court Justice Gorman sanctioning Ms. Kellett, that these statements would subject Plaintiff to emotional distress so extreme that no reasonable person could be expected to endure it.

664.   As a direct, substantial, proximate and foreseeable result of Cavanaugh's conduct, Plaintiff has suffered extreme emotional distress.

WHEREFORE, Plaintiff demands judgment in the form of compensatory and punitive damages, legal fees, costs and such other and further relief that this Court deems just and equitable.

### V.    PRAYER FOR RELIEF

666.   The Plaintiffs requests the following relief on all counts herein:

    i. Compensatory damages;

    ii. Punitive damages;

    iii. Attorney fees and cost pursuant to 42 U.S.C. §1988, and 5 M.R.S. § 4683;

    iv. and all other monetary and equitable relief the Court finds appropriate.

### VI.    JURY DEMAND

667.   Plaintiff hereby requests a trial by jury on all claims so triable.

Dated this 8th day of January, 2015 at Portland, Maine.

Respectfully submitted,

Thomas F. Hallett, Esq., Bar No.  3142
Timothy E. Zerillo, Esq., Bar No. 9108
David A. Weyrens, Esq., Bar No. 4035
Attorneys for Plaintiff

HALLETT, ZERILLO & WHIPPLE
75 Market Street, Suite 502
Portland, ME 04101
(207) 775-4255