UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

| | | |
|---|---|---|
| VLADEK FILLER, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | 1:15-cv-00048-JAW |
| | ) | |
| HANCOCK COUNTY et al., | ) | |
| | ) | |
| Defendants. | ) | |

**ORDER ON MOTIONS TO DISMISS**

This case involves the complicated saga of the state prosecution of Vladek Filler for the gross sexual assault and assault of his then wife Ligia Arugetta. What began as an indictment for five counts of gross sexual assault and two counts of assault ended, after two trials and two appeals to the Maine Supreme Judicial Court, with Mr. Filler being convicted of only one assault charge, a conviction he is now challenging in a post-conviction review proceeding. Unfortunately, the prosecution of Mr. Filler also resulted in the Maine Supreme Judicial Court's imposition of discipline against Assistant District Attorney Mary Kellett for a number of violations of the Maine Rules of Professional Conduct, the first disciplinary proceeding ever filed with the Maine Supreme Judicial Court by the Overseers of the Bar against a member of Maine's prosecutorial bar based on the prosecutor's representation of the State. In the wake of these extraordinary events, Mr. Filler filed a civil action against eighteen State Defendants, including Assistant District Attorney Kellett and her colleague Assistant District Attorney Paul Cavanaugh, who have filed a motion to dismiss the

Amended Complaint. In this Order, with some exceptions, the Court denies the assistant district attorneys' motions to dismiss the Amended Complaint.

## I.   BACKGROUND

### A.   Procedural History

On January 9, 2015, Vladek Filler filed a civil complaint in Hancock County Superior Court for the state of Maine against Hancock County and fourteen other Defendants, alleging that he had been wrongfully arrested, prosecuted, and convicted by the Defendants and that he had suffered damages as a consequence. *Notice of Removal* Attach. 1 (ECF No. 1) (*Compl.*); *State Court Docket Record* Attach. 1 (ECF No. 6) (*Docket Record*). On January 9, 2015, Mr. Filler filed an amended complaint, expanding the number of Defendants to eighteen. *Notice of Removal* Attach. 2 (ECF No. 1) (*Am. Compl.*). On February 4, 2015, Defendants Paul Cavanaugh and Mary Kellett removed the case from state to federal court. *Notice of Removal* (ECF No. 1).

On March 16, 2015, Mary Kellett and Paul Cavanaugh separately filed motions to dismiss the amended complaint. *Def. Mary Kellett's Mot. to Dismiss* (ECF No. 14) (*Kellett's Mot.*); *Def. Paul Cavanaugh's Mot. to Dismiss* (ECF No. 15) (*Cavanaugh's Mot.*). On April 20, 2015, Mr. Filler separately filed oppositions to both motions. *Pl.'s Opp'n to the Mot. to Dismss of Paul Cavanaugh* (ECF No. 22) (*Pl.'s Cavanaugh Opp'n*); *Pl.'s Opp'n to the Mot. to Dismiss of Mary Kellett* (ECF No. 23) (*Pl.'s Kellett Opp'n*). On May 18, 2015, Ms. Kellett and Mr. Cavanaugh filed replies to Mr. Filler's responses. *Def. Paul Cavanaugh's Reply Mem. in Support of Mot. to Dismiss* (ECF

No. 31) (*Cavanaugh's Reply*); *Def. Kellett's Reply Br. in Support of Mot. to Dismiss* (ECF No. 32) (*Kellett's Reply*).

### B.    The Amended Complaint[1]

The Amended Complaint consists of 103 pages and details the complex and tumultuous events leading up to the arrest, prosecution and conviction of Mr. Filler of three state crimes, including Class A Gross Sexual Assault and two misdemeanor charges of assault against his then wife, Ligia Arugetta Filler, the vacating of those convictions by the Maine Supreme Judicial Court, the retrial of Mr. Filler, and his subsequent conviction for one misdemeanor count of assault and the not guilty verdicts on the Gross Sexual Assault and the other misdemeanor assault charge. *See Am. Compl.* ¶¶ 2-3.

The Amended Complaint contains the following counts directed against Assistant District Attorneys (ADA) Kellett and Cavanaugh:

> (1) Count One – 42 U.S.C. § 1983 – Denial of Rights to Due Process and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments Against ADA Kellett;
>
> (2) Count Two – 42 U.S.C. § 1983 – Defamation; Malicious Prosecution and Deprivation of Liberty Under the Fourth and Fourteenth Amendments' Denial of Due Process Rights and a Fair Trial Under the Fifth, Sixth, and Fourteenth Amendments Against ADAs Kellett and Cavanaugh;
>
> (3) Count Seven  - Defamation – Against ADA Cavanaugh; and

---

[1]    In considering a motion to dismiss, a court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  *See also Town of Barnstable v. O'Connor*, 786 F.3d 130, 141 n.12 (1st Cir. 2015) (discussing *Waterson*).

    (4) Count Eight – Negligent Infliction of Emotional Distress – Against
        ADA Cavanaugh.

*Am. Compl.* at 1-102.

### 1.    An Overview

Vladek Filler and Ligia Arugetta were married in October 1995. *Id.* ¶ 43. Ms. Arguetta brought a fifteen year old daughter to the marriage and Mr. Filler and Ms. Arguetta subsequently had two sons. *Id.* ¶ 44. Unfortunately, by 2007 the marriage had deteriorated and Mr. Filler and Ms. Arugetta were in the process of separating and, as such, they were required to resolve the question of custody of their children. *Id.* ¶¶ 48-51. Mr. Filler alleges that in the spring of 2007, in order to gain physical custody of their children, Ms. Arguetta engaged the police and made numerous allegations of abuse, which resulted in the state of Maine Department of Health and Human Services (DHHS) taking temporary custody of the children and Mr. Filler's arrest. *Id.* ¶¶ 52-53. After a three-month investigation, on July 24, 2007, DHHS exonerated Mr. Filler and placed the couple's two sons in his custody. *Id.* ¶ 54.

On April 24, 2007, Ms. Arguetta alleged that she had been violently and brutally raped by her husband on April 6, 2007. *Id.* ¶ 204. On August 8, 2007, a Hancock County grand jury indicted Mr. Filler on five counts of Class A Gross Sexual Assault and two counts of Class D Assault.[2] *Id.* ¶ 55. ADA Kellett was responsible for making presentations to the grand jury and for prosecuting Mr. Filler once the

---

[2]    In the Amended Complaint, Mr. Filler alleges that ADA Kellett "brought forth the indictments." *Am. Compl.* ¶ 55. This must be incorrect since only a grand jury is authorized to issue an indictment in Maine. The Court altered the allegation to reflect that ADA Kellett was the state prosecutor responsible for making presentations to the grand jury and prosecuting the case once the grand jury indicted Mr. Filler.

grand jury indicted him. *Id.* A criminal trial was held from January 12 through 15, 2009 and the jury found Mr. Filler guilty of one count of gross sexual assault and two counts of misdemeanor assault. *Id.* ¶¶ 56-57. On March 2, 2009, the trial court granted a motion for new trial, based on ADA Kellet's prosecutorial misconduct. *Id.* ¶ 58. The state of Maine appealed the trial judge's order to the Maine Supreme Judicial Court; ADA Kellett represented the State during the appeal.[3] *Id.* ¶ 59.

While the State's appeal was pending, a final divorce hearing was held on November 16-18, 2009 and the Maine District Court found that Ms. Arguetta had abused the children, had knowingly made false accusations of child molestation, had publicly threatened to kill Mr. Filler and a Sheriff's deputy, had demonstrated her ability to lie and make up stories, and the District Court found that the Ms. Arguetta's allegations of spousal rape, the focal point of the criminal trial, did not meet the preponderance of the evidence standard. *Id.* ¶¶ 61-62. The District Court concluded that the children required protection from Ms. Arguetta and granted custody to Mr. Filler. *Id.* ¶ 63.

On September 9, 2010, the Maine Supreme Judicial Court affirmed the trial court's order requiring a new trial, citing improper evidentiary rulings and prosecutorial misconduct. *Id.* ¶ 65; *see State v. Filler*, 2010 ME 90, ¶¶ 8-9, 27, 3 A.3d

---

[3]     Again, the Amended Complaint is imprecise. It alleges that "ADA Kellett appealed to the Law Court." *Am Compl.* ¶ 59. ADA Kellett is not technically a party to the case. The Court has altered the allegation to reflect that the state of Maine, not ADA Kellett, took the appeal, but, based on the opinion of the Maine Supreme Judicial Court, the Court has taken judicial notice of the fact that ADA Kellett argued the appeal. *State v. Filler*, 2010 ME 90, 3 A.3d 365.

365.  On October 6, 2010, ADA Kellett announced publicly through the Bangor Daily News that she intended to retry Mr. Filler.  *Id.* ¶ 66.

The case was retried on May 24 through 27, 2011.  *Id.* ¶ 68.  This time ADA Paul Cavanaugh was the prosecutor.  *Id.*  On May 27, 2011, the jury acquitted Mr. Filler of the remaining count of gross sexual assault and of one of the two misdemeanor assault counts; it found Mr. Filler guilty of one misdemeanor assault count.  *Id.* ¶ 68. This conviction was affirmed on appeal.  *Id.* ¶ 69; *see State v. Filler*, No. Han-11-460, 2012 Me. Unpub. LEXIS 75 (Me. Supreme Ct. July 3, 2012). Subsequently, a Maine state court found sufficient cause to approve a post-conviction review for prosecutorial misconduct and inadequate representation.  *Id.* ¶ 69.  Mr. Filler's post-conviction review is still pending.  *Id.* ¶ 74.

### 2.  ADA Mary Kellett

In his response to the motion to dismiss, Mr. Filler clarified that:

> [t]he three general categories or activities which support [his] claims are legal advice [ADA Kellett] rendered to police officers in derogation of [his] rights, falsification of evidence, and withholding of exculpatory evidence during the pre-indictment investigation phase in order to wrongfully, and without probable cause charge and convict [him] of sexual assault, and defamatory statements she made to the media for the purpose and effect of falsely informing and inflaming the passions of the populace of Hancock County.

*Pl.'s Kellett Opp'n* at 2-3.  More specifically, he claims ADA Kellett's conduct in "three areas" violated his rights: (1) her advice to law enforcement, (2) her role in the pre-indictment investigation of Mr. Filler, and (3) her statements to the media.  *Id.*  Mr. Filler explains the legal bases for his claims:

6

> First, by Kellett's actions [he] was denied his right to [a] fair trial as guaranteed by the [S]ixth [A]mendment without providing him with due process as required by the Fifth and Fourteenth Amendments to the U.S. Constitution.   Second, Kellett's action constitutes a malicious prosecution and deprivation of Filler's liberty in violation of his Fourth Amendment without due process of law as guaranteed by the Fourteenth Amendment.

*Id.* at 3.  The Court turns to the Amended Complaint's allegations supporting each theory of liability.

### a.      ADA Mary Kellett's Advice to Law Enforcement

In Count One of the Amended Complaint, Mr. Filler alleges that ADA Kellett "assumed the role of legal counsel to three law enforcement officers, Defendants Willey, Mycoff and Malloy, and advised them not to comply with lawful subpoenas which would have led to the production of exculpatory evidence and that she also asserted a legal privilege on behalf of a law enforcement officer (Off. Wilmot and the Ellsworth Police Department), again to prevent the production of exculpatory evidence." *Pl.'s Kellett Opp'n* at 9.

### b.      The April 11, 2007 Ellsworth Police Department Interview

The first claim of improper legal advice centers on an April 11, 2007 interview at the Ellsworth Police Department between Ellsworth Police Officer Chad Wilmot and Ms. Arguetta concerning Stephen Fay, the editor of the local newspaper.  *Am. Compl.* ¶¶ 201-02.  The Amended Complaint alleges that Ms. Arguetta told Officer Wilmot that she witnessed Mr. Fay push Mr. Filler, that she was afraid for her husband's safety, and that he should never be pushed because he was physically frail, had a bad back, and had trouble maintaining his balance.  *Id.* ¶ 202.  Mr. Filler

7

maintains that the contents of the April 11, 2007 Ellsworth Police Department interview were exculpatory. *Id.* ¶ 205.

During his defense of Mr. Filler in the original trial, Attorney Daniel Pileggi sought to obtain the records of the April 11, 2007 Ellsworth Police Department interview from ADA Kellett through standard discovery procedures. *Id.* ¶¶ 206-08. On September 6, 2007, Attorney Pileggi made a written request to ADA Kellett for the contents of Officer Wilmot's April 11, 2007 interview and he renewed his request on October 5, 2007. *Id.* ¶¶ 206-07. ADA Kellett ignored the requests. *Id.* On October 12, 2007, Attorney Pileggi filed a motion for discovery, mentioning specifically the statement Ms. Arguetta gave the Ellsworth police on April 11, 2007. *Id.* ¶ 208.

On May 15, 2008, Attorney Pileggi served Officer Wilmot with a subpoena to appear in court on June 9, 2008 and to bring all his reports and witness statements of the April 11, 2007 Stephen Fay incident interview. *Id.* ¶ 210. Officer Wilmot spoke with Attorney Pileggi and agreed to voluntarily comply with the subpoena and bring the records to Attorney Pileggi's law office. *Id.* ¶ 211. Attorney Pileggi had discussed the subpoena with ADA Kellett and she offered no objection. *Id.* ¶ 212. However, on or after May 16, 2008, ADA Kellett instructed Officer Wilmot not to provide the subpoenaed records to Attorney Pileggi; Officer Wilmot complied with ADA Kellett's instructions. *Id.* ¶¶ 212-13.

On May 29, 2008, Attorney Pileggi wrote and faxed a complaint letter to ADA Kellett, citing prosecutorial misconduct, interference with a defense subpoena, a conflict of interest in ADA Kellett's legal advice to Officer Wilmot, and a violation of

the Maine Rules of Professional Conduct.  *Id.* ¶ 214.  Justice William Anderson held a hearing on the discovery motion on June 3, 2008 and ordered ADA Kellett to provide Attorney Pileggi with all "reports concerning . . . # 3" including "any audio or videotapes that may exist."  *Id.* ¶ 216.  Number 3 read:

> Ellsworth Police Department investigative reports: The reports include interviews with defendant and the alleged victim, and relating to an altercation between the defendant and a representative of a local newspaper.  Upon information and belief, Ms. Filler made numerous statements bearing on Mr. Filler's physical limitations, and his lack of capacity to commit the acts for which he is charged in this action.

*Id.*  ADA Kellett did not comply with the Superior Court Order of June 8, 2008.  *Id.* ¶ 217.  Attorney Pileggi testified before a Panel of the Grievance Commission of the Board of Bar Overseers for the state of Maine that ADA Kellett told him that there was only a brief Ellsworth Police Department report and there were no witness statements.  *Id.* ¶ 218.

Months after the first criminal trial, Mr. Filler himself presented the Superior Court Order to the Ellsworth Police Department and received all witness statements and the police report directly from Ellsworth Police Chief DeLeo.  *Id.* ¶ 222.  At the disciplinary hearing before the Grievance Panel, ADA Kellett testified that she acted on behalf of Officer Wilmot by advising him about his response to the records request concerning the April 11, 2007 complaint.  *Id.* ¶ 223.  On December 5, 2012, the Grievance Panel found that ADA Kellett had violated seven of the Maine Rules of Professional Conduct, including her failure to produce the Stephen Fay incident interview witness statements.  *Id.* ¶¶ 225-26.

c.    The April 24, 2007 Washington County 911 Calls and Video/Audio Records

The second allegation of improper legal advice addresses a series of telephone calls from Ms. Arguetta to the 911 number at the Washington County Sheriff's Office, as well as a video and audiotape of Ms. Arguetta's later encounter with a Washington County Sheriff's Deputy, all on April 24, 2007.

The Amended Complaint alleges that Ms. Arguetta began calling the Washington County 911 number early on April 24, 2007, demanding that the police seize her ten-year-old son from her husband but primarily complaining about her missing cat. *Id.* ¶ 116. The Amended Complaint claims that Ms. Arguetta sounded delusional and psychotic one moment in one call and calm and calculating minutes later. *Id.* ¶ 117. The Amended Complaint states that Ms. Arguetta "immediately made clear her motives of winning the child custody dispute against her husband and his family, and repeatedly demanded Police immediately go back to [Mr. Filler's] house and remove their ten year old son by force." *Id.* ¶ 118. When the 911 dispatcher failed to comply with her demands, she called back with more accusations and claims against Mr. Filler "until she threatened to murder [Mr. Filler] and then claimed he sexually assaulted her." *Id.* ¶ 119. She went on to tell the dispatcher that she "believed the children were molested by [Mr. Filler] and that she was going to go kill [him] for what he did to the children if the Police [did not] immediately respond and take the ten year old child from [his] custody." *Id.* ¶ 120.

At that point, Ms. Arguetta attempted to convince her seventeen-year-old daughter to say that Mr. Filler had molested her. *Id.* ¶ 121. The daughter refused

to do so and instead called 911 to inform the dispatcher that her mother was "crazy," that her brother had chosen to live with his father, and that her mother was going to use criminal charges to try and get Mr. Filler convicted "of anything" so that her brother would have no choice but to live with her.  *Id.* ¶ 122.  The daughter also told the dispatcher that Ms. Arguetta had left their home on foot with their one-year-old in hand to go to Mr. Filler's house.  *Id.* ¶ 123.

Deputy Travis Willey, Deputy Crabtree, and Lieutenant Denbow observed Ms. Arguetta running on the road barefoot "only in a bra" and pants with a child, screaming that she would cut her husband to pieces and kill Deputy Willey.  *Id.* ¶ 124.  Restrained in the cruiser, Ms. Arguetta was screaming and kicking the door, talking to herself in English and Spanish, chanting, laughing and crying.  *Id.* ¶ 126.  The full incident was captured on Deputy Willey's cruiser camera, both by video and audiotape.  *Id.* ¶ 127.  In addition, Deputy Willey used his portable pocket recorder as he entered and exited the cruiser where Ms. Arguetta was restrained.  *Id.* ¶ 128.

During this encounter with law enforcement, Ms. Arguetta alleged that her husband had sexually molested her three children and might try to kill their ten-year-old son.  *Id.* ¶ 129.  Ms. Arugetta threatened to kill Deputy Willey and her husband.  *Id.* ¶¶ 132-33.  Deputy Willey also informed DHHS that Ms. Arguetta claimed she had left the marital home on April 21, 2007 because her husband had raped her seventeen-year-old daughter.  *Id.* ¶ 135.  Deputy Willey prepared a report of his encounter with Ms. Arguetta.  *Id.* ¶ 232.

On May 29, 2007, Deputy Willey hand-delivered a copy of his report of the April 24, 2007 incident to ADA Kellett; his report was stamped "Received May 29, 2007." *Id.* ADA Kellett did not turn over the Willey report in the automatic discovery she provided to Attorney Pileggi in August 2007. *Id.* ¶ 233. Attorney Pileggi learned about the April 24, 2007 incident and renewed his requests on October 5, 2007. *Id.* ¶ 234. He then initiated a series of additional discovery requests seeking the Washington County Sheriff's Office records of the April 24, 2007 encounter. *Id.* On October 12, 2007, Attorney Pileggi filed a motion for discovery. *Id.* ¶ 235. On or about October 24, 2007, ADA Kellett provided only a brief five-page report with partial dispatch log of the incident, which was date stamped as having been in her office since May 29, 2007. *Id.* ¶ 237. Attorney Pileggi followed up with a request for photographs, videotape recordings, audio recordings, tapes and logs of the 911 calls referenced in Deputy Willey's report. *Id.* ¶ 238. ADA Kellett did not provide photographs, the requested video, audio or the 911 recordings. *Id.* ¶ 239.

On May 15, 2008, Attorney Pileggi subpoenaed documents from both the Gouldsboro Police Department and the Washington County Sheriff's Office relating to an incident "on or about April 24, 2007." *Id.* ¶ 240. ADA Kellett did not produce these documents. *Id.* ¶ 241. On May 16, 2008, Attorney Pileggi subpoenaed Washington County Deputy Sheriff Willey to produce "[a]ll reports, audio tape, video tape, radio log materials, photographs or other material relating to the Washington County Sheriff's Department's Interactions with Ligia Filler on or about April 24, 2007, including, but not limited to, emergency call records." *Id.* ¶ 242. On June 3,

2008, Justice Anderson of the Superior Court issued an order, requiring the State to provide all "reports concerning # 1" to Attorney Pileggi, "including any audio or videotapes that may exist." *Id.* ¶ 245. Item 1 read:

> Washington County Sheriff's incident reports dated April 24, 2007. Deputy Sheriff Travis Willey and Lieutenant Denbow interviewed the alleged victim, Ligia Filler after intervening for a "crisis evaluation," in which Ms. Filler chanted about "cutting up" the defendant while laughing and crying hysterically, swearing and kicking a door. It was reported that Ms. Filler made various statements about the facts giving rise to the charges in this matter.

*Id.*

On July 16, 2008, Attorney Pileggi wrote ADA Kellett reminding her that he was still awaiting copies of the audio and visual recordings as per Justice Anderson's order. *Id.* ¶ 246. Receiving no response, Attorney Pileggi wrote again on September 3, 2008, stating that he was going to be forced to seek a contempt finding or discovery sanctions. *Id.* ¶ 247. On September 3, 2008, ADA Kellett emailed Attorney Pileggi representing that the "video could not be copied" for production to the defense, that the video "doesn't really show anything," that she would provide only a CD of the audio copied "from the video" tape, and if Attorney Pileggi still wanted to view the video, he should make his own arrangements and "go watch it." *Id.* ¶ 248. On September 15, 2008, ADA Kellett provided Attorney Pileggi with an edited non-continuous audio recording of Deputy Willey's and Ms. Arguetta's interaction; the same day, Attorney Pileggi renewed his request for the full court-ordered videotape and he attempted to gain access to the video. *Id.* ¶ 249. In fact, the full continuous audio or videotapes contained exculpatory evidence. *Id.* ¶ 250. On December 18,

2008, Attorney Pileggi subpoenaed Deputy Willey to produce "[c]opies of all video recordings of Arguetta" but it was never provided. *Id.* ¶ 251.

After the first trial on March 29, 2009, Mr. Filler made a Freedom of Access Act (FOAA) request of the Washington County Sheriff's Office. *Id.* ¶ 252. Between May 7 and May 15, 2007, Mr. Filler spoke with Deputies Crabtree and Willey. *Id.* ¶ 257. On May 7, 2007, Deputy Willey told Mr. Filler that "the District attorney's office has everything we have . . . I don't have any video—right now." *Id.* ¶ 258. Deputy Willey informed Mr. Filler that "no one ordered him to provide the video to [Mr. Filler] and that his compliance with a subpoena would be "up to the district attorney's office." *Id.* Deputy Willey told Mr. Filler that "if [he] wanted to subpoena him or get any of his records it would have to be done through prosecutor Mary Kellett's office." *Id.* On May 14, 2009, the Washington County Sheriff's Office provided Mr. Filler with an audiotape copy of an "entire series of extremely important and exculpatory 911 phone calls made by Arugetta and her daughter Natasha on the morning of April 24, 2007." *Id.* ¶ 253.

On May 15, 2009, Mr. Filler "subpoenaed Deputy Willey and all his records, notes, and recordings concerning Arguetta for a hearing scheduled on June 15, 2009." *Id.* ¶ 261. On or about June 9, 2009, Deputy Willey spoke with ADA Kellett who advised him concerning Mr. Filler's subpoena and, after speaking with ADA Kellett, Deputy Willey telephoned Mr. Filler and informed him that he "would not comply with the subpoena, would not provide the records, would not even appear at the hearing that he was subpoenaed to, and for the first time Willey . . . reported that the

14

court ordered April 24, 2007 video recording of Arguetta's statement [had] now been erased." *Id.* ¶¶ 262-63.

On December 5, 2012, the Grievance Panel found ADA Kellett had violated seven Bar rules and specifically found that the 911 recording from April 24, 2007 was a key piece of exculpatory evidence and "should have been produced pursuant to rules, a court order, case law and ethical obligations." *Id.* ¶ 256.

### d.    The April 24, 2007 Gouldsboro Police Records

On April 24, 2007, Ms. Arguetta communicated with the town of Gouldsboro, Maine's police department and told Gouldsboro Police Sergeant Charles Bagley that Mr. Filler had raped her seventeen-year-old daughter and that this was the reason Ms. Arguetta had left the marital home on April 21, 2007. *Id.* ¶¶ 272-74. Following Ms. Arguetta's report, Sergeant Charles Bagley was instructed to go to Mr. Filler's home and break into the residence, if necessary, to save Ms. Arguetta's daughter as a rape victim in Mr. Filler's physical custody. *Id.* ¶ 274. The interactions between the Gouldsboro Police Department and Ms. Arguetta were documented by police reports, including Ms. Arguetta's false report to the police that Mr. Filler had raped her daughter. *Id.* ¶ 272. The contents of these reports were potentially exculpatory. *Id.* ¶ 275. The Gouldsboro police department reports should have been provided as automatic discovery, in response to Attorney Pileggi's specific discovery requests, and after Attorney Pileggi subpoenaed them. *Id.* ¶ 278. However, they were not. *Id.*

On April 29, 2009, Mr. Filler spoke with Gouldsboro Police Sergeant James Malloy and Sergeant Malloy revealed to him that the Gouldsboro police records of the

April 24, 2007 incident did exist and were available. *Id.* ¶ 272. During that conversation Sergeant Malloy agreed to provide Mr. Filler with these records, and following the conversation Mr. Filler subpoenaed Sergeant Malloy and the records to the June 15, 2009 civil hearing. *Id.* ¶ 276-77. When Sergeant Malloy appeared at the June 15, 2009 hearing, he informed Mr. Filler that ADA Kellett instructed him not to provide Mr. Filler with the Gouldsboro records unless ordered to do so by a court. *Id.* ¶¶ 279, 497. Sergeant Malloy showed Mr. Filler a sealed envelope containing the Gouldsboro police reports but said he would not provide it under ADA Kellett's orders. *Id.* ¶ 280.

During the disciplinary hearing before the Grievance Panel on October 23-24, 2012, ADA Kellett testified that Sergeant Malloy contacted her office seeking assistance in locating available reports for production to Mr. Filler. *Id.* ¶ 283. The Amended Complaint claims that ADA Kellett suppressed and refused to provide the Gouldsboro police reports to the defense. *Id.* ¶ 284.

### e.   ADA Kellett's Role in the Pre-indictment Investigation of Vladek Filler

Mr. Filler claims that:

The second category of activity alleged against Kellett for which she is not protected by absolute immunity are the pre-indictment investigatory acts, committed directly by her, which, in conspiracy with other police defendants served to withhold exculpatory information and falsify evidence in order to wrongfully arrest, and indict Filler for sexual assault despite the lack of probable cause in violation of his Fourth Amendment rights – acts which form the basis for Filler's malicious prosecution claim.

*Pl.'s Kellett Opp'n* at 12.   Mr. Filler explains that ADA Kellett was acting in an investigatory capacity when she "participated in, or approved of the editing out of exculpatory information from the April 25, 2007 Arguetta interview." *Id.* at 13.   Mr. Filler further asserts that ADA Kellett "chose to disregard the fact that Arguetta had falsely claimed that Filler had sexually molested his one year old and ten year old sons, as well as Arguetta's seventeen year old daughter in favor of prosecuting her clearly false claims of herself being gross sexually assaulted on five separated occasions and assault on another." *Id.*

The Amended Complaint alleges that on April 25, 2007, Gouldsboro Police Department Chief Wycoff and Detective Stephen McFarland gave a videotaped interview in which Ms. Arguetta's friend Linda Gleason, a nurse, was allowed to sit with her during the interview. *Id.* ¶ 148.   After about one hour, Chief Wycoff briefly left the room and the video recorder was still recording as Ms. Arguetta admitted to her friend, Ms. Gleason, that "her report of sexual abuse against her husband was her way of 'fighting for the children.'" *Id.* ¶ 149.   Nurse Gleason advised her to "cry stating that 'it wouldn't seem real' unless Arguetta cried during the interview." *Id.* ¶¶ 150-51.   Ms. Arguetta told Nurse Gleason that she did not feel like crying, but Nurse Gleason "repeatedly urged her to cry." *Id.* ¶ 151.   When Chief Wycoff returned to the interview room, Ms. Arguetta began crying hysterically. *Id.* ¶ 153.

When ADA Kellett provided Attorney Pileggi with initial discovery, it included a transcript of the Wycoff interview but omitted entirely the communications between Nurse Gleason and Ms. Arguetta. *Id.* ¶ 154.   Subsequently, ADA Kellett provided

two separate audio CDs which omitted the conversation between Nurse Gleason and Ms. Arguetta.  *Id.* ¶ 155.  Months later, Attorney Pileggi obtained the entire videotape from the Gouldsboro Police Department, which showed the missing conversation between Nurse Gleason and Ms. Arguetta.  *Id.* ¶ 156.

In the Amended Complaint, Mr. Filler alleged that "[o]n or about April 25, 2007, and prior to indictment of Filler on August 8, 2007, Kellett engaged in or supported and approved of, the falsification of an April 25, 2007 videotape interview of Arguetta by Wycoff."  *Id.* ¶ 495.  The falsification of evidence claim appears to relate to the suppression of photographs taken by the police identifying the area where the sexual assault allegedly occurred and the presentation instead of staged photographs taken by Ms. Arguetta.   On April 26, 2007, Detective McFarland and Chief Wycoff executed a search warrant of Mr. Filler's residence and specifically inspected the area where the sexual assault was alleged to have taken place.  *Id.* ¶¶ 174-75.  The Amended Complaint states that the "area where the bizarre and physically impossible sexual assault claim was alleged to have taken place was so small, 24" x 24", that one adult could barely fit standing in that area, let alone two people bent over as was alleged."  *Id.* ¶ 176.  During the search, an "official set of photographs" was taken of the bathroom.  *Id.* ¶¶ 177-78.

The Amended Complaint states that on January 12, 2009, the first day of Mr. Filler's first trial, ADA Kellett "presented never released, illegally obtained, staged photographs of [Mr. Filler's] residence showing a different alleged *crime scene* than that in the indictments, and in discovery."  *Id.* ¶ 312 (emphasis in original).  The

Amended Complaint alleges that these photographs "were completely different from the official photographs initially taken by police on April 26, 2007 using a search warrant." *Id.* ¶ 313.  The admitted photographs showed a washing machine and dryer area, where ADA Kellett told the jury the sexual assault took place.  *Id.* ¶¶ 315-16.

### f.    ADA Kellett's Statements to the Media

In Count Two, Mr. Filler alleges that ADA Kellett repeatedly released "information known to be false and/or defamatory to the media . . . and for the purpose of falsely informing, and inflaming the passions of the populace of Hancock County in order to maliciously prosecute and deprive Filler of his liberty, and ultimately to deny Filler a fair trial." *Pl.'s Kellett Opp'n* at 15.

Specifically, the Amended Complaint states that on April 27, 2007, ADA Kellett "provided to the press a copy of an alleged 'Affidavit in Support of Arrest Warrant' by Chief Wycoff for the arrest of [Mr.] Filler." *Am Compl.* ¶ 542.  The Amended Complaint alleges that the affidavit contained "false information including that Filler had forced non-consensual anal sex with his wife on April 6, 2007, and that Arguetta kept a diary of Filler's assaultive behavior." *Id.* ¶ 544.  In fact, no arrest warrant had ever been signed. *Id.* ¶ 548.  In addition, ADA Kellett released to the press Mr. Filler's "mug shot," which shortly thereafter appeared in a front page story in the Bangor Daily News. *Id.* ¶ 545.  The rape allegations were subsequently broadcast on local television and written up in the local and regional newspapers. *Id.* ¶ 546.  Moreover, in September 2008, ADA Kellett falsely informed guardian ad litem John Lorenz that she was in possession of a journal which detailed Mr. Filler's abuse

19

of Ms. Arguetta. *Id.* ¶ 549. ADA Kellett's statement to Mr. Lorenz was false and she knew it was false when she made it. *Id.* Finally, on January 16, 2009, the Bangor Daily News quoted ADA Kellett as stating that Mr. Filler had engaged in ". . . sexual punishment [of his wife] . . . it was punitive and angry." *Id.* ¶ 550.

### 3.    ADA Paul Cavanaugh

Paul Cavanaugh was employed as an Assistant District Attorney by Hancock County and the Hancock County District Attorney's Office. *Id.* ¶ 28. After the Maine Supreme Judicial Court issued its September 9, 2010 Order, affirming Justice Cuddy's order for a new trial, ADA Cavanaugh assumed responsibility for the re-trial of the case. *Id.* ¶ 362.

The Amended Complaint alleges that ADA Cavanaugh engaged in two discovery violations.  First, it claims that he assured the new defense counsel, Stephen Smith, that all discovery had been provided, when in fact it had not. *Id.* Specifically, neither the April 24, 2007 exculpatory recordings from Washington County nor the Gouldsboro police records had been turned over. *Id.* Next, the Amended Complaint alleges that during the second trial, ADA Cavanaugh was allowed to present Ms. Arguetta with a photograph of a bruise that Chief Wycoff had taken and that she was allowed to speculate about where she got the bruise. *Id.* ¶ 364. Ms. Arguetta acknowledged at the second trial that she "didn't know what it was" when the bruise first appeared three days after the couple separated, but when she returned to the house with Chief Wycoff, "the chair was the only thing she could think of." *Id.* ¶ 365. During the second trial, Chief Wycoff and Gouldsboro Sergeant

Harry Larrabee admitted that no one knew where Ms. Arguetta got the bruise and that it was Chief Wycoff who suggested that the chair may have caused it.  *Id.* ¶ 366.

The Amended Complaint then turns to the defamation allegations against ADA Cavanaugh.  It states that ADA Cavanaugh announced his candidacy for district attorney of Hancock and Washington Counties on January 17, 2014.  *Id.* ¶ 367.  It alleges that on February 19, 2014, ADA Cavanaugh gave a public campaign speech where he publicly stated:

> Those two pieces of evidence that were so important and fundamental in the first trial were never used in the second trial—they did not have anything to do with the second trial.

*Id.* ¶ 368.  In fact, the Amended Complaint alleges that the "Bar Judgment against Kellett specifically cited three pieces of exculpatory evidence that were not provided to [Mr. Filler]."  *Id.* ¶ 369.  During the speech, ADA Cavanaugh further blamed Mr. Filler:

> Mr. Filler has now filed what we call a Post-Conviction Review, a PCR, where he's saying even that conviction should now be thrown out because his defense attorneys weren't competent.  So one thing we can be clear of is that it was not Mr. Filler's fault; it was his wife's fault, and then it was the prosecution's fault, and now it's the defense attorney's fault that he had to do time for assaulting his wife.

*Id.* ¶ 370.  The Amended Complaint states that ADA Cavanaugh "publicly attacked [Mr. Filler] and made false public statements about the facts and nature of the prosecutorial misconduct and even the pending issues of the Post-Conviction Review against his office."  *Id.* ¶ 371.  Additionally, Mr. Filler says that ADA Cavanaugh "grossly misrepresented the ongoing positive relationship [Mr. Filler] has with all his attorneys."  *Id.*

21

In Counts Two, Seven and Eight of the Amended Complaint, Mr. Filler only made claims against ADA Cavanaugh involving the February 19, 2014 speech. *Id.* ¶¶ 553-54. Specifically, the Amended Complaint alleges that ADA Cavanaugh said: (1) that the "Board of Bar Overseers Order regarding ADA Kellett was about only two piece[s] of evidence"; (2) that "Mary Kellett had done nothing wrong"; (3) that Mr. Filler "got away with criminal conduct against his wife because there was an evidentiary mistake"; (4) that "the two pieces of evidence that were so important that ADA Kellett was sanctioned [for] were never used in the second trial"; and (5) that Mr. Filler "improperly blamed everyone [including Kellett] but himself." *Id.* ¶¶ 554, 659, 664.

## II.    THE PARTIES' POSITIONS

### A.    The Kellett Motion to Dismiss

#### 1.    ADA Kellett's Position

In her motion to dismiss, ADA Kellett argues that Mr. Filler's Amended Complaint fails to state a claim upon which relief may be granted. *Kellett's Mot.* at 1-20.

##### a.    The Statute of Limitations Defense

ADA Kellett first poses a statute of limitations defense to many of the claims in Count One of the Amended Complaint. *Id.* at 3. ADA Kellett observes that Maine's six-year statute of limitations applies to Mr. Filler's claims. *Id.* (citing 14 M.R.S. § 752). As Mr. Filler filed his Complaint in the Hancock County Superior Court on January 9, 2015, ADA Kellett effectively argues that her actions before January 9,

2009 are barred by the statute of limitations.  Specifically, she says that ADA Kellett's legal advice to Officer Wilmot not to comply with Attorney Pileggi's May 15, 2008 subpoena must have occurred before January 9, 2009 because Mr. Filler alleges that Attorney Pileggi wrote to ADA Kellett on May 29, 2008 complaining about ADA Kellett's actions.  *Id.* (citing *Am. Compl.* ¶ 218).  Next she points to Attorney Pileggi's subpoenas to Chief Wycoff on May 15, 2008 and to Deputy Willey on May 16, 2008 and December 18, 2008; she says that Mr. Filler never asserts that ADA Kellett advised Chief Wycoff or Deputy Willey not to comply with those subpoenas, but if she had, the claims would be time-barred.  *Id.* at 3-4.

### b.    Absolute Prosecutorial Immunity for Legal Advice

ADA Kellett concedes that her advice to Deputy Willey and Sergeant Malloy in the spring of 2009 not to comply with Attorney Pileggi's subpoenas would not be barred by the statute of limitations.  However, she maintains that she "is absolutely immune from suit for any claim that she wrongfully withheld *Brady*[4] materials or otherwise violated Plaintiff's due process rights by virtue of failing to turn over exculpatory evidence."  *Id.* at 5.  Acknowledging that Mr. Filler might claim that ADA Kellett does not enjoy absolute immunity for legal advice to law enforcement officials during the investigatory phase of a criminal case, ADA Kellett argues that *Burns v. Reed*, 500 U.S. 478 (1991), the United States Supreme Court case that carved out the legal advice exception to absolute immunity, does not apply to ADA Kellett's actions. *Id.* at 7-8.  In contrast with *Burns*, here by the spring of 2009, the prosecution against

---

[4]    *Brady v. Maryland*, 373 U.S. 83 (1963).

Mr. Filler was already pending and therefore ADA Kellett argues she did not render legal advice during the investigatory stage. *Id.* at 9. Even if the *Burns* exception to absolute immunity applied, ADA Kellett contends that there is a functional equivalence between her failing to turn over discoverable evidence and her advising another to do the same. *Id. at* 9-10.

### c.   Absolute Prosecutorial Immunity from Malicious Prosecution

Citing *Imbler v. Pachtman*, 424 U.S. 409 (1976), ADA Kellett contends that she is absolutely immune from the civil action of malicious prosecution in both Counts One and Two. *Id.* at 10-11, 17.

### d.   Statute of Limitations for Malicious Prosecution

Noting that Mr. Filler alleges he was arrested and charged on April 26, 2007 and indicted on August 8, 2007, ADA Kellett contends his malicious prosecution claim is barred by Maine's six-year statute of limitations. *Id.* at 11.

### e.   Prima Facie Case for Malicious Prosecution

ADA Kellett argues that because Mr. Filler was ultimately convicted of one count of assault, he may not maintain a civil action for malicious prosecution because he did not receive "a favorable termination of the proceedings" required under Maine law for the tort of malicious prosecution. *Id.* at 11-12.

### f.   Defamation Claim and the Statute of Limitations

Turning to Count Two of the Amended Complaint, ADA Kellett applies her earlier statute of limitations argument to the claims of defamation. *Id.* at 12-13. ADA Kellett observes that the Amended Complaint alleges that in September, 2008 ADA

Kellett provided: (1) the press a copy of the "Affidavit in Support of Arrest Warrant," (2) the press the April 27, 2007 mug shot,  and (3) false information about Mr. Filler to the guardian ad litem; all having occurred more than six years before January 9, 2015.  *Id.*

### g.      The Remaining Defamation Claim and § 1983 Liability

ADA Kellett acknowledges that one allegedly defamatory statement took place within the six year statute of limitations.  *Id.* at 13.  Although ADA Kellett does not identify the statement, the Court notes that the Amended Complaint charges that on January 16, 2009, the Bangor Daily News quoted ADA Kellett as stating that Mr. Filler had engaged in ". . . sexual punishment [of his wife] . . . it was punitive and angry."  *Am. Compl.* ¶ 550.  Even so, citing *Paul v. Davis*, 424 U.S. 963 (1976), ADA Kellett argues that Mr. Filler may not maintain a defamation claim under 42 U.S.C. § 1983 because the United States Supreme Court has ruled that a defamation claim "will not give rise to liability under 42 U.S.C. § 1983."  *Kellett's Mot.* at 14.

Finally, observing that ADA Kellett made the statement to the Bangor Daily News the day after the jury returned a verdict in his first criminal trial, the statement could not have affected his first trial.  *Id.* at 16.  ADA Kellett also notes that the sole conviction for Gross Sexual Assault was overturned by Justice Cuddy on March 2, 2009 and the vacating of that conviction was affirmed by the Maine Supreme Judicial Court on September 9, 2010.  *Id.*  ADA Kellett observes that Mr. Filler never served a day in jail due to the Gross Sexual Assault conviction and therefore she maintains that the accusation is "bald and unadorned."  *Id.*

25

### h.   *Brady* Violations

ADA Kellett says that it is unclear whether Mr. Filler is claiming that ADA Kellett's failure to turn over *Brady* material provides the basis for a civil action, but she reminds the Court that she would be absolutely immune from such a claim under the doctrine of absolute prosecutorial immunity.  *Id.* at 17.

### i.   Rule 8(a)(2) Violation

Observing that Mr. Filler's Amended Complaint is 103 pages long and consists of 667 separate paragraphs, ADA Kellett contends that the Amended Complaint should be dismissed because it fails to comply with the requirement in Federal Rule of Civil Procedure 8(a)(2) for a "short and plain" statement of the claim.  *Id.* at 17-20.

### 2.   Vladek Filler's Response

### a.   Statute of Limitations

In his opposition to ADA Kellett's motion to dismiss, Mr. Filler acknowledges that Maine's six year statute of limitations is applicable; however, citing *Nieves v. McSweeney*, 241 F.3d 46, 51-52 (1st Cir. 2001), he maintains that the accrual date for the running of the statute of limitations for the malicious prosecution claim was not until "the termination of the antecedent criminal proceedings."  *Pl.'s Kellett Opp'n* at 5-6.  Regarding ADA Kellett's legal advice to law enforcement, Mr. Filler contends that his claim should be considered a conspiracy charge against ADA Kellett "intentionally designed to convict him without a fair trial and which did in fact succeed in doing that on January 15, 2009."  *Id.* at 6.  Whether the claim arose directly

after the first or second trial, Mr. Filler argues that the six-year statute of limitations has not run against either the defamation or malicious prosecution claim. *Id.* at 6-7.

### b.   Prosecutorial Immunity for Legal Advice

Relying on *Burns*, Mr. Filler argues that ADA Kellett is not absolutely immune for giving legal advice to law enforcement officers to ignore lawful subpoenas to produce exculpatory evidence. *Id.* at 9-12.  Indeed, Mr. Filler points out that ADA Kellett advised Sergeant Malloy and Deputy Willey to ignore subpoenas that directed them to appear at a civil proceeding on June 15, 2009, a proceeding unrelated to the then pending criminal charges. *Id.* at 11.  Mr. Filler disputes ADA Kellett's assertion that giving advice to law enforcement is the functional equivalent of prosecuting a case, saying that ADA Kellett's view is "plainly not the view of the Supreme Court." *Id.*  In support, Mr. Filler quotes the United States Supreme Court in *Buckley v. Fitzsimmons*, 509 U.S. 259 (1993) that "providing legal advice to the police was not a function 'closely associated with the judicial process.'" *Id.* (quoting *Buckley*, 509 U.S. at 271) (quoting *Burns*, 500 U.S. at 495).

### c.   Prosecutorial Immunity for Investigative Work

Mr. Filler contends that before the grand jury indicted him, ADA Kellett either participated in or approved of the editing out of exculpatory evidence from the April 25, 2007 Arguetta interview videotape. *Id.* at 13.  Mr. Filler also maintains that ADA Kellett's decision to ignore Ms. Arguetta's false claims that he had sexually molested his sons and her daughter falls within the category of investigative work. *Id.*  All of

this, he claims, is activity that under *Buckley* and *Imbler* is not accorded absolute immunity. *Id*. at 13-14.

### d.   The Malicious Prosecution Claim: the Statute of Limitations and the Elements of the Claim

Mr. Filler reiterates his view that the statute of limitations on the malicious prosecution claim does not begin to run until the conclusion of the antecedent criminal case. *Id*. at 14. As regards the elements of the malicious prosecution claim, Mr. Filler observes that the original charge against him alleged five counts of Gross Sexual Assault and two counts of simple assault and that he successfully defended six of the seven charges, the assault being "a separate incident date from all of the gross sexual assaults alleged." *Id*. at 15.

### e.   The Defamation Claim and the Statute of Limitations

Mr. Filler reiterates his view that the statute of limitations did not begin to run on the defamation claim until January 15, 2009, the date of his first conviction. *Id*. at 15-16.

### f.   The Defamation Claim and the § 1983 Action

Quoting *Buckley*, Mr. Filler asserts that ADA Kellett's statements to the press from April 2007 through October 2010 are entitled only to qualified, not absolute immunity because they are tied to the violation of a constitutional right, namely his Sixth Amendment right to a fair trial. *Id*. at 16-17.

### g.   Rule 8(a)(2)

Mr. Filler justifies the length and detail of this Amended Complaint by noting that his claims arose from a "lengthy fact pattern encompassing eight plus years and, unfortunately, eighteen separate defendants." *Id.* at 17. Mr. Filler states that his counsel drafted the Amended Complaint knowing that the defense lawyers would closely scrutinize it to test its sufficiency under Rule 12. *Id.* He observes that ADA Kellett has been able, as a consequence of the detailed allegations, to file and argue a motion to dismiss. *Id.* at 20.

### 3. ADA Kellett's Reply

#### a. Rule 8(a)(2)

In her reply, ADA Kellett re-argues her point that the Amended Complaint in this case violates the letter and spirit of Rule 8(a)(2). *Kellett's Reply* at 1-2.

#### b. Statute of Limitations Accrual

ADA Kellett begins by observing that the accrual date for the running of the statute of limitations is governed by federal law, *id.* at 2 (citing *Wallace v. Kato*, 549 U.S. 384, 388 (2007)), and she concurs with Mr. Filler's contention that the "accrual period for a § 1983 action begins when the plaintiff knows or has reason to know of the injury which is the basis of the action." *Id.*

Turning to ADA Kellett's advice to law enforcement officers about their response to subpoenas, ADA Kellett notes that these subpoenas were served between May 15, 2008 and December 18, 2008, a period beyond the six-year statute of limitations. *Id.* at 2 n.3. Similarly, ADA Kellett notes that Mr. Filler is apparently alleging that she asserted a "legal privilege" on behalf of his ex-wife and the editor of

a local newspaper to prevent access to exculpatory material.  *Id.*  ADA Kellett argues that the accrual date would have to be the date he was not provided with the information he subpoenaed, which would, in her view, either be the date of her advice or the response date for the subpoenas.  *Id.*

ADA Kellett rejects as "specious" Mr. Filler's argument that the statute of limitations for the malicious prosecution claim controls his discovery claims, noting that he could "get to the end of the road on his claims about the subpoenas without establishing that [ADA Kellett] lacked probable cause for his prosecution, or that [she] acted with malice, or even that Plaintiff received a favorable termination of the criminal proceedings."  *Id.* at 3.

ADA Kellett also dismisses Mr. Filler's contention that he was unaware of the advice she had given because, as his defense lawyer's objection reveals, Attorney Pileggi knew about it in 2008 and his lawyer's knowledge is attributable to him.  *Id.* at 3-4.

Finally, to the extent that Mr. Filler is arguing that ADA Kellett's actions were a form of continuing tort, she cites the Maine Supreme Judicial Court's definition of a continuing tort as one where "no single incident in a chain of tortuous activity can fairly or realistically be identified as the cause of significant harm."  *Id.* at 4 (quoting *McLaughlin v. Superintending Sch. Comm. of Lincolnville*, 2003 ME 114, ¶ 23 n.6, 832 A.2d 782).  She contends by definition, the "continuing tort" theory does not apply here.  *Id.*

### c.    The Subpoenas and the § 1983 Action

In ADA Kellett's view, the only within-time claims of improper legal advice against her must be related to Mr. Filler's and Ms. Arguetta's divorce proceedings. *Id.* at 5. As such, since the advice was not given in the context of a criminal prosecution, ADA Kellett argues that it does not state a § 1983 claim. *Id.* at 5-6.

### d.    The Malicious Prosecution Claim and § 1983

Regarding Mr. Filler's § 1983 claim for malicious prosecution, ADA Kellett observes that the gravamen of this action is for her pre-indictment investigatory acts, not her post-indictment actions. *Id.* at 6-7. As such, ADA Kellett maintains Mr. Filler has "conflated the torts of wrongful imprisonment and malicious prosecution." *Id.* at 7 . The dividing line, she states, is "the commencement of a criminal case." *Id.* (quoting *Harrington v. City of Nashua*, 610 F.3d 24, 29 (1st Cir. 2010)). ADA Kellett asserts that in this case the accrual date for a false imprisonment claim would have been April 27, 2007, the date he was released from jail, and the six-year statute of limitations on that claim would have expired on April 27, 2013. *Id.* at 7-8. "Consequently, all of Plaintiff's claims related to Defendant's alleged improper conduct leading up to his bail hearing on April 27, 2007 are barred by the statute of limitations." *Id.* at 8.

ADA Kellett disputes Mr. Filler's contention that her decision to ignore certain evidence when initiating the prosecution against him falls outside the absolute immunity protections for prosecutors. *Id.* at 8-9.

### e.    The Defamation Claims and § 1983

31

Again, ADA Kellett contends that the allegedly defamatory statements of 2007 and 2008 fall beyond the six-year statute of limitations. *Id.* at 9. ADA Kellett describes as "seriously flawed" Mr. Filler's argument that the accrual date for his malicious prosecution claims should control the accrual date for his defamation claims. *Id.* at 9. ADA Kellett says that "[t]he elements of defamation are entirely distinct from the elements of malicious prosecution, as *they are entirely separate causes of action.*" *Id.* (emphasis in original). Finally, regarding the one in-time statement of January 16, 2009, ADA Kellett states that there is no allegation in the Amended Complaint that "any of the jurors in the second trial were aware of the January 16, 2009 statement, or that it bore any causal connection to his conviction." *Id.* at 10.

## B.    The Cavanaugh Motion to Dismiss

### 1.    ADA Cavanaugh's Position

#### a.    Anti-SLAPP Law

ADA Cavanaugh's first argument is that Mr. Filler's lawsuit must be dismissed because it constitutes a Strategic Lawsuit Against Public Participation within the meaning of 14 M.R.S. § 556, the so-called Anti-SLAPP law. *Cavanaugh's Mot.* at 2-8. ADA Cavanaugh says that Mr. Filler initiated three claims against him: (1) a claim under 42 U.S.C. § 1983 (Count Two), (2) a state law defamation claim (Count Seven), and (3) a state law negligent infliction of emotional distress claim (Count Eight). *Id.* at 2. He says that "[a]ll three claims relate to statements that [ADA Cavanaugh] allegedly made in February of 2014" and that at that time, ADA Cavanaugh was

32

"running for election for the Office of District Attorney for State of Maine Prosecutorial District No. 7 (Hancock and Washington Counties)." *Id.* at 2-3. ADA Cavanaugh says that Mr. Filler admits that all the statements were "allegedly made during a political speech or debate that Defendant was engaged in with regards to that election for public office." *Id.* at 3. ADA Cavanaugh says that this part of the Amended Complaint focuses on five statements:

1. The Board of Overseers Order regarding ADA Kellett was only about two pieces of evidence;
2. ADA Kellett had done nothing wrong;
3. Mr. Filler got away with criminal conduct against his wife because there was an evidentiary mistake;
4. The two pieces of evidence that were so important that ADA Kellett was sanctioned were never used in the second trial; and
5. Mr. Filler improperly blamed everyone [including ADA Kellett] but himself.

*Id.* At the time ADA Cavanaugh made these statements, Mr. Filler still had a petition for post-conviction review pending relating to his conviction for Assault. *Id.* ADA Cavanaugh says that he made these alleged statements "as part of political debate." *Id.*

ADA Cavanaugh argues that his allegedly defamatory statements constitute the exercise of his "right to petition" as that term is defined in the Anti-SLAPP law. *Id.* at 3-4; *see* 14 M.R.S. § 556 (protecting a person's "right to petition"). ADA Cavanaugh first contends that, because Mr. Filler had a petition for post-conviction review pending, ADA Cavanaugh's statements were connected to "an issue then under consideration or review by a judicial body" at the time the statements were made. *Id.* (quoting § 556). Next, ADA Cavanaugh states that his statements were

33

"reasonably likely to encourage consideration and debate of an issue by an executive body," namely the District Attorney's Office. *Id.* at 4-5 (quoting § 556). Third, ADA Cavanaugh argues that his statements were "'reasonably likely to enlist pubic participation' in an effort to bring that very issue to the forefront of public debate." *Id.* at 5 (quoting § 556). Finally, ADA Cavanaugh maintains that the statements "fall within the Anti-SLAPP statute's catchall provision of statements that fall within 'constitutional protection of the right to petition government.'" *Id.* (quoting § 556). Having noted that the statements were made during a political campaign, ADA Cavanaugh says they were protected by the First Amendment. *Id.* at 6-8.

### b.   Count Two and § 1983

ADA Cavanaugh next argues that the allegations in Count Two, which makes a claim under 42 U.S.C. § 1983, must fail because defamation, which underlies Count Two, does not give rise to § 1983 liability. *Id.* at 8-9. Citing *Paul v. Davis*,[5] ADA Cavanaugh observes that the United States Supreme Court has so held. *Id.* at 9-11. Finally, although Mr. Filler claims that ADA Cavanaugh's statements were connected with Mr. Filler's right to a fair trial, because the first trial had taken place more than five years before and the second trial almost three years before he made the comments, ADA Cavanaugh argues they could not have affected his right to a fair trial. *Id.* at 11-12.

### c.   Count Seven: The Defamation Count

---

[5]      424 U.S. 693 (1976).

ADA Cavanaugh recites the allegations in Count Seven, namely that he is alleged to have said:

> (1) That the Board of Overseers of the Bar Order regarding ADA Kellett was only about two pieces of evidence;
> (2) That ADA Kellett had done nothing wrong;
> (3) That Mr. Filler got away with criminal conduct against his wife because there was an evidentiary mistake; and
> (4) That two pieces of evidence that were so important that ADA Kellett was sanctioned were never used in the second trial.

*Id.* at 13 (citing *Am. Compl.* ¶ 658). ADA Cavanaugh argues that the first, second and fourth statements are not defamatory because they are not "of and concerning" Mr. Filler. *Id.* at 13-14. Furthermore, ADA Cavanaugh claims that these statements are "not defamatory in the sense that they are not the type of statement that would harm one's reputation or otherwise lower one's standing in the community." *Id.* at 14. ADA Cavanaugh argues that all the statements are merely an expression of opinion and therefore not defamatory. *Id.*

### d.   Count Eight: Negligent Infliction of Emotional Distress

ADA Cavanaugh asserts that Count Eight, the negligent infliction of emotional distress claim, fails to state a claim because he had no special duty or special relationship necessary to bring such an action. *Id.* at 14-15.

### e.   Rule 8(a)(2)

Lastly, ADA Cavanaugh urges the Court to dismiss the entire Amended Complaint on the ground that it violates the "short and plain statement" requirement of Federal Rule of Civil Procedure 8(a)(2). *Id.* at 15-17.

### 2.     Vladek Filler's Response[6]

### a.     The Anti-SLAPP Law

Mr. Filler first notes that the Anti-SLAPP law was enacted to assure that lawsuits brought not to vindicate the plaintiff's rights but to punish the defendant for exercising his constitutional right to petition the government were dismissed at an early stage before the defendant incurs great expense. *Pl.'s Cavanaugh Opp'n* at 3 (citing *Nader v. Me. Democratic Party*, 2012 ME 57, 41 A.3d 551). He argues that this lawsuit does not "fit into the category of baseless lawsuits for which Anti-SLAPP laws were originally promulgated." *Id.*

To support his position, Mr. Filler attached a transcript of a video posted on YouTube.com on March 1, 2014 of ADA Cavanaugh's Pat's Pizza remarks. *Id.* Attach. 1 (*Tr. of Video From YouTube Posted on March 1, 2014*) (*Cavanaugh Tr.*). Mr. Filler disputes the assertion that ADA Cavanaugh's statements were "petitioning activity." *Id.* at 4-5. He also states that ADA Cavanaugh's statements were devoid of any reasonable factual support. *Id.* at 6. Mr. Filler says that consistent with the Maine Supreme Judicial Court's requirements in *Nader*, he has made a prima facie showing that ADA Cavanaugh's statements were "devoid of reasonable factual support or arguable basis in law." *Id.* (citing *Nader*, 2012 ME 57, ¶ 36, 41 A.3d 551). In addition to the four statements cited by ADA Cavanaugh, Mr. Filler points out there was a fifth statement, namely that he "blamed everyone [including Kellett] but himself." *Id.* (citing *Am. Compl.* ¶ 554). Mr. Filler maintains that ADA Cavanaugh's

---

[6]     The page numbers in Mr. Filler's response do not correspond to the page numbers in the ECF system. The Court has cited the ECF page numbers.

"statements to the assembled citizens at Pat's Pizza conveyed a belief that Filler was a man who blamed women for the ills of the world and had gotten away with raping his wife." *Id.* at 8.  He also claims that he sustained damages as a consequence of ADA Cavanaugh's defamatory statements. *Id.* at 8-10.

### b.     Count Two: Defamation and § 1983

Mr. Filler contends that ADA Cavanaugh's statements to the public and the press, which he knew to be false when he made them, resulted in "the deprivation of his rights to a fair trial and fair post-trial proceedings." *Id.* at 11.  He points out that his petition for post-conviction review was pending at the time ADA Cavanaugh made these statements and that ADA Cavanaugh referenced the post-conviction proceeding in his remarks. *Id.*  He contends that the underlying constitutional violation alleged in this § 1983 count is the deprivation of his Sixth Amendment right to a fair trial. *Id.*  To support his contentions, he cites *Buckley*[7] for the proposition that a prosecutor's statements to the media are not entitled to absolute immunity. *Id.* at 11-12.

### c.     Count Seven: Defamation[8]

Contrary to ADA Cavanaugh's argument, Mr. Filler contends that ADA Cavanaugh's statement that he raped his wife and got away with it clearly meet each of the elements of defamation. *Id.* at 12-14.

### d.     Rule 8(a)(2)

---

[7]     509 U.S. 259, 277-78 (1993)

[8]     Mr. Filler voluntarily dismissed Count Eight: Negligent Infliction of Emotional Distress. *Pl.'s Cavanaugh Opp'n* at 14.

Finally, Mr. Filler argues that the Amended Complaint meets the pleading requirements of Rule 8(a)(2) and should not be dismissed. *Id.* at 15-17.

### 3.      ADA Cavanaugh's Reply

#### a.      Rule 8(a)(2)

In his reply, ADA Cavanaugh presses his argument that the Amended Complaint violates Rule 8(a)(2) and should be dismissed. *Cavanaugh's Reply* at 1-2.

#### b.      The Anti-SLAPP Law

ADA Cavanaugh observes that Mr. Filler has recognized "that [his] statements were made within the context of a public debate between candidates for the Office of District Attorney for Prosecutorial District Number 7." *Id.* at 2. ADA Cavanaugh accuses Mr. Filler of omitting "important dialogue" from the beginning and end of the video of the Pat's Pizza comments. *Id.* He represents that he made additional comments not included in the transcript. *Id.* at 2-3. ADA Cavanaugh reiterates his earlier point that his comments were directed toward a matter under judicial consideration and were important to a "legitimate hot button" issue in the context of a public debate in connection with the election of the new District Attorney. *Id.* at 3-4.

Once it is established that the comments fit within the statutory definition of "petitioning activity," ADA Cavanaugh says the burden shifts to Mr. Filler to prove that the statements "were devoid of any reasonable factual support." *Id.* at 4. He effectively says that one comment (that there were two, not three pieces of evidence at issue) is de minimis. *Id.* Also he notes that the transcript does not reveal that he

stated ADA Kellett had done "nothing wrong"; to the contrary, he told the audience that "[t]here had to be a more formal process and she failed to follow it, and she was held responsible for that." *Id.* at 4-5 (quoting *Cavanaugh Tr.* at3). ADA Cavanaugh also observes that Mr. Filler omitted words from the transcript that change the meaning of his remarks. *Id.* at 5. Regarding ADA Cavanaugh's statement that the two specific pieces of evidence were not used in the second trial, ADA Cavanaugh notes that Mr. Filler has never asserted those statements were false. *Id.* Finally, he says that his statement about Mr. Filler blaming his attorney is correct since Mr. Filler had filed a post-conviction review based on incompetency of counsel. *Id.* at 5-6. ADA Cavanaugh concludes that Mr. Filler "cannot meet his burden in establishing that the statements were devoid of any factual support (or even that some of them were actually said in the first place)." *Id.* at 6.

### c.   Defamation and § 1983

ADA Cavanaugh observes that in his opposition, Mr. Filler conceded that he may not maintain a defamation claim absent a showing of some underlying violation of a constitutionally protected right. *Id.* at 6. Noting that Mr. Filler's asserted constitutional violation is the right to a fair trial, ADA Cavanaugh states that as of the date of his comments, February 19, 2014, Mr. Filler had already had two public trials and the only matter then pending was a petition for post-conviction review. *Id.* at 6-7. ADA Cavanaugh makes the point that his February 19, 2014 comments could not have affected the fairness of the earlier trials. *Id.* at 7.

This leaves, he says, only the post-conviction petition as a basis for the § 1983 constitutional deprivation.   First, he says that he is unaware of a federal constitutional right to a state law post-conviction review process.   *Id.*   Second, to the extent Mr. Filler bases his claim on ADA Cavanaugh's "inflam[ing] the populace of Hancock County," the post-conviction review would be before a state judge, not a jury. *Id.*   Indeed, ADA Cavanaugh states that on information and belief, the post-conviction review has been granted by a Superior Court Justice.   *Id.*   In short, ADA Cavanaugh says there is no causal link between his statements and the disposition of the post-conviction review petition.   *Id.*

### d.   Defamation

Noting that Mr. Filler attached a copy of the transcript of ADA Cavanaugh's actual comments on February 19, 2014, ADA Cavanaugh says that the Court may consider the transcript in ruling on the motion to dismiss pursuant to Federal Rule of Civil Procedure 12(d).   *Id.* at 8.   ADA Cavanaugh notes several critical differences between the Amended Complaint and the transcript:

1) First, he says that contrary to the allegation in the Amended Complaint, he never said that ADA Kellett had done nothing wrong;
2) Second, he says contrary to the allegation in the Amended Complaint he never said that Mr. Filler got away with criminal conduct against his wife because of an evidentiary mistake; and
3) Third, he says contrary to the allegation in the Amended Complaint he never said that Mr. Filler blamed everyone [including Kellett] but himself.

*Id.*   Each of ADA Cavanaugh's actual statements is, according to ADA Cavanaugh, true and therefore may not provide a basis for a defamation claim.   *Id.* at 9.   ADA

Cavanaugh reiterates his earlier arguments about the remainder of his February 19, 2014 statements. *Id.* at 9-10.

## III.   LEGAL STANDARDS

### A.   Motion to Dismiss

When evaluating a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim upon which relief can be granted, a court must determine "whether, construing the well-pleaded facts of the complaint in the light most favorable to the plaintiffs, the complaint states a claim for which relief can be granted." *Ocasio–Hernández v. Fortuño–Burset,* 640 F.3d 1, 7 (1st Cir. 2011) (citing FED. R. CIV. P. 12(b)(6)).   A court need not assume the truth of conclusory allegations, and the complaint must state at least a "plausible claim for relief." *Ashcroft v. Iqbal,* 556 U.S. 662, 678-79 (2009).   However, "[n]on-conclusory factual allegations in the complaint must . . . be treated as true, even if seemingly incredible." *Ocasio–Hernández,* 640 F.3d at 12.   A court may not "attempt to forecast a plaintiff's likelihood of success on the merits." *Id.* at 12-13.

In 2007, the United States Supreme Court issued *Twombly*, which emphasized the need for a plaintiff's complaint to marshal sufficient facts to demonstrate a "plausible entitlement to relief." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 559 (2007).   It is noteworthy that *Twombly* is an antitrust case in which the plaintiff claimed a violation of § 1 of the Sherman Act. *Id.* at 548.   In stressing the need for plausibility, the *Twombly* Court observed that an antitrust action "can be expensive," *id.* at 558, and the Supreme Court worried that "the threat of discovery expense will

push cost-conscious defendants to settle even anemic cases before reaching" the summary judgment or trial stages.  *Id.* at 559.

Two years later, in *Iqbal*, the United States Supreme Court refined the dismissal standard:

> To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face.  A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.

556 U.S. at 678 (internal quotation marks and citations omitted).  The *Iqbal* Court suggested that courts when considering motions to dismiss could "chose to begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  Having isolated "the well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Id.*

In 2013, the First Circuit described the *Twombly* and *Iqbal* decisions as "watershed cases."  *García-Catalán v. United States*, 734 F.3d 100, 101 (1st Cir. 2013). The "plausibility standard," the First Circuit wrote, has become "the 'new normal' in federal civil practice."  *Id.* (quoting *A.G. v. Elsevier, Inc.*, 732 F.3d 77, 78-79 (1st Cir. 2013)).  The First Circuit explained that "[t]he plausibility inquiry necessitates a two-step pavane."  *Id.* at 103 (citing *Rodríguez-Reyes v. Molina-Rodríguez*, 711 F.3d 49, 53 (1st Cir. 2013)).  "First, the court must distinguish 'the complaint's factual allegations (which must be accepted as true) from its conclusory legal allegations (which need not be credited).'"  *Id.* (quoting *Morales-Cruz v. Univ. of P.R.*, 676 F.3d

42

220, 224 (1st Cir. 2012)).  "Second, the court must determine whether the factual allegations are sufficient to support 'the reasonable inference that the defendant is liable for the misconduct alleged.'"  *Id.* (quoting *Haley v. City of Boston*, 657 F.3d 39, 46 (1st Cir. 2011) (quoting *Iqbal*, 556 U.S. at 678)).

## B.   The Transcript of ADA Cavanaugh's February 19, 2014 Comments

In considering a motion to dismiss, a court "must take the allegations in the complaint as true and must make all reasonable inferences in favor of the plaintiffs." *Waterson v. Page*, 987 F.2d 1, 3 (1st Cir. 1993).  *See also Town of Barnstable v. O'Connor*, 786 F.3d 130, 141 n.12 (1st Cir. 2015) (discussing *Waterson*).   In his opposition to the motion to dismiss, Mr. Filler attached a transcript of ADA Cavanaugh's February 19, 2014 Pat's Pizza remarks.  *See Cavanaugh Tr.*

 "Ordinarily, of course, any consideration of documents not attached to the complaint, or not expressly incorporated therein, is forbidden, unless the proceeding is properly converted into one for summary judgment under Federal Rule of Civil Procedure 56."  *Waterson*, 987 F.2d at 3 (citing FED. R. CIV. P. 12(b)(6)).  At the same time, there are "narrow exceptions" for "documents the authenticity of which are not disputed by the parties; for official records; for documents central to plaintiffs' claim; or for documents sufficiently referred to in the complaint."  *Id.* at 3 (citations omitted). Here, as Mr. Filler attached the transcript and ADA Cavanaugh has made reference to it in his reply, the Court concludes that the transcript falls within the *Waterson* exception for documents the authenticity of which are not disputed by the parties and are central to Mr. Filler's claims against ADA Cavanaugh.

## IV.     DISCUSSION

### A.      The ADA Kellett Motion to Dismiss

#### 1.      The Statute of Limitations Issue

In Count One, Mr. Filler claims that ADA Kellett rendered legal advice to law enforcement officers Willey, Wycoff and Malloy and advised them not to comply with lawful defense subpoenas. *Am. Compl.* ¶ 522.[9]  The statute of limitations defense applies only to the legal advice claims involving officers Wilmot, Willey and Wycoff, not Malloy.  ADA Kellett isolated the time for her advice to the officers: (1) Officer Wilmot as between on or about May 15, 2008, when Officer Wilmot received the subpoena, and May 29, 2008, when Attorney Pileggi wrote to her complaining about her legal advice, *Kellett's Mot.* at 3; (2) May 15, 2008 as the date of the subpoena to Chief Wycoff, *id.* at 3; and (3) May 16, 2008 and December 18, 2008 as the dates for the two Willey subpoenas.  *Id.*  As such, she claims the six-year statute of limitations period would have expired on May 29, 2014, May 15, 2014, May 16, 2014, and December 18, 2014, respectively.  *Id.* at 4.  As the original Complaint was filed on January 9, 2015, ADA Kellett says these claims are time-barred.

#### a.      Maine Law: 14 M.R.S. § 752

---

[9]      The Court is confused about whether Mr. Filler is making a claim against ADA Kellett regarding her advice to Ellsworth Police Department Officer Chad Wilmot.  The body of the Amended Complaint contains a lengthy series of allegations that ADA Kellett gave improper legal advice to Officer Wilmot about whether to respond to a defense subpoena. *Am. Compl.* ¶¶ 210-26.  However, in Count One of the Amended Complaint, Mr. Filler lists officers Willey, Wycoff and Malloy as the officers who received advice not to respond to the subpoenas from ADA Kellett; he does not list Officer Wilmot. *Id.* ¶ 522.  Yet in her motion to dismiss, ADA Kellett discusses Officer Wilmot. *Kellett's Mot.* at 3.  Perhaps, the failure to list Officer Wilmot as a defendant in this part of Count One was simply an oversight.  The Court has addressed the statute of limitations issue on the assumption that Mr. Filler is making a claim that arises from ADA Kellett's advice to Officer Wilmot.  If he is not, counsel are free to bring this clarification to the attention of the Court.

### i.    Caselaw

The Maine general statute of limitations is six years and is directly applicable to all Mr. Filler's state claims.  14 M.R.S. § 752.  For the state tort claims, the Court looks to Maine state law for not only the length of the statute of limitations but for its accrual date.  "Maine courts generally consider an action accrued 'when a plaintiff received a judicially recognizable injury." *Erlich v. Ouellette, Labonte, Roberge & Allen, P.A.*, 637 F.3d 32, 35 (1st Cir. 2011) (quoting *McLaughlin*, 2003 ME 114, ¶ 9, 832 A.2d 782).  This rule applies "no matter when the injury was discovered." *Erlich*, 637 F.3d at 35.   "[A] tort claim 'accrues when "the plaintiff sustains harm to a protected interest."'" *Id.* (quoting *McLaughlin*, 2003 ME 114, ¶ 22, 832 A.2d 782) (quoting *Johnston v. Dow & Coulombe, Inc.*, 686 A.2d 1064, 1066 (Me. 1996)).  Thus, a tort claim accrues in Maine at "the point at which a wrongful act produces an injury for which a potential plaintiff is entitled to seek judicial vindication." *Williams v. Ford Motor Co.*, 342 A.2d 712, 714 (Me. 1975).

Maine has recognized a discovery rule, but only in restricted types of cases. *Erlich*, 637 F.3d at 35 ("few and . . . limited").  In *Anderson v. Neal*, 428 A.2d 1189 (Me. 1981), the Maine Supreme Judicial Court applied a discovery rule in an attorney malpractice action based on an allegedly negligent title search.  *Id.* at 1192.  It has applied the discovery rule to "foreign-object surgical malpractice," *Myrick v. James*, 444 A.2d 987, 996 (Me. 1982), to asbestos cases, *Bernier v. Raymark Indus., Inc.*, 516 A.2d 534, 544 (Me. 1986), and to a fiduciary providing financial services.  *Nevin v. Union Trust Company*, 1999 ME 47, ¶ 30, 726 A.2d 694.  In *Nevin*, the Maine Law

Court wrote that in *Anderson*, it held that "application of the discovery rule is appropriate only when there exists a fiduciary relationship between the plaintiff and defendant, the plaintiff must rely on the defendant's advice as a fiduciary, and the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship." *Id.* ¶ 25..

### ii.    Application to this Claim

The Court is extremely chary about expanding the discovery rule to fit the facts in this case. The First Circuit declined to do so in *Erlich*, noting that departures from the date of injury rule are rare in Maine, that the Maine Legislature has cabined those judicial holdings, and that departures from the accrual rules are better left to the state. 637 F.3d at 37. At the same time, as the *Erlich* Court noted, whether to expand the discovery rule involves "careful balancing between competing interests of fairness and repose." *Id.* As such, based on the unique circumstances in this case, and in the interest of fairness, the Court determines that the Maine Supreme Judicial Court would extend the *Anderson* discovery rule to Mr. Filler's claim against ADA Kellett.

First, *Anderson* involved an attorney-client relationship, one that the Law Court described as being "a fiduciary relationship of the highest confidence." *Anderson*, 428 A.2d at 1191. Mr. Filler did not have an attorney-client relationship with ADA Kellett, but the Maine Rules of Professional Conduct contain a separate section on the ethical obligations of a prosecutor. *See* M. R. PROF. CONDUCT 3.8. Specifically, Rule 3.8(b) states:

> The prosecutor shall . . . make timely disclosure in a criminal . . . case to counsel for the defendant . . . of the existence of evidence or information known to the prosecutor after diligent inquiry and within the prosecutor's possession or control, that tends to negate the guilt of the accused, mitigate the degree of the offense, or reduce the punishment.

The Commentary states that "public prosecutors carry special ethical duties: they have an obligation to seek justice, not just to convict." *Id.* cmt.(3). The Commentary observes that the prosecutor has an obligation "to assure protection of all citizens' rights, including those of criminal defendants." *Id.*

Given the special ethical duty of a prosecutor, a duty that extends to the defendant, including the Plaintiff in this case, the Court concludes that the Maine Supreme Judicial Court would extend this part of the *Anderson* fiduciary rationale to a prosecutor's relationship to a defendant when the prosecutor fails to make the timely disclosures Rule 3.8(b) mandates. The Court's conclusion is narrow. The Bar Rules do not create a traditional fiduciary relationship between a prosecutor and a defendant. After all, a prosecutor is prosecuting the defendant, attempting to prove a criminal case against him, and seeking to punish him with a sanction that may include prison. The Court does not view the Bar Rules as generally imposing a discovery rule for purposes of the statute of limitations against a prosecutor. Here, Mr. Filler has plausibly claimed that ADA Kellett violated the discovery obligations imposed upon her by the Bar Rules and that he did not and could not have discovered her ethical violation during the period within the statute of limitations. Thus, the plaintiff's failure to file an otherwise timely suit is directly linked to the prosecutor's failure to comply with her ethical obligations.

47

Second, the *Anderson* Court requires that the person rely on the advice of the fiduciary. *Anderson*, 428 A.2d at 1191-92. Here, the situation is different than the attorney-client relationship in *Anderson* because Mr. Filler was represented by counsel. However, his defense counsel necessarily had to rely on ADA Kellett's representations that the state of Maine had produced all exculpatory evidence, an obligation that ADA Kellett had under the Maine Rules of Professional Conduct. Moreover, when Attorney Peliggi attempted to subpoena the exculpatory records, ADA Kellett stymied his efforts by advising the law enforcement officers not to produce the records and not to respond to the subpoenas. In the case of the April 11, 2007 Ellsworth Police Department interview, Mr. Filler claims that in response to the Order of June 3, 2008, ADA Kellett told him that "only a brief [Ellsworth Police Department] incident report was available and witness statements did not exist," which turned out to be untrue. *Am. Compl.* ¶ 218. The Court concludes that in these circumstances the Maine Law Court would conclude that Mr. Filler relied on the word of ADA Kellett.

The final *Anderson* criterion is that the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship. *Anderson*, 428 A.2d at 1192. The *Anderson* Court found that "[u]nder such circumstances, fairness, justice and common sense dictate . . . that a cause of action . . . does not accrue until the plaintiff discovers, or reasonably should have discovered, the injury," and went on to note that:

> the Legislature has established a policy that encourages the judiciary to date accrual from the time of discovery in cases of professional

> malpractice.  In Title 14, Section 859 of the Maine Revised Statues, the Legislature mandated that a fraudulently concealed cause of action does not accrue until discovery of the cause of action.  Section 859 represents legislative recognition of the fact that dating accrual of an undiscoverable cause of action from the time of injury works an injustice on injured plaintiffs.

*Id.*  Once ADA Kellett produced what she represented was all the discoverable evidence in this case, Mr. Filler had few avenues to effectively challenge her representations.  Attorney Peliggi attempted to obtain the information by subpoena, but ADA Kellett countermanded the legal effectiveness of the subpoenas by advising the officers not to comply with them.   Attorney Peliggi obtained a court order requiring ADA Kellett to produce the records, but she ignored the court order and misrepresented the records that did exist.  It is true that Attorney Peliggi knew in some cases that ADA Kellett had given the subpoenaed officers legal advice not to respond to the subpoenas.  But Attorney Peliggi did not know what ADA Kellett knew about the non-disclosed evidence or even that it was actually exculpatory.  Furthermore, as just noted, when Attorney Peliggi obtained a court order requiring ADA Kellett to produce the records, she not only ignored the court order, but she also actively misrepresented the records that did in fact exist.

Based on the unique circumstances in this case and the closeness of its facts to the *Anderson* case, the Court concludes that the Maine Supreme Judicial Court would apply the discovery rule to Mr. Filler's state law claims against ADA Kellett, and as Mr. Filler did actually discover the exculpatory evidence within the statute of limitations period, the Court concludes that the state law claims are not time barred.

### b.        Federal Law: 42 U.S.C. § 1983

### i.     Caselaw

Regarding Mr. Filler's claims under 42 U.S.C. § 1983, § 1983 does not have a "built-in statute of limitations." *McIntosh v. Antonino*, 71 F.3d 29, 33 (1st Cir. 1995). Accordingly, courts borrow the limitation period from state law for personal injury claims. *Wallace v. Kato*, 549 U.S. 384, 387 (2007).    Thus, the six year statute of limitations period found in Maine law is applicable to Mr. Filler's § 1983 claims. To the extent that Mr. Filler is making discrete claims about events that took place before January 9, 2009, the claim is barred by 14 M.R.S. § 752 unless the claim did not accrue until after January 9, 2009.

Unlike the length of a statute of limitations, which is governed by state law, "the accrual date of a § 1983 cause of action is a question of federal law that is *not* resolved by reference to state law." *Id.* at 388 (emphasis in original). The "standard rule" is "that [accrual occurs] when the plaintiff has a complete and present cause of action," that is "when the plaintiff can file suit and obtain relief." *Id.* (internal punctuation and citations omitted).  In other words, the accrual occurs "when the plaintiff knows, or has reason to know of the injury on which the action is based." *Randall v. Laconia, NH*, 679 F.3d 1, 6 (1st Cir. 2012) (quoting *Gorelik v. Costin*, 605 F.3d 118, 122 (1st Cir. 2010)).   Federal law has a discovery rule, which "allow[s] a claim to accrue when the litigant first knows *or with due diligence should know* facts that will form the basis for an action." *Id.* at 7 (emphasis in original) (internal punctuation and citation omitted).

Finally, federal law recognizes equitable tolling, a "rare remedy to be applied in unusual circumstances, not a cure-all for an entirely common state of affairs." *Neves v. Holder*, 613 F.3d 30, 36 (1st Cir. 2010). To qualify a litigant "bears the burden to establishing two elements: (1) that he has been pursuing his rights diligently, and (2) that some extraordinary circumstance stood in his way." *Id.* (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)).

### ii.    Application to the § 1983 Claim

Applying the facts in this case to the federal discovery rule, the Court concludes that Mr. Filler filed this lawsuit within six years of the date of accrual, when he first knew or with due diligence should have known the facts that form the basis of his § 1983 action, and in any event, he would qualify for equitable tolling of the statute. Accordingly, the Court concludes that Mr. Filler's § 1983 claim against ADA Kellett is not time-barred.

### 2.    Absolute Prosecutorial Immunity and Legal Advice

### a.    Caselaw

Immunity is "defined by the functions it protects and serves, not by the person to whom it attaches." *Acevedo-Garcia v. Vera-Monroig*, 204 F.3d 1, 8 (1st Cir. 2000) (citation omitted). "[T]he official seeking absolute immunity bears the burden of showing that such immunity is justified for the function in question." *Burns v. Reed*, 500 U.S. 478, 486 (1991). There is a "presumption . . . that qualified rather than absolute immunity is sufficient to protect government officials in the exercise of their duties." *Id.* at 486-87. Prosecutors are absolutely immune from suit for monetary

damages under § 1983 for conduct that is "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976).

In *Buckley*, following *Imbler*, the Supreme Court reiterated the view that absolute immunity does not extend to all actions by a prosecutor. The *Buckley* Court refused to accord absolute immunity to "[a] prosecutor's administrative duties and those investigatory functions that do not relate to an advocate's preparation for the initiation of a prosecution or for judicial proceedings." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993). The Court further observed that it "did not attempt to describe the line between a prosecutor's acts in preparing for those functions, some of which would be absolutely immune, and his acts of investigation or 'administration,' which would not." *Id.* at 270.

The caselaw provides some examples of conduct that is absolutely immune and conduct that is not. In *Burns*, the Supreme Court concluded that prosecutors are not entitled to absolute immunity for the advice they give the police, but they are entitled to absolute immunity for participating in a probable cause hearing. 500 U.S. at 489-96. In *Buckley* itself, the Supreme Court rejected the plaintiff's argument that absolute immunity extended "only to the act of initiation itself and to conduct occurring in the courtroom." *Buckley*, 509 U.S. at 272. It restated *Imbler*'s conclusion that absolute immunity includes "actions preliminary to the initiation of a prosecution and actions apart from the courtroom." *Id.* (quoting *Imbler*, 424 U.S. at 431 n.33). The *Buckley* Court distinguished between actions a prosecutor takes as an advocate, ranging from evaluating evidence for prosecution to the prosecution itself,

and actions a prosecutor takes as an investigator, such as "searching for the clues and corroboration" and planning and executing "a raid on a suspected weapons cache." *Id.* at 273-74.

In *Guzman-Rivera v. Rivera-Cruz*, the First Circuit explained that the "prosecutorial nature of an act does not spread backwards like an inkblot, immunizing everything it touches." 55 F.3d 26, 29 (1st Cir. 1995). The First Circuit quoted *Burns* as stating: "Almost any action by a prosecutor, including his or her direct participation in purely investigative activity, could be said to be in some way related to the ultimate decision whether to prosecute, but we have never indicated that absolute immunity is that expansive." *Id.* at 29-30 (quoting *Burns*, 500 U.S. at 495). In broad terms, if the prosecutor is prosecuting, there is absolute immunity; if the prosecutor is investigating or policing, there is not. *Id.* at 29 (stating "[a]bsolute immunity protects the prosecutor's role as advocate for the State, and not his or her roles as an administrator or investigator") (punctuation and citation omitted); *see also Celia v. O'Malley*, 918 F.2d 1017, 1020 (1st Cir. 1990) (same).

The line between absolute and qualified immunity can be subtle. ADA Kellett is absolutely immune for her failure to comply with *Brady* obligations, even if Mr. Filler could demonstrate that her failure to do so was in bad faith. *Campbell v. Maine*, 787 F.2d 776, 778 (1st Cir. 1986) ("*Imbler* rejected a suggestion that the prosecutor's immunity be reduced to a qualified one when he is alleged to have withheld exculpatory information"); *Donovan v. Fowle*, 762 F. Supp. 2d 186, 199 (D. Me. 2010).

Yet under *Buckley*, 509 U.S. at 271 and *Burns*, 500 U.S. at 495, providing legal advice to the police is not a function closely associated with the judicial process. The question narrows to whether providing legal advice to the police is a function closely associated with the judicial process when the advice is about producing potentially exculpatory evidence. The United States Supreme Court has adopted a "functional approach" to this question. *Rehberg v. Paulk*, 132 S. Ct. 1497, 1503 (2012); *Burns*, 400 U.S. at 486. This approach suggests that the Court should focus not just on the timing but also on the function of the advice. The *Buckley* Court applied this "function test" when it explained that "a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards. Even after that determination . . . a prosecutor may engage in 'police investigative work' that is entitled to only qualified immunity." *Buckley*, 509 U.S. at 274 n.5.

The Court uneasily concludes that ADA Kellett is not entitled to absolute immunity for the legal advice she gave the law enforcement officers about how to respond to defense subpoenas. Turning to *Buckley's* application of the "functional approach" to police investigative work after the determination of probable cause, the Court considered ADA Kellett's advice to Officer Wilmot of the Ellsworth Police Department; once Officer Wilmot was subpoenaed, he contacted ADA Kellett for her advice on how he should respond. There is no evidence that in giving Officer Wilmot legal advice, ADA Kellett was acting as the lawyer for the Ellsworth Police Department and, in fact, no evidence that the Ellsworth Police Department investigation was even related directly to the charges ADA Kellett was prosecuting

54

against Mr. Filler.  If Officer Wilmot had questioned the Ellsworth Police Department attorney about how to respond to the subpoena, and if the Ellsworth Police Department attorney had given the same advice that ADA Kellett gave, namely to ignore the subpoena and refuse to produce the evidence, there would be no plausible claim for immunity on the part of the private lawyer.  The same can be said, but with less force, of the other subpoenas because at least those were directly related to the ongoing investigation of the charges being prosecuted.  However, because this advice regarding the subpoenas was to law enforcement officers, as part of an ongoing investigation, the scales tip against absolute immunity.

The Court's unease is based on its recognition that there is a good reason for absolute prosecutorial immunity, a principle that Chief Judge Learned Hand described as "a balance" of "evils."  *Van de Kamp v. Goldstein*, 555 U.S. 335, 340 (2009) (quoting *Gregoire v. Biddle*, 172 F.2d 579, 581 (2d Cir. 1949)).  The *Van de Kamp* Court explained the concern that with some frequency "a defendant often will transform his resentment at being prosecuted into the ascription of improper and malicious actions to the State's advocate."  *Van de Kamp*, 555 U.S. at 342 (quoting *Imbler*, 424 U.S. at 425).  One worry is that "[c]onstant vulnerability to vexatious litigation would give rise to the 'possibility that [the prosecutor] would shade his decisions instead of exercising the independence of judgment required by his public trust.'"  *Rehberg,* 132 S. Ct. at 1504 (quoting *Imbler*, 424 U.S. at 423).  The Court is also sensitive to the fact that by refusing to dismiss this case, Mr. Filler will have the

right to discovery, which can be an invasive and unpleasant business for anyone, especially a prosecutor being civilly sued by a former defendant.

At least the evil of vexatious and frivolous lawsuits is not a concern in this case because ADA Kellett admitted to Justice Ellen Gorman of the Maine Supreme Judicial Court that she "violated the rights of the defendant; and violated . . . [Bar Rule] 3.7(i)(2) (failing to comply with a public prosecutor's duty to make timely disclosure to the defense of exculpatory evidence)." *Pl.'s Cavanaugh Opp'n* Attach. 2 at 18-19 (*J. Board of Overseers of the Bar v. Mary N. Kellett, Esq.* (Jul. 16, 2013)). Indeed, Justice Gorman noted that "[t]his case is the first disciplinary proceeding ever filed with the Court by the Overseers of the Bar against a member of Maine's prosecutorial bar that is based on the prosecutor's representation of the State." *Id.* at 21-22.

With some hesitancy, the Court concludes that ADA Kellett is not entitled to absolute immunity regarding the legal advice she rendered to Officers Wilmot, Willey, Wycoff and Malloy.

### 3.    Absolute Prosecutorial Immunity and the § 1983 Malicious Prosecution Claim

#### a.    Caselaw

In Count One of the Amended Complaint, Mr. Filler asserts that ADA Kellett committed the tort of malicious prosecution and thereby deprived him of his right to be free from arrest and imprisonment under the Fourth and Fourteenth Amendments absent probable cause. *Am. Compl.* ¶¶ 534-36. In *Imbler*, the United States Supreme Court reiterated the long-held conclusion that under the common law, prosecutors

56

were absolutely immune from civil lawsuits for malicious prosecution.  424 U.S. at 421-24 ("The common law rule of immunity is thus well settled").  The *Imbler* Court next addressed whether absolute immunity for malicious prosecution should extend to § 1983 actions and it concluded that it does.  *Id.* at 424 ("We now must determine whether the same considerations of public policy that underlie the common-law rule likewise countenance absolute immunity under § 1983.  We think they do").

In *Harrington v. City of Nashua*, 610 F.3d 24, 30 (1st Cir. 2010), the First Circuit discussed whether a "malicious prosecution claim can embody a Fourth Amendment violation and, thus, ground a cause of action under § 1983."  *Id.* at 30.  The *Harrington* Court did not decide the issue.  *Id.* ("[W]e do not propose to resolve that uncertainty today").  But it proceeded on that assumption.  *Id.*  In 2012, the First Circuit again discussed the issue in *Moreno-Medina v. Toledo*, 458 Fed. Appx. 4 (1st Cir. 2012).  Again the First Circuit "assume[d], without deciding, 'that malicious prosecution can embody a Fourth Amendment violation and, thus, ground a cause of action under § 1983.'"  *Id.* at 7 (quoting *Harrington*, 610 F.3d at 30).  But the First Circuit went a step further and set forth what a plaintiff in the First Circuit must prove to state a malicious prosecution claim under § 1983:

> In this circuit, a plaintiff seeking to bring a malicious prosecution claim under § 1983 must do more than simply satisfy the elements of the common law tort of malicious prosecution.  The plaintiff must "show a deprivation of liberty, pursuant to legal process, that is consistent with the concept of a Fourth Amendment seizure."

*Id.* (quoting *Harrington*, 610 F.3d at 30) (internal citations omitted).

### 4.    Application to the Malicious Prosecution § 1983 Allegations in the Amended Complaint

Based on the tealeaves from the First Circuit, the Court concludes that Mr. Filler may state a claim for malicious prosecution under § 1983. However, his claim must be strictly circumscribed to allege a "constitutional violation" that "lies in the 'deprivation of liberty accompanying the prosecution' rather than the prosecution itself.'" *Moreno-Medina*, 458 Fed. Appx. at 7 (quoting *Britton v. Maloney*, 196 F.3d 24, 29 (1st Cir. 1999) (quoting *Gallo v. City of Philadelphia*, 161 F.3d 217, 222 (3d Cir. 1998)). The First Circuit has further limited such a claim to "some *post-arraignment* deprivation of liberty, caused by the application of legal process, that approximates a Fourth Amendment seizure." *Id.* (quoting *Nieves*, 241 F.3d at 54) (emphasis in *Nieves*).

The First Circuit has made it clear that the trigger for a malicious prosecution claim under § 1983 is a seizure "*pursuant to legal process,*" which it has noted is generally "an arrest warrant" or "a subsequent charging document." *Nieves*, 241 F.3d at 54 (emphasis in original). When a person is subject to a warrantless arrest, which antedates any legal process, the arrest "cannot be part of the Fourth Amendment seizure" upon which a § 1983 claim is based. *Id.* In addition, not every obligation incident to a criminal charge amounts to a Fourth Amendment claim. *Moreno-Medina*, 458 Fed. Appx. at 7-8. Merely attending court proceedings, being required to notify a court of a change of address, or refraining from criminal conduct are not sufficient. *Id.* at 7. A plaintiff must allege that he was forced to "'yield' to the assertion of authority over him and thereby [had] his liberty restrained." *Id.* at 8 (quoting *Britton*, 196 F.3d at 30). The *Moreno-Medina* Court gives "being detained or

58

having his travel restricted" as examples of a sufficient Fourth Amendment liberty restraint.  *Id.* at 8.

Here, the Amended Complaint alleges:

On April 26, 2007, Plaintiff was arrested and charged with gross sexual assault.

*Am. Compl.* ¶ 2.  The Amended Complaint later explains:

[On] April 26, 2007, Plaintiff was confronted at his house and taken outside by Chief Guy Wycoff and DA Detective Stephen McFarland and told by McFarland the only chance Plaintiff had to save himself was to immediately talk to him.

. . . .

When Plaintiff enthusiastically agreed to talk with McFarland and Wycoff but asked for his lawyer Daniel Pileggi to be present, McFarland immediately instructed Wycoff to place Plaintiff in handcuffs and under arrest.

. . . .

Plaintiff was charged and arrested on a claim that he raped his wife on April 6, 2007.

*Id.* ¶¶ 163-65.

The Amended Complaint alleges that Mr. Filler was subject to a warrantless arrest on April 26, 2007.  *Id.* ¶ 543.  The Amended Complaint alleges that he was "held without bail."  *Id.* ¶ 169.  The Amended Complaint further alleges that a bail hearing was held the following day and Mr. Filler was released on bail but forced to live in a motel from April 27, 2007 until May 1, 2007 after posting bail.  *Id.* ¶¶ 171, 181-82.  The bail conditions included a strict curfew and a waiver of his Fourth Amendment rights against unreasonable search and seizure.  *Id.* ¶ 182.

59

The exact sequence of critical events as alleged in the Amended Complaint is inexact.  Maine Rule of Unified Criminal Procedure 3(a) allows the State to initiate a criminal case by complaint.  *See* M.R.U. CRIM. P. 3(a).  Based on the allegations in the Amended Complaint, the Court infers that the state of Maine initiated a criminal charge against Mr. Filler on April 26, 2007, either just before or just after his arrest, and that pursuant to that complaint and arrest (or more likely arrest and then complaint), Mr. Filler was jailed overnight, brought before a judge the next day, and released on bail with bail conditions that imposed some curfew and other restrictions.  In any event, once he was arrested, he was formally charged and bailed with some significant conditions.  These allegations are enough to survive a motion to dismiss.

### 5.     Allegations Sufficient to State a Malicious Prosecution Claim

In her motion to dismiss, ADA Kellett contends that Mr. Filler has failed to state a tort claim under Maine's malicious prosecution law.  First, she asserts that to the extent the arrest was before the commencement of a criminal action, Mr. Filler's remedy is one of false imprisonment, not malicious prosecution.  *Kellett's Reply* at 7.  She is correct as far as she goes.  *Harrington*, 610 F.3d at 29 ("[T]he commencement of a criminal case by the institution of legal process marks the dividing line between claims of false imprisonment and claims of malicious prosecution").  But as the Court just reviewed, the state of Maine did initiate a criminal prosecution against Mr. Filler on April 27, 2007 and immediately thereafter imposed restraints on his liberty by the imposition of significant bail conditions imposed and, based on these facts, Mr. Filler's malicious prosecution states a claim.

ADA Kellett raises one clearly meritorious issue.  Mr. Filler claims that when ADA Kellett initiated the criminal complaint and later presented the case to a grand jury, she elected to ignore certain facts and to emphasize others.  *Pl.'s Kellett Opp'n* at 13-14.  ADA Kellett's consideration of the evidence, her decision whether to charge the case, what charges to present to the grand jury, and how to prosecute the charges are all "intimately associated with the judicial phase of the criminal process."  *Imbler*, 424 U.S. at 430.  ADA Kellett is entitled to absolute immunity for this aspect of Mr. Filler's claim.  However, this part of the claim is buried within other allegations in Count One and the Count as a whole is not amenable to dismissal.

### a.    The Elements of the Malicious Prosecution Claim

ADA Kellett maintains that Mr. Filler may not proceed with his malicious prosecution claim because one of the alleged crimes, an assault, was not terminated in his favor.  *Kellett's Mot.* at 11-12.  ADA Kellett correctly states that one of the elements of a malicious prosecution claim is that the plaintiff must have received a favorable termination of the proceedings.  *Id.* (citing *Trask v. Devlin*, 2002 ME 10, ¶ 11, 788 A.2d 179).  However, she cites no authority for the proposition that in order to proceed with a malicious prosecution action all of the criminal charges must be resolved in favor of the plaintiff as opposed to only the proceedings the plaintiff contends were maliciously filed.  *Id.*  In his response, Mr. Filler disputes ADA Kellett's contention but cites no case that stands for the proposition that "proceedings" as used by the Maine Supreme Judicial Court may mean fewer than all of the crimes prosecuted.  *Pl.'s Kellett Opp'n* at 15.

The Court rejects ADA Kellett's motion on this issue as inadequately briefed. It may be that in order to proceed with a malicious prosecution claim, a plaintiff must demonstrate that all of the criminal actions filed as part of the same charging instrument were favorably terminated in the plaintiff's favor. Yet, it may also be that circumstances like those in this case would allow a malicious prosecution claim.

According to the Amended Complaint, ADA Kellett prosecuted Mr. Filler for five counts of gross sexual assault charged as Class A crimes, the next to the highest crime classification under Maine law.[10]  *Am. Comp.* ¶ 55; *see* 17-A M.R.S. § 253(1). Under Maine law, a person convicted of a Class A crime is subject to a sentence not to exceed thirty years.   17-A M.R.S. § 1252(2)(A).   The first trial resulted in Mr. Filler's acquittal of four of the five gross sexual assault charges and the second trial in his acquittal of the fifth gross sexual assault charge.  *Am. Compl.* ¶¶ 57, 68.  In addition to the five gross sexual assault charges, ADA Kellett prosecuted Mr. Filler for two assaults, each Class D crimes under Maine law.  *Id.* ¶ 55.  A Class D assault is a misdemeanor under Maine law and the maximum statutory sentence is less than one year.  17-A M.R.S. § 1252(2)(D).  Mr. Filler was initially convicted of two assaults, but upon retrial was convicted of only one.  *Id.* ¶ 68.

Here, ADA Kellett is blankly asserting that a prosecution may not as a matter of law be malicious despite the fact that five extremely serious charges with a potential penalty of decades in prison were terminated in favor of the plaintiff, leaving only two misdemeanors, one of which was also terminated in his favor.  On

---

[10]     Maine law provides for a potential life sentence for murder.  17-A M.R.S. § 1251.

its face, the Court has qualms about whether ADA Kellett is correct when she maintains that the law does not recognize the tort of malicious prosecution in these circumstances.  However, neither party provided any authority at all on this point; the Court will not grant the motion to dismiss because it is ADA Kellett's burden to convince the Court she is entitled to relief.

### 6.   The Statute of Limitations and the Defamation Claim Under § 1983

ADA Kellett contends that three of the allegedly defamatory statements charged in Count Two of the Amended Complaint were beyond the six-year statute of limitations.  *Kellett's Mot.* at 12-13.  Specifically, she says that the April 27, 2007 "Affidavit in Support of Arrest Warrant," the April 27, 2007 mug shot of the Defendant, and the September, 2008 false statement to Dr. Lorenz, the guardian ad litem, all took place before January 9, 2009, six years before the date the original complaint was filed.  *Id.*  As noted above, in *Nevin*, the Maine Law Court wrote that in *Anderson*, it held that "application of the discovery rule is appropriate only when there exists a fiduciary relationship between the plaintiff and defendant, the plaintiff must rely on the defendant's advice as a fiduciary, and the cause of action was virtually undiscoverable absent an independent investigation that would be destructive of the fiduciary relationship."  *Nevin*, 1999 ME 47, ¶ 25, 726 A.2d 694.

Without reaching whether any of these statements are actually defamatory, the Court concludes that the six-year statute of limitations does not bar Mr. Filler's defamation claim regarding ADA Kellett's September 2008 statements to Dr. Lorenz; however, the Court finds that her provision to the press of the Affidavit in Support of

Arrest Warrant and Mr. Filler's mug shot are barred by the six-year statute of limitations.

Regarding the Lorenz statements, ADA Kellett had an ethical obligation to Mr. Filler similar to a fiduciary relationship, Mr. Filler was required to rely on ADA Kellett to fulfill her ethical obligations, and, although the record is less than clear on this issue, it appears that Mr. Filler had no way to discover that ADA Kellett had even spoken to Dr. Lorenz, much less that she had given Dr. Lorenz inaccurate information.

The same may not be said of the mug shot and the "Affidavit in Support of Arrest Warrant." Mr. Filler alleges that the mug shot appeared on the front page of the Bangor Daily News on April 28-29, 2007; therefore, it was clearly discoverable when it was published. *Am. Compl.* ¶ 545. Mr. Filler also maintains that the "alleged affidavit provided to the press included false information including that Filler had forced non-consensual anal sex with his wife on April 6, 2007, and that Arguetta kept a diary of Filler's assaultive behavior." *Id.* ¶ 544. He contends that this information "was prominently and repeatedly displayed on television and in the newspapers." *Id.* ¶ 545.

Applying the rulings of the Maine Supreme Judicial Court, the Court concludes that Mr. Filler's defamation claims for ADA Kellett's statements to Dr. Lorenz in September, 2008 are not time-barred. However, providing the press the "Affidavit in

Support of Arrest Warrant" and a mug shot of Mr. Filler on April 27, 2007 are time-barred.[11]

### 7.    The Defamation Action and § 1983

Citing *Paul v. Davis*, 424 U.S. 963 (1976), ADA Kellett contends that Mr. Filler may not bring a defamation action under § 1983. *Kellett's Mot.* at 14. Mr. Filler responds citing *Buckley* and arguing that ADA Kellett's statements to the press are entitled only to qualified immunity because they affected his constitutional right to a fair trial. *Pl.'s Kellett Opp'n* at 16-17.

It is a close question as to whether Mr. Filler may bring a § 1983 action for defamation. In *Paul v. Davis*, addressing a § 1983 claim that state officials had defamed the plaintiff and violated his due process rights under the Fourteenth Amendment, the United States Supreme Court observed that the "Fourteenth Amendment" is not a "font of tort law to be superimposed on whatever systems may

---

[11]     Mr. Filler argues that the continuing tort doctrine applies to, *inter alia*, all defamatory statements made by ADA Kellett before the Plaintiff's January 15, 2009 conviction. *Pl.'s Kellett Opp'n* at 7 n.5. Specifically, Mr. Filler explains that the Maine Law Court has held that the continuing tort doctrine "may be applied when no single incident in a chain of tortuous activity can fairly or realistically be identified as the cause of significant harm. In such cases, the breach of duty is regarded as a single continuing wrong that terminates when the exposure to the harm terminates." *Id.* (quoting *McLaughlin v. Superintending Sch. Comm. Of Lincolnville*, 2003 ME 114, ¶ 23 n.6, 832 A.2d 782) (internal quotations and citations omitted). Mr. Filler argues that "at the time they were occurring, the import of each and every [violation] was not necessarily apparent. . . . [L]ike that in *McLaughlin*, where no single incident by Kellett can fairly or realistically be identified as the cause of significant harm . . . his deprivation of liberty occurred at the time of his January 15, 2009 conviction." *Id.*

The Court disagrees. ADA Kellett notes that a typical example of a continuing tort would be where a plaintiff is exposed to toxins in the environment over a long period of time, making it impossible to identify which exposure caused the harm. *Kellett's Reply* at 4. As Mr. Filler can identify each specific instance of harm, the continuing tort doctrine does not apply. *Id.* Moreover, this Court has held that "[c]ourts almost universally decline to apply the doctrine [of continuing tort] in defamation cases." *Knowlton v. Shaw*, 708 F. Supp. 2d 69, 77 (D. Me. 2010) (citing *Murphy v. Maine*, No. CV-06-62-BW, 2006 WL 2514012, at *5 (D. Me. Aug. 29, 2006)). "[E]ach separate defamatory statement itself constitutes a separate and distinct cause of action." *Murphy*, 2006 WL 2514012, at *5.

already be administered by States." 424 U.S. at 701. The *Paul* Court worried that if such a claim were recognized, it would be "hard to perceive any logical stopping place." *Id.* at 698-99. The Supreme Court rejected the notion that "[t]he words 'liberty' and 'property' as used in the Fourteenth Amendment . . . single out reputation as a candidate for special protection over and above other interests that may be protected by state law." *Id.* at 701. The Court noted that "the weight of our decisions establishes no constitutional doctrine converting every defamation by a public official into a deprivation of liberty within the meaning of the Due Process Clause of the Fifth or Fourteenth Amendment." *Id.* at 702. It stated that the Supreme Court had "never held that the mere defamation of an individual, whether by branding him disloyal or otherwise, was sufficient to invoke the guarantees of procedural due process absent an accompanying loss of government employment." *Id.* at 706.

Following *Paul*, the First Circuit has warned against attempts to use § 1983 to federalize the state tort system. *Harrington v. City of Nashua*, 610 F.3d 24, 33 (1st Cir. 2010) ("Such a wholesale importation of garden-variety tort concepts into the jurisprudence of § 1983 would trivialize the statute"). Thus, in *Pendleton v. Haverhill*, 156 F.3d 57 (1st Cir. 1998), the First Circuit wrote that "defamation, even from the lips of a government actor, does not in and of itself transgress constitutionally assured rights." *Id.* at 62-63; *Wojcik v. Mass. State Lottery Comm'n*, 300 F.3d 92, 102-03 (1st Cir. 2002). It is questionable whether Mr. Filler's claim that the constitutional right that ADA Kellett infringed – his right to a fair trial – is a

viable distinction from a long line of federal authority rejecting reputational injury, standing alone, as a proper basis for a § 1983 lawsuit.

In response, Mr. Filler cites *Buckley* and its progeny for the proposition that a prosecutor is entitled only to qualified immunity for false statements made during a press conference.  509 U.S. at 277-78.  Logically, if a plaintiff is not entitled to bring a § 1983 claim based on defamation to begin with, the Supreme Court would not have reached the question of whether a prosecutor is entitled to absolute or qualified immunity for making false statements at a press conference.  Unfortunately, ADA Kellett did not respond to this part of Mr. Filler's argument so the parties' arguments have passed like ships in the night and the Court has not had the benefit of a point-counterpoint.

The Court turns to *Buckley*.  In *Buckley*, the plaintiff initiated a lawsuit based on several state tort theories and based on a § 1983 allegation that among other things, the defendants violated his right to a fair trial.  *Buckley*, No. 88 C 1939, 1989 U.S. Dist. LEXIS 6689, at *1 (N.D. Ill. Jun. 9, 1989).  The *Buckley* plaintiff claimed that the state prosecutors engaged in specific acts "to prejudice and defame plaintiff . . . and in so doing defendants allegedly violated plaintiff's rights to due process and fair trial by causing the jury to dead-lock rather than acquit which in turn caused him to be incarcerated for an additional two years."  *Id.* at *19-20.

In the Seventh Circuit opinion in *Buckley*, Judge Easterbrook addressed whether an allegation of defamation by prosecutors could state a § 1983 claim:

> One possibility is that accusations of crime cause infamy.  *Paul v. Davis*, 424 U.S. 693 (1976), holding that the Constitution does not deal with

67

libel or slander by a public official, means that Fitzsimmons' announcement, standing alone, is not actionable under § 1983. Some other injury is essential to create a constitutional wrong. Buckley maintains that the press conference created additional injury because a defendant with a blackened reputation will have trouble obtaining release on bail or a fair trial . . . .

This approach avoids the rock of *Paul* only by falling into the whirlpool of *Imbler*. For if the injury lies in an alteration of the probabilities at trial, the remedy lies in the criminal process rather than in damages litigation. Buckley was entitled to a decision on bail made on the record, as opposed to a decision made on the basis of prejudicial publicity. If the judge denied bail or set it too high, Buckley was entitled to appeal. Similarly, if the press conference poisoned some minds against him, Buckley was still entitled to a voir dire adequate to find unbiased jurors. If such a venire could not be found in DuPage County, Buckley was entitled to a change of venue -- or to dismissal of the charges against him. (citations omitted). If the judges who conducted the bail hearing and the trial did their jobs properly, they eliminated any constitutionally impermissible effects of the press conference. If they could not do so, then Buckley was entitled to the best remedy of all: dismissal of the prosecution.

Stating the constitutional wrong as an increase in the probability of an unfair trial demonstrates that absolute immunity applies to the announcement of the indictment. Given *Paul*, there was no (constitutional) injury independent of the indictment and trial.

*Buckley*, 919 F.3d 1230, 1242-43 (7th Cir. 1990). In the United States Supreme Court's review of the Seventh Circuit's opinion, Justice Stevens began with an important caveat: "[W]e make two important assumptions about the case: first, that petitioner's allegations are entirely true; and, second, that they allege constitutional violations for which § 1983 provides a remedy." *Buckley*, 509 U.S. at 261. If, as a matter of law, a defamation claim against a prosecutor grounded on the denial of a fair trial could not state a § 1983 claim, the Supreme Court would no doubt have said so in *Buckley* and avoided the absolute immunity question altogether.

Applying Judge Easterbrook's analogy to Greek mythology, Mr. Filler's allegation that ADA Kellett's defamatory comments deprived him of a fair trial avoids the "rock of *Paul*," or in other words, it states a potential claim under § 1983 and narrowly skirts the *Imbler* whirlpool by being statements to the press entitled to only qualified immunity under *Buckley*.

The Court declines to dismiss the § 1983 claims against ADA Kellett based on *Buckley*. However, the Court may well revisit this issue as the case progresses and it is possible that the Court may reach a different result once the issue is more fully briefed.

**B.    The Cavanaugh Motion to Dismiss**

   **1.    The Anti-SLAPP Statute Claim**

      **a.    The Statute**

Maine's anti-SLAPP statute reads:

> When a moving party asserts that the civil claims, counterclaims or cross claims against the moving party are based on the moving party's exercise of the moving party's right of petition under the Constitution of the United States or the Constitution of Maine, the moving party may bring a special motion to dismiss. The special motion may be advanced on the docket and receive priority over other cases when the court determines that the interests of justice so require. The court shall grant the special motion, unless the party against whom the special motion is made shows that the moving party's exercise of its right of petition was devoid of any reasonable factual support or any arguable basis in law and that the moving party's acts caused actual injury to the responding party. In making its determination, the court shall consider the pleading and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

14 M.R.S. § 556. The statute contains a definition of "a party's exercise of its right to petition":

69

As used in this section, "a party's exercise of its right of petition" means any written or oral statement made before or submitted to a legislative, executive or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive or judicial body, or any other governmental proceeding; any statement reasonably likely to enlist public participation in an effort to effect such consideration; or any other statement falling within constitutional protection of the right to petition government.

*Id.*

### b.    Caselaw:  Purpose and Analytic Approach

The Maine Supreme Judicial Court explained that the "anti-SLAPP statute is designed to allow a defendant to file a special motion to dismiss a lawsuit that a plaintiff brings 'with the intention of chilling or deterring the free exercise of the defendant's First Amendment right to petition the government by threatening would-be activists with litigation costs.'" *Nader v. Me. Democratic Party*, 2012 ME 57, ¶ 14, 41 A.3d 551 (quoting *Schelling v. Lindell*, 2008 ME 59, ¶ 6, 942 A.2d 1226).  The Law Court has written that "Section 556 was designed to combat 'litigation without merit filed to dissuade or punish the exercise of First Amendment rights of defendants.'" *Maietta Constr., Inc. v. Wainwright*, 2004 ME 53, ¶ 6, 847 A.2d 1169 (quoting *More Bros., Inc. v. Webster*, 2001 ME 70, ¶ 10, 772 A.2d 842).  In other words, "[b]ecause winning is not a SLAPP plaintiff's primary motivation, defendants' traditional safeguards against meritless actions, (suits for malicious prosecution and abuse of process, requests for sanctions) are inadequate to counter SLAPP [suits]."  *More Bros., Inc.*, 2001 ME 70, ¶ 70, 772 A.2d 842.  Thus, in *Bradbury v. City of Eastport*, 2013 ME 72, ¶ 10, 72 A.3d 512, the Law Court reiterated that the "typical mischief

70

that [the statute] intended to remedy was lawsuits directed at individual citizens of modest means for speaking publicly against development projects." (quoting *Maietta Constr., Inc.* 2004 ME 53, ¶ 7, 847 A.2d 1169).

The Maine Supreme Judicial Court has developed a two-step process to determine the validity of an anti-SLAPP motion to dismiss. *Nader*, 2012 ME 57, ¶ 15, 41 A.3d 551. The first step is for the court to resolve whether the anti-SLAPP statute applies. "At this step, the moving party (i.e. the defendant) 'carries the burden to show that the suit was based on some activity that would qualify as an exercise of the defendant's First Amendment right to petition the government.'" *Id.* (quoting *Schelling*, 2008 ME 59, ¶ 7, 942 A.2d 1226). "If the moving party fails to meet its burden at this step, the anti-SLAPP statute does not apply, and the special motion is denied." *Id.* In *Nader*, the Maine Supreme Judicial Court announced a change in the parties' burdens at the preliminary anti-SLAPP dismissal stage:

> Upon a special motion to dismiss, a nonmoving party's action or claim should be allowed to proceed unless the nonmoving party . . . by pleading or affidavits, fails to make a prima facie showing that any, rather than all, of the petitioning activities by the moving parties . . . were devoid of any reasonable factual support or arguable basis in law.

*Id.* ¶ 36.

If the moving party successfully meets the requirements of the first step, "the burden shifts to the nonmoving party to establish, through pleadings and affidavits, that the moving party's exercise of its right of petition (1) was 'devoid of any reasonable factual support or any arguable basis in law,' and (2) 'caused actual injury' to the nonmoving party." *Id.* ¶ 16 (quoting 14 M.R.S. § 556). "If the nonmoving party

fails to meet its burden at this second step of the analysis, the court must grant the special motion to dismiss." *Id.*

In evaluating whether the moving party has sustained its burden on the first step, the court must review "the evidence in the light most favorable to the moving party because the responding party bears the burden of proof when the statute applies." *Maietta Constr.*, 2004 ME 53, ¶ 8, 847 A.2d 1169.   The Law Court acknowledged that "[a]pplication of this standard becomes problematic when the 'evidence' to be viewed most favorably to the moving party is disputed and consists only of pleadings and statements in affidavits not yet subject to discovery or trial." *Nader*, 2012 ME 57, ¶ 17, 41 A.3d 551.

### c.    Application to this Case

In ADA Cavanaugh's motion, he cites four ways that by making his statements at Pat's Pizza, he was "exercis[ing] his right of petition": (1) they were oral statements made during a public debate connected to an issue under consideration or review by a judicial body, (2) they expressed his disagreement with the decisions of the Board of Overseers of the Bar and the Maine Supreme Judicial Court, (3) they were reasonably likely to enlist public participation in this issue, and (4) they fall within his right to petition the government. *Cavanaugh's Mot.* at 4-6.  Even though the Maine Supreme Judicial Court has written that the Maine Legislature "very broadly defines the exercise of the 'right to petition,' *Schelling*, 2008 ME 59, ¶ 11, 942 A.2d 1226,  the Court is not convinced that ADA Cavanaugh's Pat's Pizza statements represented his exercise of his right to petition the government.

72

ADA Cavanaugh was not making the statements "before . . a legislative, executive, or judicial body," nor were his statements "submitted to a legislative, executive or judicial body." 14 M.R.S. § 556. His statements were not made "in connection with an issue under consideration or review by a legislative [or] executive body or any other governmental proceeding." *Id.* There is no indication that he made the statements "to encourage consideration or review of an issue by a legislative, executive or judicial body." *Id.* Instead, he made the statements at a political event as part of his campaign for election as the local District Attorney.

ADA Cavanaugh's most salient attempt to come within the anti-SLAPP statute is that his statements were made "in connection with an issue under consideration or review . . . by a . . . judicial body" because – as ADA Cavanaugh mentions – Mr. Filler had filed a petition for post-conviction review of his assault conviction. The Court has qualms about whether in enacting the anti-SLAPP legislation, the Maine Legislature intended to encourage out-of-court statements by a prosecuting attorney about matters pending before a tribunal in an attempt to influence the tribunal. Nevertheless, assuming that ADA Cavanaugh's Pat's Pizza statements could fall under the broad definition of exercising his right to petition, the Court is not convinced that the defamation action is "devoid of any reasonable factual support or arguable basis in law." *Nader*, 2012 ME 57, ¶ 35, 41 A.3d 551 (quoting 14 M.R.S. § 556).

As the Amended Complaint alleges, ADA Kellett had prosecuted Mr. Filler for seven crimes – five gross sexual assaults and two assaults.   The disciplinary Judgment of the Maine Supreme Judicial Court dated July 16, 2013 states:

> 60. At the hearing held on July 15, 2013, ADA Kellett agreed and admitted that her conduct in the Filler criminal prosecution was in violation of the following then applicable Maine Bar Rules: 3.1(a); 3.2(f)(4); 3.6(a); 3.7(e)(1)(i); and 3.7(i)(2).
>
> 61. ADA Kellett admitted that, in her closing arguments she referred to the lack of evidence about Ligia's attempts to best Filler in the context of their disputes over child custody issues, after asking for and receiving an order from the trial court that prevented Filler from presenting evidence on those issues.  She also admits that she made statements that could have been understood by the jury to suggest that Filler had some burden of disproving the State's case.  ADA Kellett acknowledges that her arguments were improper.
>
> 62.  She also admitted that, despite her obligations as a prosecutor, and despite a court order, she failed to provide required discovery to Filler and his attorney during the seventeen months after the indictment but before trial began.

*J. Board of Overseers of the Bar v. Mary N. Kellett, Esq.* at 17-18.  Furthermore, on September 9, 2010, the Maine Supreme Judicial Court had affirmed the trial court's judgment granting Mr. Filler a new trial based in part on ADA Kellett's misconduct. *State v. Filler*, 2010 ME 90, ¶ 27, 3 A.3d 365.  ADA Cavanaugh must have been aware of all of this before he spoke on February 19, 2014 at Pat's Pizza.  Moreover, ADA Cavanaugh was not only a colleague of ADA Kellett but also actually prosecuted Mr. Filler; therefore, ADA Cavanaugh's audience must have thought he had inside knowledge about the truth of the facts surrounding prosecution of Mr. Filler and about ADA Kellett's dealings with the disciplinary process.

74

It is within this context that ADA Cavanaugh described Mr. Filler as viewing "Mary Kellett as just another one of those women that have taken away all of the rights for men," that the source of his complaint was only "two pieces of evidence," that ADA Kellett had requested the discoverable information from law enforcement but never got it, that the only matter before the Board of Overseers of the Bar was whether ADA Kellett had been sufficiently diligent in requesting discoverable information from law enforcement, and that according to Mr. Filler it was not "Mr. Filler's fault. It was his wife's fault, it was the prosecution's fault, now it is the defense attorney's fault that he had to do time for assaulting his wife." *Cavanaugh Tr.* at 1-2.

Finally, the Court observes that Mr. Filler's case does not implicate the underlying purpose of the anti-SLAPP statute. ADA Cavanaugh made his Pat's Pizza comments on February 19, 2014 in the middle of a political campaign for the office of District Attorney. The election was held in November 2014 and ADA Cavanaugh was not successful. Mr. Filler did not file this lawsuit until January 9, 2015, well after the district attorney race was over. There is no evidence that Mr. Filler filed the lawsuit to affect ADA Cavanaugh's political campaign, to punish him by forcing him to pay for the defense of Mr. Filler's lawsuit, or to dissuade him from petitioning the government.

Taken together and placed in the context of the actual facts, the Court views ADA Cavanaugh's statements as sufficient to meet the "low standard" that any of

ADA Cavanaugh's petitioning activities were "devoid of factual or legal support." *Nader*, 2012 ME 57, ¶ 35, 41 A.3d 551 (quoting 14 M.R.S. § 556).

### 2.    The Defamation Claim and § 1983.

In his motion, ADA Cavanaugh makes the same argument as ADA Kellett about defamation being an insufficient basis for a § 1983 claim. *Cavanaugh's Mot.* at 8-12. It is true that ADA Cavanaugh's comments at Pat's Pizza could not have affected Mr. Filler's right to a fair trial for the two trials that pre-dated his comments. *Id.* at 12. However, as ADA Cavanaugh mentioned at Pat's Pizza, Mr. Filler had filed a petition for post-conviction review of his assault conviction. *Cavanaugh Tr.* at 2. Elsewhere, ADA Cavanaugh argues that his Pat's Pizza statements were an attempt to petition the judiciary. The Court takes him at his word. Regarding his argument that post-conviction review is not of constitutional significance, he provides no authority and the Court disagrees.

As regards his overall contention that defamation cannot as a matter of law form the basis for a § 1983 action, the Court disagrees for the same reason it rejected ADA Kellett's similar claim.

### 3.    Defamation

In his motion, ADA Cavanaugh argues that the transcript of his Pat's Pizza remarks confirms that his statements were not defamatory as a matter of law. *Cavanaugh's Mot.* at 13-14; *Cavanaugh's Reply* at 8-10. For reasons the Court reviewed in its discussion of the anti-SLAPP issue, the Court disagrees with ADA Cavanaugh that his remarks at Pat's Pizza could not be deemed defamatory.

76

### 4. Negligent Infliction of Emotional Distress

ADA Cavanaugh urges the dismissal of Mr. Filler's negligent infliction of emotional distress claim based on the assertion that as a prosecutor, he owed no legal duty to Mr. Filler. *Cavanaugh's Mot.* at 14-15. In response, Mr. Filler agrees to voluntarily dismiss Count Eight, observing that the negligent infliction of emotional distress claim is legally subsumed by his other viable claims against ADA Cavanaugh. *Pl.'s Cavanaugh Opp'n* at 14. In accordance with Mr. Filler's motion, the Court dismisses Count Eight, the Negligent Infliction of Emotional Distress claim.

### C. The Rule 8(a) Issue

Both ADA Kellett and ADA Cavanaugh argue that the Court should dismiss the Complaint because it has violated Rule 8(a)(2)'s admonition that a complaint should be only a "short and plain statement" of the claim, showing the that the pleader is entitled to relief. *Kellett's Mot.* at 17-20; *Kellett's Reply* at 1-2; *Cavanaugh's Mot.* at 15-17; *Cavanaugh's Reply* at 1-2. The Court agrees with ADA Kellett and ADA Cavanaugh that Mr. Filler's Amended Complaint is not a model pleading. It runs 103 pages long, contains 667 separate paragraphs, and is repetitive and confusing. *Am. Compl.* at 1-103. At the same time, Mr. Filler has named eighteen defendants and the back story behind his allegations must necessarily be detailed and complicated, and it is correct that this long and verbose pleading has placed each defendant on notice about what Mr. Filler is complaining. The Court rejects the Defendants' effort to dismiss the Amended Complaint under Rule 8(a)(2).

## V.     CONCLUSION

The Court DENIES in part and GRANTS in part Defendant Mary Kellett's Motion to Dismiss (ECF No. 14) and DENIES in part and GRANTS in part Defendant Paul Cavanaugh's Motion to Dismiss (ECF No. 15).    Regarding Defendant Mary Kellett's motion to dismiss insofar as Vladek Filler is claiming that Defendant Kellett ignored some evidence she should have considered in initiating the prosecution against him, the Court GRANTS Defendant Kellett's motion to dismiss that part of Vladek Filler's lawsuit.   The Court also GRANTS Defendant Kellett's motion to dismiss Vladek Filler's defamation claim to the extent he is claiming that her provision of the Affidavit in Support of Arrest Warrant and his mug shot to the press defamed him.   The Court GRANTS Defendant Paul Cavanaugh's Motion to Dismiss Count VIII, the negligent infliction of emotional distress count.   Otherwise, the motions are DENIED,

SO ORDERED.


/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 27th day of January, 2016

78