UNITED STATES DISTRICT COURT
DISTRICT OF MAINE

VLADEK FILLER,                    )
                                  )
              Plaintiff,          )
                                  )
      v.                          )        1:15-cv-00048-JAW
                                  )
HANCOCK COUNTY et al.,            )
                                  )
              Defendants.         )

## ORDER AND JUDGMENT

Concluding that a defendant committed the tort of malicious prosecution, the Court awards $1,769,354 in compensatory, economic, and punitive damages in favor of a man the defendant falsely accused of committing gross sexual assaults and assaults against his then wife. The Court's verdict and judgment runs against his now ex-wife's friend, who conspired with his wife to concoct the allegations that he committed these crimes, falsely reported these crimes to law enforcement, encouraged his wife to make false reports to the police, and falsely testified at his trials, resulting in his convictions for gross sexual assault and assault of which he was later entirely absolved.

## I.      BACKGROUND

### A.      Procedural Background

On January 9, 2015, Vladek Filler filed a civil action in the Superior Court of Hancock County, Maine against Hancock County, a number of government officials, and Linda Gleason. *State Ct. Record* Attach. 1, *Docket Record* at 2 (ECF No. 6). On February 4, 2015, the Defendants removed Mr. Filler's lawsuit to this Court. *Notice*

*of Removal* (ECF No. 1) (*Notice of Removal*). This Court and the Court of Appeals for the First Circuit resolved issues of governmental immunity by and large in favor of Mr. Filler. *Order on Mots. to Dismiss* (ECF No. 42), 2016 U.S. Dist. LEXIS 10777 (D. Me. Jan. 27, 2016); *Filler v. Kellett*, 859 F.3d 148 (1st Cir. 2017). In July and August 2018, Mr. Filler and all the Defendants except Linda Gleason filed Stipulations of Dismissal with the Court. *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 98); *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 101); *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 103).

Mr. Filler impleaded Ms. Gleason as an original Defendant in January 2015 and on March 17, 2015, he served a copy of the Amended Complaint on her in South Greenfield, Missouri. *See Notice of Removal* Attach. 1, *Compl.*, *State Ct. Record* Attachs. 4-5, *Am. Compl.*; *Mot. for Entry of Default Against Linda Gleason Pursuant to F.R. Civ. P. 55*, Attach. 1 *Proof of Serv. of Summons and Compl.*, Attach. 2, *Aff. of Counsel in Support of Req. for Entry of Default as to Def. Linda Gleason Pursuant to F.R. Civ. P. 55* (ECF No. 27). Ms. Gleason never filed an answer to the Amended Complaint nor has she otherwise defended the civil action. Accordingly, on May 1, 2015, Mr. Filler moved for entry of default against Ms. Gleason and on June 1, 2015, the Deputy Clerk of Court duly entered a default against her. *Order Granting Mot. for Entry of Default* (ECF No. 33).

On October 12, 2018, Mr. Filler moved for a default judgment against Ms. Gleason. *Pl.'s Mot. for Default J. Against Def. Linda Gleason* (ECF No. 106) (*Pl.'s*

*Mot.*).  Mr. Filler's Amended Complaint contains two counts against Ms. Gleason: Count Five, a malicious prosecution count, and Count Six, a negligent infliction of emotional distress count. *Am. Compl.* ¶¶ 616-54.  Mr. Filler requested a hearing and the entry of a judgment against Ms. Gleason. *Pl.'s Mot.* at 1-2.

On November 9, 2018, the Court entered an order on Mr. Filler's motion for default judgment. *Order on Mot. for Default J.* (ECF No. 108).  The Court allowed Mr. Filler to proceed with an evidentiary hearing on damages, required him to give notice of the hearing to Ms. Gleason, and mandated that he provide evidence that Ms. Gleason had not otherwise defended the lawsuit. *Id.* at 1-6.  On January 23, 2019, the Court held a default hearing on damages. *Min. Entry* (ECF No. 114).  Mr. Filler appeared with his attorney, David Weyrens; Ms. Gleason did not appear.  Attorney Weyrens confirmed by affidavit that he had a notice of the January 23, 2019 damages hearing served on Ms. Gleason on December 17, 2018 in South Greenfield, Missouri. *Aff. of Paralegal, Andrew R. Ambrose* ¶¶ 5-6 (ECF No. 110).  On February 22, 2019, Mr. Filler filed a memorandum of law in support of his claim for damages. *Pl.'s Demand for Damages Against Linda Gleason* (ECF No. 117) (*Pl.'s Damages Demand*).

**B.    The Allegations in the Amended Complaint**

**1.    The Truth of the Factual Allegations is Assumed**

"A party who defaults is taken to have conceded the truth of the factual allegations in the complaint as establishing the grounds for liability as to which damages will be calculated." *Franco v. Selective Ins. Co.*, 184 F.3d 4, 9 n.3 (1st Cir. 1999); *Perfect Fit, LLC v. Inmate Legal Forms Serv.*, No. 1:18-cv-00239-LEW, 2019

U.S. Dist. LEXIS 14537, at *1 (D. Me. Jan. 30, 2019) (citations omitted).  The Court turns first to the allegations in the Amended Complaint and later describes the evidence Mr. Filler presented at the damages hearing.  In describing the allegations in the Amended Complaint, the Court focused on Ms. Gleason's role, but the significance of her actions becomes meaningful in the context of the actions of others because Ms. Gleason and others caused the sequence of tragic events that befell Mr. Filler.

### 2.      A Cautionary and Extraordinary Tale

### a.      Ligia Arguetta's Mental Health History

Mr. Filler's Amended Complaint tells a cautionary and extraordinary tale.  Mr. Filler says that before he knew her, his ex-wife, Ligia Arguetta, had "a history of serious mental problems, psychiatric treatment, and [a] history of claims of sexual abuse and abandonment." *Am. Compl.* ¶ 40.  In fact, Ms. Arguetta had "a prior child custody dispute involving three restraining orders, numerous claims of abuse, and criminal charges against [her] for Assault and Battery and Assault and Battery with a Deadly Weapon (her teeth) on one Carlos Badias who sought parental rights to the daughter he had with Arguetta in 1990." *Id.* ¶ 41.  Mr. Filler says that when he began dating Ms. Arguetta in October 1991, he was "unaware of her previous hospitalization and court experiences." *Id.* ¶ 42.

### b.      Vladek Filler and Ligia Arguetta's Relationship: 1994-2007

Mr. Filler and Ms. Arguetta moved in together in 1994 and were married in October 1995. *Id.* ¶ 43.  Mr. Filler and Ms. Arguetta had been intimate partners for

sixteen years and married for twelve, producing two sons. *Id.* ¶ 37. Ms. Arguetta brought a daughter, Natasha, to the marriage and Mr. Filler "raised and mentored" Natasha from the time she was one year old. *Id.* ¶ 38. In May of 2004, Mr. Filler, Ms. Arguetta and their family moved to coastal Maine, where Mr. Filler worked from home and cared for the three children and for Ms. Arguetta. *Id.* ¶ 45. Mr. Filler owned an historic 1800's timber-framed project house in Gouldsboro, Maine that overlooked Frenchman Bay and Mount Desert Island and the family moved into the house in May 2004. *Id.* ¶ 39.

### c.     The Filler-Arguetta Marriage Deteriorates: 2007

While in Maine, Ms. Arguetta's mental health deteriorated and she was prescribed medications "with daily doses reaching some twenty-four pills." *Id.* ¶ 46. By 2007, Mr. Filler's and Ms. Arguetta's marriage had "deteriorated beyond repair and the parties were in the midst of a separation initiated by [Mr. Filler]." *Id.* ¶ 48. Mr. Filler "openly made plans and arrangements to relocate with the children to the state of Georgia to live with relatives." *Id.* ¶ 49.

### d.     Linda Gleason and Ligia Arguetta

Linda Gleason was "a registered nurse working at the Maine Coast Memorial Hospital and Mount Desert Island Hospital." *Id.* ¶ 617. Ms. Gleason also "taught a nursing course at Sumner High School Adult Education." *Id.* In 2007, Ms. Gleason was unmarried and residing alone in a new three-bedroom house in Steuben, Maine. *Id.* ¶ 618. Ms. Gleason met Ms. Arguetta when Ms. Arguetta took her "adult education certified nurs[es] aid[e] class, beginning in January 2007." *Id.* ¶ 619. Over

the next few months, Ms. Gleason and Ms. Arguetta developed "a close relationship." *Id.* ¶ 620. Ms. Arguetta informed Ms. Gleason that Mr. Filler "intended to leave [Ms.] Arguetta and move back to his family's home in Georgia and take his two sons with him." *Id.* ¶ 621.

### e. Ligia Arguetta and Linda Gleason Concoct a Plan

Ligia Arguetta and Linda Gleason "conspired to concoct a plan which would allow [Ms.] Arguetta to keep custody of her two sons" and the plan "included [Ms.] Arguetta and her children residing at [Ms.] Gleason's home in Steuben." *Id.* ¶¶ 622-23. On April 21, 2007, Ms. Arguetta "in fact moved into [Ms.] Gleason's Steuben home, along with her daughter and one-year-old son." *Id.* ¶ 624. "This move was part of the plan, and was in place prior to April 21, 2007." *Id.* It "was agreed between [Ms.] Gleason and [Ms.] Arguetta that [Ms.] Arguetta would falsely accuse [Mr. Filler] of simple assault and gross sexual assault." *Id.* ¶ 625. "The purpose of this was to promote [Ms.] Arguetta obtaining custody of the children, to subject [Mr.] Filler to false and malicious prosecution, and preclude him from maintaining a relationship of any kind with his children." *Id.* ¶ 626.

### f. April 2007: Ligia Arguetta's Allegations, Linda Gleason and Initial Police Involvement

"As the date of [Mr. Filler's] departure approached, on April 21, 2007, [Ms.] Arguetta unexpectedly took their one-year-old son and relocated to live with an unknown new friend at an undisclosed location in another county." *Id.* ¶ 51. In an "effort to gain physical custody of the couple's ten-year-old son, [Ms.] Arguetta engaged the police and began making numerous allegations of abuse." *Id.* ¶ 52.

On April 22, 2007, Linda Gleason, Ms. Arguetta's new friend, "called the Gouldsboro police to go over to [Mr. Filler's] house and 'get' the couple's ten-year-old son and deliver him . . . to [Ms.] Arguetta's custody." *Id.* ¶ 75. Gouldsboro police "only agreed to get involved if [Ms.] Arguetta was a victim of abuse," and Ms. Arguetta "then took the phone and claimed she was a victim of being 'pushed' by [Mr. Filler] two days earlier on April 20, 2007." *Id.* ¶ 76. Gouldsboro Police Sergeant Harry Larrabee "later testified he could hear [Ms.] Arguetta's friend Linda Gleason 'in the background advising her' to make claims of sexual abuse." *Id.* ¶ 77.

Without meeting Ms. Arguetta or Ms. Gleason in person, Gouldsboro police officers drove directly to Mr. Filler's home and "separately interviewed [Mr. Filler] and his ten-year-old son. Both denied [Ms.] Arguetta's allegations and according to Sgt. Larrabee, [Mr. Filler] appeared to have no prior knowledge that police were coming to interview him." *Id.* ¶ 78. The ten-year-old reported prior incidents of witnessing his mother assault and punch his father; however, other than an argument, no physical contact at all took place on the night [of April 20, 2007]." *Id.* ¶ 79. The ten-year-old "refused to be taken to his mother or live with her." *Id.* ¶ 80.

Mr. Filler "informed Gouldsboro Police that he and [Ms.] Arguetta were in the middle of separation and a child custody dispute and that [Ms.] Arguetta was clearly attempting to gain an advantage in their child custody dispute as she employed identical tactics in another custody fight with the father of her daughter in Massachusetts." *Id.* ¶ 81. Mr. Filler "reported he never assaulted [Ms.] Arguetta but suffered physical violence from [her] including being hit and punched in the face in

front of the children and that he didn't call the police because he was a man." *Id.* ¶ 82. Mr. Filler "reported [Ms.] Arguetta was on numerous medications, and had previous criminal charges for attacking the father of her first child in Massachusetts." *Id.* ¶ 83. Gouldsboro police "still issued a summons to [Mr. Filler] for simple assault and then traveled to meet and interview [Ms.] Arguetta and her friend Linda Gleason for the first time." *Id.* ¶ 84.

### g. Sergeant Larrabee's April 22, 2007 Interview of Ligia Arguetta

When the police arrived at Linda Gleason's residence, and Ligia Arguetta observed that they did not have her ten-year-old son with them, she "collapsed in her friend's driveway." *Id.* ¶ 85. Sergeant Larrabee interviewed Ms. Arguetta and inspected her arms, finding no bruises or markings of any kind, two days after the alleged assault. *Id.* ¶ 86. Before leaving, Sergeant Larrabee advised Ms. Arguetta to get a physical examination at one of the two local hospitals and provide him with a medical release required for his investigation. *Id.* ¶ 87.

### h. Chief Wycoff's April 23, 2007 Interview of Ligia Arguetta

On April 23, 2007, Ligia Arguetta met with town of Gouldsboro Chief of Police Guy Wycoff at Ms. Gleason's residence. *Id.* ¶ 88. At that time, Mr. Filler had been ordered to stay out of his house so that Ms. Arguetta could retrieve her belongings. *Id.* At Ms. Gleason's house, Ms. Arguetta showed Chief Wycoff a new bruise on her upper arm and she alleged that Mr. Filler had caused the bruise during his alleged

altercation with her three days before. *Id.* ¶ 89. Chief Wycoff took photographs of Ms. Arguetta showing her bruise. *Id.* ¶ 90.

### i. Ligia Arguetta Suffers a Mental Breakdown

Soon after Ms. Arguetta began to act "delusional and psychotic" one moment and "calm and calculating" another moment. *Id.* ¶ 117. Ms. Arguetta was intent upon regaining custody of her ten-year-old son, who was still with Mr. Filler, and after a series of escalating claims, on April 24, 2007, she claimed that he had sexually assaulted her. *Id.* ¶¶ 116-19. After failing to convince her seventeen-year-old daughter to claim that Mr. Filler had molested her, Ms. Arguetta headed down the road on foot with her one-year-old son in tow with the intention of going to Mr. Filler's residence and retrieving their ten-year-old son. *Id.* ¶¶ 121-23. She was "spotted and apprehended by Deputy Willey, Deputy Crabtree and Lieutenant Denbow running on the road barefoot 'only in a bra' and pants with a child while screaming she would cut her husband into pieces and kill Deputy Willey." *Id.* ¶ 124. Ultimately on April 24, 2007, she was taken to Machias Hospital "and involuntarily hospitalized for psychiatric observation and physical examination." *Id.* ¶ 143.

### j. The April 25, 2007 Chief Wycoff Videotaped Interview

Linda Gleason was "the first one to promote that [Ms.] Arguetta should tell the police she had been sexually assaulted by Plaintiff." *Id.* ¶ 627. On April 25, 2007, Ms. Gleason "made arrangements to pick up [Ms.] Arguetta at the Next Steps facility (a women's shelter) following [her] involuntary psychiatric hospitalization on April 24, 2007 as a result of a psychotic episode" and Ms. Gleason brought Ms. Arguetta to

the Hancock County District Attorney's Office to give a taped interview to Gouldsboro Chief Wycoff and Detective Stephen McFarland. *Id.* ¶¶ 630-31, 146. Ms. Gleason "knew that [Ms.] Arguetta did not eat or sleep between April 21, 2007 and April 24, 2007, and that when [Ms.] Gleason left [Ms.] Arguetta the morning of April 24, 2007 to go to work, [Ms.] Arguetta was in a state of total confusion, and was rambling in a paranoid fashion." *Id.* ¶ 634. Ms. Gleason was aware that Ms. Arguetta "was suffering a psychotic episode brought about in part because [Ms.] Arguetta could not tolerate the thought of [Mr. Filler] getting custody of the children." *Id.*

At the interview, Chief Wycoff allowed Ms. Gleason "who has never met [Mr. Filler], to sit in during the entire interview, and then to submit her own 'witness statements' to help corroborate Ms. Arguetta's claims." *Id.* ¶ 148. At the time of the interview, Ms. Gleason knew that Ms. Arguetta was "mentally unsound." *Id.* ¶ 628.

After about an hour, when the interview was coming to a close, Chief Wycoff left the room. *Id.* ¶ 149. The videorecorder was still recording as Ms. Arguetta "admitted to her friend that her report of sexual abuse against her husband was her way of 'fighting for the children.'" *Id.* Ms. Gleason advised Ms. Arguetta "to cry during the interview to make the story of spousal rape 'seem real.'" *Id.* ¶¶ 150, 632. Ms. Arguetta "calmly put lip gloss or lip balm on, and told Linda Gleason that she didn't feel like crying, but Linda Gleason repeatedly urged her to cry stating that 'it wouldn't seem real' unless [Ms.] Arguetta cried during the interview." *Id.* ¶ 151. Ms. Arguetta "expressed some strategic concerns about claims she was making against her husband making her sound less believable." *Id.* ¶ 152. When Chief Wycoff

returned to the room and briefly resumed the interview, Ms. Arguetta "began crying hysterically." *Id.* ¶ 153.

### k.     Vladek Filler April 26, 2007 Arrest

On April 26, 2007, Mr. Filler "was charged and arrested on a claim that he raped his wife on April 6, 2007 . . . because, according to [Ms.] Arguetta, 'He was very upset that I spent money from his bank account to have my hair cut.'" *Id.* ¶¶ 163, 165. "No investigation beyond [Ms.] Arguetta's claims was done prior to [Mr. Filler's] arrest" and "[b]oth [Mr. Filler's] joint and business bank account records showed no money being withdrawn by anyone at any time on or around April 6, 2007." *Id.* ¶ 166.

### l.     Linda Gleason Witness Statement

One week after the April 25, 2007 Wycoff interview, the police allowed Ms. Gleason to complete a witness statement, which was incorporated into the discovery the state disclosed to Mr. Filler. *Id.* ¶ 157.

### m.     Linda Gleason Knowledge, False Reports, False Comments, and False Testimony

Linda Gleason was aware that Mr. Filler "had at no time sexually assaulted [Ms.] Arguetta and that the sexual assaults were a total fabrication." *Id.* ¶ 635. Nevertheless, on April 29, 2007, Ms. Gleason "filed a police report including false information." *Id.* ¶ 636. Ms. Gleason wrote "comments on the internet to stories linked to newspaper articles related to the alleged events, and which were designed to spread false information and to incite hatred and ridicule in the community against [Mr. Filler]." *Id.* ¶ 637.

At the first trial in January 2009, Ms. Gleason "falsely testified that she saw a bruise on [Ms.] Arguetta's arm when [Ms.] Arguetta moved into [Ms.] Gleason's home on April 21, 2007." *Id.* ¶¶ 638-39. Ms. Gleason also "lied that she had not 'coached' [Ms.] Arguetta during the April 25, 2007 Wycoff interview." *Id.* ¶ 640. Ms. Gleason "took these actions knowingly, lacking probable cause to believe the allegations of gross sexual assault or the allegations of simple assault." *Id.* ¶ 641. Ms. Gleason "conspired with [Ms.] Arguetta to promote the false allegations for the purpose of having [Mr. Filler] charged criminally, and convicted." *Id.* ¶ 642. Ms. Gleason took these actions with malice and as a "direct, substantial, proximate, and foreseeable result of [Ms.] Gleason's malicious conduct, criminal charges were initiated and continued against [Mr. Filler]." *Id.* ¶ 645.

## C. *State v. Filler*, No. ELLSC-CR-2007-00135: April 27, 2007 to April 24, 2015

Following the damages hearing, Mr. Filler filed certified copies of six exhibits, reflecting the travel of the state of Maine's criminal case against him. *Pl.'s Damages Demand* at 2, Attachs. 1-7. The Court admits these exhibits. The first exhibit is the docket record of the case against Mr. Filler. *Pl.'s Ex.* 1 at 1-24 (*State Docket Record*). The docket reflects that on April 27, 2007, the state charged seven counts against Mr. Filler:

(1) gross sexual assault, Class A, an alleged violation of 17-A M.R.S. § 253(1)(A),

(2) assault, Class D, an alleged violation of 17-A M.R.S. § 207(1)(A),

(3) gross sexual assault, Class A, an alleged violation of 17-A M.R.S. § 253(1)(A),

(4) gross sexual assault, Class A, an alleged violation of 17-A M.R.S. § 253(1)(A),

(5) gross sexual assault, Class A, an alleged violation of 17-A M.R.S. § 253(1)(A),

(6) gross sexual assault, Class A, an alleged violation of 17-A M.R.S. § 253(1)(A), and

(7) assault, Class D, an alleged violation of 17-A M.R.S. § 207(1)(A).

*Id.* at 1.

The docket record reflects that a jury trial took place from January 12, 2009 to January 15, 2009, and on January 15, 2009, the jury returned verdicts, convicting Mr. Filler of Count I, gross sexual assault, Count II, assault, and Count VII, assault. *Id.* at 7. The jury returned not guilty verdicts on Count III, gross sexual assault, Count IV, gross sexual assault, Count V, gross sexual assault, and Count VI, gross sexual assault. *Id.* Immediately following the verdicts, Mr. Filler filed a motion for new trial "based on prosecutorial misconduct and the court's error in excluding from evidence the protection from abuse complaints and the divorce complaint, initiated by his wife." *State v. Filler*, 2010 ME 90, ¶ 8, 3 A.3d 365. On March 2, 2009, the Superior Court Justice granted the motion for new trial and on March 5, 2009, the state of Maine filed a motion for further findings of fact and conclusions of law. *Id.* ¶¶ 8-10. In regard to the state of Maine's motion for further findings of fact and

conclusions of law, the Superior Court Justice held "the interest of justice required . . . a new trial [because the] state[']s arguments were on facts not presented by the defendant as a result of rulings by the court during the trial, thereby creating the high likelihood of unfairly prejudicing the [defendant] in the eyes of the jury." *State Docket Record* at 8.

On March 31, 2009, however, the state of Maine, with the approval of the Attorney General, appealed to the Maine Supreme Judicial Court the trial judge's granting of a new trial. *Id.* Mr. Filler cross-appealed the same day. *Id.* The Maine Supreme Judicial Court affirmed the trial court judgment granting Mr. Filler's motion and remanded the case for new trial on Counts I, II and VII. *Filler*, 2010 ME 90, ¶ 27, 3 A.3d 365.

The state of Maine retried the case. On May 16, 2011 a jury was selected, and the case was retried from May 24, 2011 through May 27, 2011. *Docket Record* at 15-16. The jury found Mr. Filler not guilty on Count One, gross sexual assault, not guilty on Count Two, assault, and guilty on Count Seven, assault. *Id.* at 16. On August 10, 2011, Mr. Filler was sentenced to twenty-one days of incarceration in the Hancock County Jail. *Id.* at 17. Mr. Filler appealed his conviction to the Maine Supreme Judicial Court and on July 3, 2012, the Maine Law Court affirmed the judgment in a memorandum decision. *State v. Filler*, No. Han-11-460, 2012 Me. Unpub. LEXIS 75 (Me. Jul. 3, 2012).

Mr. Filler filed a pro se petition for post-conviction relief on October 15, 2012. *Pl.'s Damages Demand*, Attach. 2, *Am. Pet. for Post-Conviction Review* at 2. On June

3, 2013, this time represented by counsel, Mr. Filler filed an amended petition for post-conviction review. *Id.* at 1-8. On February 3, 2015 and February 5, 2015, Mr. Filler's attorney and the district attorney for Hancock County entered into the following stipulation:

> The parties hereby stipulate and agree that the Court enter judgment in favor of the Petition in this matter and vacate the assault conviction entered in *State of Maine v. Vladek Filler*, ELLSC-CR-07-135.

*Pl.'s Damages Demand*, Attach. 4, *Stip of J. Vacating Conviction* at 1. On April 24, 2015, a superior court justice vacated the assault conviction based on the stipulation of the parties. *Pl.'s Damages Demand*, Attach. 5, *Order on Am. Pet. for Post-conviction Relief* at 1. On the same day, the state of Maine dismissed Count VII, the assault charge. *Pl.'s Damages Demand*, Attach. 6, *Dismissal* at 1. Quite nearly eight years after the state initiated its seven criminal counts against Mr. Filler, he was finally and completely exonerated.

## II.     THE DAMAGES HEARING: JANUARY 23, 2019

### A.     Yolanda Oden

Yolanda Oden is Mr. Filler's older sister and she testified at the damages hearing. Mr. Filler has another sister named Tatiana. Ms. Oden testified that they grew up in Kiev, Ukraine when it was part of the Soviet Union. In 1979, the entire family emigrated to Boston, Massachusetts. Ms. Oden was thirteen; Mr. Filler was nine. Their mother raised the family. Ms. Oden lived with Mr. Filler from 1979 to 2004.

Before these events with Ms. Arguetta, Ms. Oden described her brother as "very lively." She said he would "make everyone laugh" and was "very social." She thought of her brother as "sunshine." He was also "very interested in ideas and new things" and "very active."

She recalled that after Mr. Filler and Ms. Arguetta moved to Maine in 2004, she became aware that their marriage had deteriorated. Mr. Filler told his sister that Ms. Arguetta had become abusive. In 2005, Ms. Oden moved to Georgia.

In 2007, Mr. Filler called Ms. Oden and told her about Ms. Arguetta's allegations. Both she and their mother got on the plane and flew to Maine. Ms. Oden stayed for four months. She testified that because of the allegations and the publicity, Mr. Filler experienced difficulty renting an apartment. Potential landlords recognized him from a photograph in the newspaper. Ms. Oden said she watched her brother change. He refused to eat and became skeletal. Mr. Filler was not allowed to see his children for a while and was not allowed to see his mother and sister when they were with the children.

Ms. Oden returned to Georgia and next saw her brother in either 2008 or 2009, when he moved to the Atlanta area. She said that Mr. Filler is "not my brother anymore" and is a "shadow" of himself. It seems as if at times, he is "not even there." He began stuttering, something he never did before. He does not want to go anywhere or socialize with people. He tends to go to the store at night, when he will see fewer people. He no longer trusts people. He lives with their mother and his two sons in the Atlanta area, but he tends not to leave the house. He has not worked.

There has been no change over the last few months. She notices that he tends to relive everything that happened over the last ten years.

## B.    Dr. Alan Brandis

Alan D. Brandis is a clinical psychologist who practices in Georgia and Dr. Brandis testified at the damages hearing. *Pl.'s Ex.* 1, *Alan Brandis' curriculum vitae* at 1-3. Dr. Brandis has seen Mr. Filler as his patient on a weekly basis for about one year, a total of about fifty times. Mr. Filler's first visit was October 24, 2017. Dr. Brandis has acted as a sounding board and supportive person.

Mr. Filler complained that he has had trouble sleeping and concentrating. He gets nightmares and falls into obsessive thinking. He is anxious and scared. Dr. Brandis has diagnosed post-traumatic stress disorder (PTSD). Dr. Brandis took the history of the criminal allegations against Mr. Filler by his ex-wife and he stated that Mr. Filler is preoccupied and obsessed with recovery of his good name and achieving some sense of justice.

Dr. Brandis found the following factors important for his PTSD diagnosis: (1) the nature of the event or events, (2) his feelings of helplessness, (3) recurrent dreams, (4) avoidant behavior, (5) detachment, and (6) a sense of a foreshortened future. Dr. Brandis attributed Mr. Filler's development of PTSD to the consequences of his being accused of and charged with these crimes. Dr. Brandis did not think Mr. Filler could work in his current condition. He hopes that years from now, Mr. Filler will improve to the point where he can return to work. Dr. Brandis is teaching Mr. Filler certain coping skills, such as breathing techniques, but he opined that Mr.

Filler is not able to concentrate well enough to return to work at this time. Dr. Brandis thought that Mr. Filler was making progress, but his progress is unfortunately variable. Mr. Filler told Dr. Brandis that he does not want to take any medicine. Mr. Filler explained that he does not drink and, even though Dr. Brandis prescribed some medicine, Mr. Filler has not wanted to take it. Dr. Brandis predicted the need to treat Mr. Filler on a weekly basis would persist for the foreseeable future; he currently charges $170 per visit.

### C.    Catherine Newich

Catherine Newich is an economist, who testified about Mr. Filler's lost earning capacity. She calculated these figures based on occupations in Hancock County, Maine and based on males with bachelors' degrees. The Hancock County total was $1,367,627 and the males with bachelors' degrees was $2,116,675. *See Pl.'s Ex.* 4, *Catherine S. Newick, M.A., An Analysis of Lost Earning Capacity for Vladek Filler* at 1-13.

### D.    Vladek Filler

Vladek Filler confirmed that he had been born in Kiev, Ukraine and that his family moved to the United States when he was about ten years old. The family settled in Brookline, Massachusetts and he attended the North Boston Trade School to learn preservation carpentry; he graduated with honors. However, he sustained a serious accident when he was nineteen and was unable to work as a carpenter. This caused him to look for other opportunities.

Mr. Filler attended Massachusetts Bay Community College, where he studied business management and liberal arts. He also attended Babson College and majored in Financial Accounting. He graduated from Babson in 1995 with high honors. He earned his license as a Certified Public Accountant.

Upon graduation in 1995, Mr. Filler married Ms. Arguetta. Ms. Arguetta brought a one-and-one-half year-old daughter into the marriage. They lived in Newton, Massachusetts. Mr. Filler and Ms. Arguetta had a son in September 1996 and another one in October 2005.

From 1995 to 2004, Mr. Filler ran a business that produced and distributed sportswear. Called VF Distributors, the business operated mostly in the United States and Canada. Mr. Filler began a website in 2003 and at one point, the website was receiving 4,000 hits per day. He said he was just about to monetize the website when they moved to Maine in 2004.

Mr. Filler moved to Maine at the behest of Ms. Arguetta. She was anxious to make a new start in Maine. Mr. Filler was able to continue his distributing business and the website continued to grow. He also opened an open-air flea market on Route One and started a business that made signs.

The move to Maine was not good for their marriage. Within about six months, Mr. Filler was thinking of moving back to Massachusetts and separating from her. However, Ms. Arguetta stopped taking birth control and became pregnant in early 2005.

The relationship continued to deteriorate and by January 2007, in his view, the marriage was over. By the spring of 2007, Mr. Filler had decided to leave for Georgia where his sister and mother lived. Ms. Arguetta, however, was taking a Certified Nurses' Aide course and he agreed to wait until she completed the course before leaving with the children. What was supposed to be a six-week course ended up being a sixteen-week course. He finally fixed the date of their departure for Georgia and Ms. Arguetta's allegations of sexual abuse and assault came just three days before he intended to leave.

Mr. Filler thought that Ms. Arguetta was "fully on board." However, in April 2007, Ms. Arguetta disappeared with their younger son. The first day they were gone, he did not panic, but when he discovered that she had also taken the son's birth certificate and social security documents, he began to worry. Mr. Filler called an elderly lady who had been helping them out and she told him, "I had nothing to do with it." He was about to call the police when the police knocked on his door.

When Mr. Filler saw the police at his door, he knew they were going to take his son away. The police immediately asked him, "Did you touch your wife?" They told him that they were responding to a 911 call from his wife and they charged him with assault. Mr. Filler said that "things exploded from there on."

Mr. Filler learned later that Ms. Arguetta had moved in with Linda Gleason. Within a few days, Ms. Arguetta and Ms. Gleason had complained to the police that he had sexually assaulted Ms. Arguetta. After the police arrested Mr. Filler on April 26, 2007 for assault, they questioned him about whether he had committed a gross

sexual assault against Ms. Arguetta, whether he had raped his step-daughter, and whether he had sexually abused his two sons. Following his arrest, he was incarcerated for twenty-four hours. When he was released on bail, he was forbidden to have any contact with his sons and had to abide by a curfew. He had never had any prior involvement with the legal system.

Mr. Filler said that beginning April 26, 2007, the date of his arrest, it was "like I died and woke in a different reality." He said, "My life stopped there." He was forbidden to live in his own home and was required to check into a hotel. When he went to the hotel desk the next morning, he saw his photograph in the Bangor Daily News with a newspaper article. He felt like the ground under his feet had collapsed. He described the moment as "surreal" and said it still is.

Mr. Filler was indicted in a seven-count indictment with multiple sexual assaults. By October 2007, his attorney and the state had become involved in several discovery battles. He said that even to this day, his heart beats out of his chest whenever he receives an email from his current civil attorney, David Weyrens.

The first trial began on January 12, 2009 and the jury found him guilty of one count of gross sexual assault and two counts of assault. When the verdict was announced, his arms went numb and his mother and sister began crying. The Assistant District Attorney Mary Kellett said, "Judge, get those people out." Mr. Filler said, "We lost our minds that day." He kept wondering how this could be. To his relief, the trial judge, however, ordered a new trial, but Mr. Filler then discovered that the state of Maine was appealing that decision to the Maine Supreme Judicial

Court. On September 9, 2010, the Maine Supreme Judicial Court denied the state of Maine's appeal. There was a second trial that took place in May 2011. He was convicted of one misdemeanor assault.

Ms. Gleason testified at both trials. Her testimony supported the state's case that Mr. Filler had assaulted Ms. Arguetta and his assault had caused bruises on her arms. There was evidence that Sergeant Larrabee had observed no bruising on Ms. Arguetta's arms on April 22, 2007 when he interviewed her and that Mr. Filler had not been in Ms. Arguetta's presence between April 22 and April 23, 2007 when Chief Wycoff observed bruises on her arms. In fact, Mr. Filler stated that the bruises first showed up four days after he had last seen Ms. Arguetta. Critically, Ms. Gleason testified that Ms. Arguetta had bruising on her arms when she showed up at Ms. Gleason's home on April 21, 2007. Mr. Filler testified that as a nurse, Ms. Gleason described the bruising in medical terminology, such as abrasion and edema, which enhanced her credibility.

After he was convicted of assault and sentenced to twenty-one days in Hancock County Jail, he was required to serve the sentence despite the appeal. He said that he was placed in protective custody at the Jail. He actually served sixteen days of the twenty-one-day sentence. He testified that during the sixteen days that he was in Jail, the corrections officers raided his cell three times and he was strip-searched seven times. He said that an inmate in the next cell, also in protective custody, was never subjected to cell raids and strip-searches.

Mr. Filler's experience with the state of Maine criminal justice system took a total of eight years before he was fully exonerated.  After his arrest, he immediately suffered a physical deterioration.  He went from 177 to 155 pounds.  His waist shrank from thirty-three to thirty inches.  He broke and lost two teeth because he was grinding his teeth at night due to stress.  He lost half his hair with chunks of hair falling out.

Mr. Filler began psychotherapy in June 2007 with a Richard Schamle of Acadia Hospital, a psychiatric hospital.  He has continued psychotherapy since then.  His sleep has been reduced to two to four hours per night.

The police confiscated his computers and would not let him gain access to them.  Mr. Filler was unable to continue VF Distributors because all his business information was on his computer.   VF Distributors "ceased to be."  In addition, he explained that people began to post comments on the VF Distributors website.  One posted a notice: "The guy who owns this website is a rapist."  People stopped visiting the website and shopping there.  He ultimately had to shut it down.

The case garnered widespread publicity.  During the summer of 2007, people refused to rent to him because of the allegations in the press about his abuse of his children.  The media reporting had an immediate impact.  The publicity made it very difficult for him to get a job.  Once, when he was offered a job and planned to start the next Monday, he received a call the Friday before from his soon-to-be employer.  The potential employer said, "I found out who you are.  Don't bother coming in."  He

was unable to find any work in Maine and he was concerned "every waking moment of my life."

On another occasion, he stopped at a diner near Augusta on his way back to Hancock County and the waitress came up to him, telling him, "I have a very good memory" and I know who you are. She refused to wait on him and he had to leave the restaurant.

Mr. Filler said that he had been granted custody of their sons. But the allegations continued to haunt him. Once, at a school play in Ellsworth, he sat down in the front row, and no one would sit in the front row with him. Instead, he heard people saying, "[t]hat's him."

After living under a curfew from April 2007 to February 2008, a Superior Court Justice revised his bail on February 15, 2008 and allowed him to leave the state of Maine. Mr. Filler moved to Georgia. Mr. Filler's psychotherapist, Mr. Schamle, fell ill and Mr. Filler began treating with Dr. Brandis. Mr. Filler said that he does not think he will ever "overcome it" and that he "cannot stop thinking about it." At one point, his primary care physician suggested he take anti-depressants and he took them for a while, but stopped, due to side effects.

Mr. Filler has looked for work in Georgia, but he feels he is a "shadow of my former self." He finds it difficult to concentrate and focus. He testified that he would like to put this all behind him and he thought that this lawsuit and the end of litigation might be of some benefit.

Currently, Mr. Filler lives with his seventy-seven-year-old mother and his two sons in Georgia. He rarely goes out of the house. He never comes to Maine. Mr. Filler says that he cannot imagine having any relationship with a female again. He said that he suffers from issues of trust.

## III. Vladek Filler's Memorandum

### A. Damage Elements and Demand

On February 22, 2019, Mr. Filler's attorney filed a memorandum setting forth his claim of damages against Ms. Gleason. *Pl.'s Damages Demand* at 1-8. In his memorandum, Mr. Filler explains his demand for special damages. First, he states that his non-economic losses, emotional pain and suffering, equal $1,000,000. *Id.* at 3-4. Second, he claims that his economic losses equal between $1,367,627 and $2,116,675 and he urges the Court to award "the upper end of Ms. Newick's economic loss calculation, $2,116,675." *Id.* at 4. Finally, he urges the Court to award punitive damages against Ms. Gleason in the amount of $50,000. *Id.* at 5-6. Mr. Filler claims a total verdict of $3,166,675.

### B. Joint Tortfeasors

Mr. Filler confirms that he settled his claims against the governmental entities that were original co-defendants in this case for a total of $375,000. He says that under Maine statutory law, 14 M.R.S. § 163, the Court should arrive at a damages figure and reduce the award by $375,000 to account for the money he received from joint tortfeasors. *Id.* at 6-8.

## IV. DISCUSSION

## A.    Legal Theories of Liability

Mr. Filler is proceeding against Ms. Gleason under two theories: malicious prosecution and negligent infliction of emotional distress.  *Am. Compl.* ¶¶ 616-54; *Pl.'s Damages Demand* at 2-3.  Even though Ms. Gleason has been defaulted, it remains incumbent upon the Court to make certain that the theories of liability are justified by the admitted facts and presented evidence.

### 1.    Malicious Prosecution

To prevail in a malicious prosecution action, a plaintiff must prove, by a preponderance of the evidence, that:

(1) The defendant initiated, procured or continued a criminal action without probable cause;
(2) The defendant acted with malice; and
(3) The plaintiff received a favorable termination of the proceedings.

*Trask v. Devlin*, 2002 ME 10, ¶ 10, 788 A.2d 179; *Davis v. Currier*, 1997 ME 199, ¶ 10, 704 A.2d 1207; *Gray v. State*, 624 A.2d 479, 483 (Me. 1993); *Price v. Patterson*, 606 A.2d 783, 785-86 (Me. 1992).

The first requirement is an absence of probable cause.  "Probable cause means reasonable grounds to believe that the party against whom the criminal action was initiated had committed the charged offense."  *Trask*, 2002 ME 10, ¶ 12, 788 A.2d 179.  "Reasonable grounds means information sufficient to justify a person who is calm, and not governed by passion, prejudice, or lack of ordinary caution and care in believing that the person committed the charged offense."  *Id.*  "Probable cause is based on the actor's belief."  *Id.*  "It may be established based on a reasonable belief

that the facts to support the charge exist. It does not require that the facts reasonably believed to be true be proven to be actually true." *Id.*

The second element is malice. *Bickford v. Lantay*, 394 A.2d 281, 285 (Me. 1978) "[M]alice is an essential element of the tort of malicious prosecution") (internal quotations omitted); *Nyer v. Carter*, 367 A.2d 1375, 1378 (Me. 1977). As Ms. Gleason has not defended this lawsuit, it is difficult to understand what motivated her in concocting with Ms. Arguetta these false stories against Mr. Filler that led to his prosecution. In *Tuttle v. Raymond*, 494 A.2d 1353 (Me. 1985), the Maine Supreme Judicial Court addressed the requirement of malice:

> The requirement of malice will be most obviously satisfied by a showing of "express" or "actual" malice. Such malice exists where the defendant's tortious conduct is motivated by ill will toward the plaintiff. . . . Punitive damages will also be available, however, where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied.

*Id.* at 1361. In addition, malice "may be inferred from the lack of probable cause." *Nyer*, 367 A.2d at 1378.

The third element is that the criminal prosecution against the person must have terminated successfully in his favor. *See Bickford*, 394 A.2d at 282-84. In *Palmer Development Corporation v. Gordon*, 1999 ME 22, 723 A.2d 881, the Maine Supreme Judicial Court observed that because '[s]ociety does not want litigants who committed the acts of which they were accused . . . [to be able] to turn around and collect damages against their accuser[,] [t]his reason justifies a requirement that the

favorable termination of the underlying proceeding be on the merits or, in some way, reflect on the merits." *Id.* ¶ 10.

### 2. Negligent Infliction of Emotional Distress

Although the Maine Supreme Judicial Court recognizes the tort of negligent infliction of emotional distress, it limits the circumstances in which this tort is available. *Desjardins v. Reynolds*, 2017 ME 99, 162 A.3d 228; *Schelling v. Lindell*, 2008 ME 59, 942 A.2d 1226; *Curtis v. Porter*, 2001 ME 158, 784 A.2d 18. In general, "emotional distress alone is not compensable unless it is 'so severe that no reasonable person could be expected to endure it . . ..'" *Desjardin*, 2017 ME 99, ¶ 20, 162 A.3d 228 (quoting *Schelling*, 2008 ME 59, ¶ 25, 942 A.2d 1226) (quoting *Curtis*, 2001 ME 158, ¶ 10, 784 A.2d 18)). Under Maine law, "'loss of sleep, mental suffering, . . . embarrassment, . . . [d]istress, irritation, and emotional upset' are not 'legally sufficient' to constitute 'actual injury,' nor are 'minor emotional injuries, such as hurt feelings.'" *Desjardins*, 2017 ME 99, ¶ 20, 162 A.3d 228 (quoting *Curtis*, 2001 ME 158, ¶ 18, 784 A.2d 18). At the same time, if a defendant committed a separate tort and "the separate tort at issue allows a plaintiff to recover for emotional suffering, the claim for negligent infliction of emotional distress is usually subsumed in any award entered on the separate tort." *Curtis*, 2001 ME 158, ¶ 19, 784 A.2d 18.

### B. Discussion of the Viability of Mr. Filler's Legal Theories

### 1. Malicious Prosecution

The evidence reveals that Ms. Gleason "initiated, procured or continued" the criminal actions against Mr. Filler. On April 21, 2007, she contacted the police to

demand that they retrieve Mr. Filler's and Ms. Arguetta's son from Mr. Filler and when told that they could do so only if there an allegation that Mr. Filler had abused Ms. Arguetta, Sergeant Larrabee testified that he heard Ms. Gleason urging Ms. Arguetta to claim to the police that Mr. Filler had sexually abused her. Next, she promoted this false story during the Wycoff videotaped interview by urging Ms. Arguetta to cry to make her allegations seem real. Third, she lied to the police and under oath during the trials when she falsely stated that Ms. Arguetta arrived at her home on April 21, 2007 with bruises on her arms.

Regarding an absence of probable cause, the Court concludes based on its review of the facts alleged in the Amended Complaint and as testified to by Mr. Filler that Ms. Gleason did not have probable cause to believe either that Mr. Filler had committed a gross sexual assault against Ms. Arguetta or that he had assaulted her. The Amended Complaint alleges that Ms. Arguetta and Ms. Gleason concocted the criminal charges against Mr. Filler in an effort to secure the custody of her two children to Ms. Arguetta. The plan, as alleged, was for Ms. Arguetta to remain in Ms. Gleason's house and to bring her two children there. Evidence that during a break in the Wycoff interview, Ms. Gleason encouraged Ms. Arguetta "to cry during the interview to make the story of spousal rape 'seem real,'" *Am. Compl.* ¶¶ 150, 632, is sufficient from this Court's perspective to establish that Ms. Gleason knew that Ms. Arguetta's claims of gross sexual assault were false, but that Ms. Arguetta had to make her false claims "seem real." Evidence that Ms. Arguetta did not have any bruises on her arms when she came to Ms. Gleason's residence on April 21, as

confirmed by Sergeant Larrabee, is sufficient to establish that Ms. Gleason's critical testimony that Ms. Arguetta was bruised when she arrived at her residence was false. To communicate what a person knows to be false information to a law enforcement officer and to press for the criminal prosecution of that person constitutes a lack of probable cause and meets this element for malicious prosecution.

Turning to malice, as Ms. Gleason has not defended this lawsuit, it is difficult to understand what motivated her in concocting with Ms. Arguetta these false allegations of criminal conduct against Mr. Filler. Yet, given the evidence presented to the Court, Ms. Gleason's conduct constitutes malice. *See Tuttle*, 494 A.2d at 1361 (When "deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied").

Of the seven original charges against Mr. Filler, he was acquitted of six. To resolve a habeas corpus petition on the seventh charge, the District Attorney for Hancock County not only stipulated that the conviction for the assault be vacated but he also dismissed the charge itself. There is no suggestion that the District Attorney undertook these actions on procedural grounds and the Court concludes he did so based "on the merits" or at least that his actions "reflect[ed] on the merits, of the action." *Jordan v. Town of Waldoboro*, No. 2:17-cv-00025-JHR, 2018 U.S. Dist. LEXIS 167836, at *52 (D. Me. Sept. 28, 2018) (quoting *Gordon*, 1999 ME 22, ¶ 10, 723 A.2d 881). In the Court's view, Mr. Filler demonstrated that all the criminal counts against him were terminated favorably to him.

Even though the Court is unable to ascribe a specific motive to Ms. Gleason, the Court concludes that Mr. Filler has proven that Ms. Gleason committed each of the elements of the tort of malicious prosecution against Mr. Filler in falsely informing law enforcement and in falsely testifying that he committed crimes against Ms. Arguetta that he did not in fact commit and in abetting Ms. Arguetta's false statements to Chief Wycoff concerning gross sexual assaults that had not occurred.

### 2. Negligent Infliction of Emotional Distress

Whether Mr. Filler's emotional damages caused by Ms. Gleason's actions could meet the Maine Law Court's high standard for a stand-alone claim of negligent infliction of emotional distress is a difficult question. However, the Court does not need to address it because it determines that Mr. Filler established a claim for malicious prosecution and Mr. Filler is entitled to claim emotional injury arising from that tort. The more cautious approach is to dismiss the claim for negligent infliction of emotional distress as a stand-alone tort and to award damages for emotional injury under the malicious prosecution count.[1]

### C. Compensatory Damages

### 1. General Principles

Under Maine law, tort damages "are intended to make the plaintiff whole by compensating him or her for any injuries or losses proximately caused by the

---

[1]    In fact, on February 20, 2015, Mr. Filler voluntarily dismissed his negligent infliction of emotional distress claim against Paul Cavanaugh, one of the governmental defendants in this case. *Pl.'s Opp'n to the Mot. to Dismiss of Paul Cavanaugh* at 13 (ECF No. 22) ("Filler Voluntarily Dismisses Count Eight – Negligent Infliction of Emotional Distress as Such a Claim is Legally Subsumed by His Other Viable Claims Against Cavanaugh"); *Order on Mots. to Dismiss* at 77 (ECF No. 42).

defendant." *Estate of Hoch v. Stifel*, 2011 ME 24, ¶ 41, 16 A.3d 137 (quoting *Reardon v. Lovely Dev., Inc.*, 2004 ME 74, ¶ 9, 852 A.2d 66).  The plaintiff bears the burden of proving damages and the plaintiff's proof must be more than "speculation or conjecture."  *King v. King*, 507 A.2d 1057, 1060 (Me. 1986).  "[W]ith the entry of default, the well-pleaded allegations in the complaint are taken as true, except those relating to damages."  *Rosecrans v. Airamedic, LLC*, No. 1:16-cv-00452-JAW, 2017 U.S. Dist. LEXIS 47719, at *18-19 (D. Me. Mar. 30, 2017).  "[T]he burden remains with the plaintiff to prove the extent of injuries established by the default."  *Foss v. Ingeneri*, 561 A.2d 498, 499 (Me. 1989).

In his memorandum, Mr. Filler claims damages in three categories: special damages, non-economic damages, and punitive damages.  *Pl.'s Damages Demand* at 1-8.

## 2.    Lost Earning Capacity

For special damages, Mr. Filler claims damages from past lost wages and future lost earning capacity in the total amount of $2,116,675.[2]  *Id.* at 4.  Ms. Newick presented two alternatives for calculating Mr. Filler's economic loss claim: occupations in Hancock County and occupations based on a male with a bachelor's degree.  Of these two alternatives, the Court finds that the male with a bachelor's degree more closely represents Mr. Filler's economic loss.  Mr. Filler testified that in April 2007, he was about to leave Hancock County and move to the Atlanta, Georgia

---

[2]      Mr. Filler introduced into evidence his bills from Dr. Brandis.  *Pl.'s Ex.* 2, *Ledger Detail*.  But he has not made a claim for reimbursement of his counseling bills either from Dr. Brandis or from Dr. Brandis' predecessor, Mr. Schamle.

area, where his mother and sister were living, when Ms. Arguetta first complained to law enforcement about his alleged crimes. To use occupations in Hancock County, Maine, therefore, does not comport with the evidence.

The Court also finds that using a male with a bachelor's degree is a reasonable proxy for Mr. Filler's past and future wage loss. In fact, because Mr. Filler is an honor graduate of business school, is qualified as a certified public accountant, and has started up and run businesses, including a web-based business, his earning capacity could well exceed the anticipated earning capacity of the average college graduate. Accordingly, the Court accepts Ms. Newick's calculation of $782,080 in past lost wages from April 2007 to January 2019. *See Newick Report* at 10. To bring this figure up to date, the Court added two months of past lost wages, or $12,274 ($73,646 ÷ 12 = $6,131 x 2 = $12,274). The total for past lost wages therefore is $794,354.

The Court is less inclined to award lost earning capacity to Mr. Filler for the rest of his working life. Mr. Filler is forty-nine years old. He graduated from Babson College in 1995 with high honors in financial accounting and he is a certified public accountant. Mr. Filler has an entrepreneurial bent. He started and managed what sounds like a successful national sportswear business with a strong web-based presence. After moving to Maine, he started an open-air flea market on Route One and became involved with a sign company.

The Court found Mr. Filler to be highly intelligent, articulate, and capable. The Court believes, once this litigation is finally over, he will be able to close the book on this terrible chapter in his life and put it behind him. Mr. Filler has chosen an

excellent treating psychologist in Dr. Brandis and Dr. Brandis testified that even though Mr. Filler cannot currently work, he hopes that years from now, Mr. Filler will improve. The Court finds that with Dr. Brandis' assistance, Mr. Filler is likely to return to work at some point in some capacity. Ms. Newick estimated the annual lost earning capacity to have a present value of about $48,000. *See Newick Report* at 8. The Court finds that Mr. Filler has proven a future earning capacity loss of $300,000, which is just over six years of total incapacity or a longer period of partial incapacity.

The Court finds that the total of economic damages is $1,094,354.

### 3. Non-economic Damages

Ms. Arguetta's allegations against him, supported by Ms. Gleason, led to charges that he committed five gross sexual assaults and two assaults. Mr. Filler was charged under 17-A M.R.S. § 253(1)(A) of the Maine Criminal Code, which provides:

> A person is guilty of gross sexual assault if that person engages in a sexual act with another person and the other person submits as a result of compulsion.

Maine law defines "compulsion":

> "Compulsion" means the use of physical force, a threat to use physical force or a combination thereof that makes a person unable to physically repel the actor or produces in that person a reasonable fear that death, serious bodily injury or kidnapping might be imminently inflicted upon that person or another human being.

17-A M.R.S. § 251(1)(E). A violation of section 253(1)(A) is defined as a Class A crime in Maine. The penalty for committing a Class A crime in Maine is incarceration for

"a definite period not to exceed 30 years." 17-A M.R.S. § 1252(2)(A). The only crime in Maine with a more severe penalty is murder. *See* § 1251.

On April 27, 2007, Mr. Filler was charged with five Class A gross sexual assaults. From then until January 15, 2009, Mr. Filler lived with the possibility that he could be found guilty of all five gross sexual assault charges. On January 15, 2009, he was acquitted of four gross sexual assault charges but convicted of one gross sexual assault charge and was vulnerable to being sentenced as someone who had committed a Class A crime despite his certainty that he had done no such thing.

Mr. Filler suffered through the uncertainty of a motion for new trial, the state of Maine's appeal of the favorable ruling, and a remand to the trial court to retry the remaining gross sexual assault trial and assaults. He learned that Assistant District Attorney Kellett was intent upon retrying him for the remaining charges. Mr. Filler was not acquitted of the Class A, gross sexual assault, charges until more than five years after originally charged.

Despite the relief from being finally acquitted of all the gross sexual assault charges, he had been convicted of one simple assault charge under 17-A M.R.S. § 207(1)(A). Maine law defines assault as:

> A person is guilty of assault if the person intentionally, knowingly or recklessly causes bodily injury or offensive physical contact to another person.

*Id.* The charged assault was a Class D crime in Maine, which provides:

> In the case of a Class D crime, the court shall set a definite period of less than one year.

§ 1252(2)(D). Thus, upon conviction of the assault, Mr. Filler was subject to being sentenced to jail.

He was. On the same day as his conviction, he was sentenced to twenty-one days of incarceration in the Hancock County Jail and he served sixteen days beginning October 17, 2012. *State Docket Record* at 21. Mr. Filler was not cleared of all the charges of April 27, 2007 until April 24, 2015, nearly eight years to the day after the charges had been initiated.

In assessing pain and suffering damages, the Court considered several factors:

(1) The charges. Except for murder, there is no crime that a man can commit against a woman more heinous than rape and some believe that rape can be worse than murder, because the victim must live with the consequences. From the viewpoint of the public and properly so, few crimes merit more universal condemnation of the perpetrator and sympathy for the victim. The public's attitude against rapists is exemplified in this case by the waitress' refusal to wait on Mr. Filler.

(2) The context. Ms. Arguetta alleged that Mr. Filler raped her while she was married to him. Any rape is an egregious violation of another person, but for a husband to rape his wife and, in this case, the mother of his children is a special breach of trust.

(3) The specifics. Here, although all gross sexual assaults are serious, the state of Maine charged Mr. Filler with Class A gross sexual assault, the most serious category of gross sexual assault, characterized by compulsion, which means that the state of Maine charged Mr. Filler with using or threatening physical force so that Ms. Arguetta was unable to physically repel him or was reasonably afraid she would be killed, subjected to serious bodily injury or kidnapped, if she did not submit.

(4) The convictions. As detailed above, Mr. Filler was convicted of one count of gross sexual assault and two counts of assault. For an extended period, he was vulnerable either to losing the motion for new trial or the state of Maine's appeal of the order for new trial. On remand, he was then vulnerable of conviction on the remaining gross sexual assault charge. On retrial, he was convicted of assaulting his ex-wife, which—

although a far cry from gross sexual assault—is also a serious and opprobrious crime.

(5) Law enforcement. As described by Mr. Filler, law enforcement's investigation and pursuit of this case violated his basic constitutional rights, violated law enforcement protocol, and at least one officer falsified evidence against him. To be falsely accused of a manifestly serious crime is stressful enough, but to realize that law enforcement has broken the rules to assure conviction would be intolerable.

(6) The publicity. The charges against Mr. Filler were the subject of intense publicity in Hancock County. Landlords refused to rent to him and employers to hire him. As noted, a waitress refused to wait on him and when he attended school events, he was ostracized by the community.

(7) The unethical prosecutor. The state prosecutor who was assigned Mr. Filler's case committed numerous violations of the Maine Bar rules in her no-holds-barred effort to convict him.

(8) Retributive jailors. During Mr. Filler's sixteen days of imprisonment, he was subjected to three cell raids and seven strip-searches. He testified that the person in the next cell was left alone. It is difficult to believe that the actions of his Hancock County jailors were not a function of their sense that he had besmirched Hancock County, its prosecutors, and law enforcement officers, that he was in fact guilty of the crimes of which he had been acquitted and that they were entitled to exact their own punishment.

(9) The uncharged alleged conduct. In addition to charging that Mr. Filler had raped and assaulted her, Ms. Arguetta also claimed that he had sexually molested his two sons. As she alleged, he was a sexually abusive monster, raping not only his wife, but both his own children.

(10) The second assistant district attorney. After the first trial, a second assistant district attorney prosecuted him and during a political speech, this prosecutor publicly and wrongfully castigated Mr. Filler, reinforcing public misconceptions about him.

(11) The change in personality. The Court accepts Yolanda Oden's testimony that these terrible events changed her brother from a social and gregarious man to someone withdrawn and a shadow of his former self.

(12) Vladek Filler's account.  The Court accepts Mr. Filler's description of the impact that this series of events has had on him: that he rarely goes out of his own home, he is obsessed with the entire matter, he cannot imagine having another relationship with a female ever again, he finds it hard to concentrate and focus, and he continues to suffer from issues of trust.

A further calculus is where Ms. Gleason's misconduct fits within this chain of events.  To prove damages, a plaintiff must demonstrate that there is a causal nexus between the defendant's actions and the asserted damages.  *Brewer v. Roosevelt Motor Lodge*, 295 A.2d 647, 652-53 (Me. 1972); JACK H. SIMMONS, DONALD N. ZILLMAN, ROBERT H. FURBISH, MAINE TORT LAW § 19.02 (2018 ed.) ("Compensatory damages by definition are circumscribed by the concept of proximate cause").  It could be argued that Ms. Gleason should not be held responsible for some of the consequences of her actions.  For example, former Assistant District Attorney Mary Kellett's ethical lapses during her prosecution of Mr. Filler resulted in "the first disciplinary proceeding ever filed with the [Maine Supreme Judicial] Court by the Overseers of the Bar against a member of Maine's prosecutorial bar that is based on the prosecutor's representation of the state."  *Pl.'s Opp'n to the Mot. to Dismiss of Paul Cavanaugh*, Attach. 2, *Bd. of Overseers of the Bar v. Mary N. Kellett, Esq.* at 21-22 (ECF No. 22).

Yet, Ms. Gleason did not merely set a ball in motion and watch it roll.  She continued to push it, testifying falsely as a witness, adding to her credibility by calling on her professionalism as a nurse.  She must have known that he had been wrongfully convicted on two occasions and yet, she never told the truth.  During this entire time from beginning to the end of the criminal case against Mr. Filler, if Ms. Gleason had

told the truth—that she and Ms. Arguetta concocted the entire claim to gain an advantage in Ms. Arguetta's custody dispute—the state of Maine's case would have fallen of its own weight. The Court concludes that Ms. Gleason, along with the other defendants, is legally responsible for all Mr. Filler's proven damages.

### D. Joint Tortfeasors

Mr. Filler revealed that he settled his claims against all the government defendants for a total of $375,000. *Pl.'s Damages Demand*, Attach. 7 *Aff. of David A. Weyrens Concerning Jt. Tortfeasor Settlements* at 1. On July 17, 2018, August 15, 2018, and August 28, 2018, the parties filed stipulations of dismissal, dismissing Mr. Filler's claims against each governmental defendant. *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 98); *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 101); *Stip. of Dismissal with Prejudice Pursuant to [Fed. R. Civ. P.] 41(a)(1)(A)(ii)* (ECF No. 103).

There are two points regarding this settlement. First, the size of the settlement against the government defendants does not, in this Court's view, reflect on the total damages Mr. Filler sustained. For governmental defendants, there are complex questions of absolute and qualified immunity and insurance coverage. These defenses and limitations are not available to Ms. Gleason. Second, the Court agrees with Mr. Filler that Maine's so-called "single injury rule" applies here. *Paine v. Spottiswoode*, 612 A.2d 235, 240 (Me. 1992). The Maine Supreme Judicial Court has written:

> The single injury rule can be summarized as follows: when joint tortfeasors by their separate negligent acts cause a single injury that is

incapable of apportionment, each actor is liable for the entire amount of the damages.

*Palleschi v. Palleschi*, 1998 ME 3, ¶ 3 n.3, 704 A.2d 383.  Under the single injury rule, the Court deducts the $375,000 from the total sum of non-punitive damages that it awards.  *See* 14 M.R.S. § 163 ("If such settlement or release has occurred, the trial judge shall reduce the verdict by an amount equal to the settlement with or the consideration for the release of the other persons").

## E.    Punitive Damages

In the seminal case of *Tuttle*, 494 A.2d  at 1361 (internal citations omitted), the Maine Supreme Judicial Court established the Maine standard for an award of punitive damages:

> If one were to select a single word or term to describe [the] essence [of conduct warranting punitive damages], it would be 'malice.'. . . The requirement of malice will be most obviously satisfied by a showing of 'express' or 'actual' malice.  Such malice exists when the defendant's conduct is motivated by ill will toward the plaintiff. . . . Punitive damages will also be available, however, where deliberate conduct by the defendant, although motivated by something other than ill will toward any particular party, is so outrageous that malice toward a person injured as a result of that conduct can be implied.

A defendant's "mere reckless disregard of the circumstances" is not sufficient to imply malice.  *Id.*  Moreover, the *Tuttle* Court held that to be awarded punitive damages, a plaintiff must make a showing of actual or implied malice by clear and convincing evidence.  *Id.* at 1364.

Here, Mr. Filler demonstrated that Ms. Gleason acted with malice as an element of the tort of malicious prosecution and based on the record before it, the Court concludes that Mr. Filler has demonstrated Ms. Gleason's malice by clear and

convincing evidence. The Court concludes that punitive damages are warranted against Ms. Gleason. *See Grace v. Sears*, No. Han-12-176, 2013 Me. Unpub. LEXIS 3 (Jan. 10, 2013) (upholding punitive damages in an abuse of process claim); *Saliem v. Glovsky*, 132 Me. 402, 172 A. 4 (1934) (in an abuse of process claim, the Maine Supreme Judicial Court wrote that "[b]esides compensatory damages, actual damage having been proved, the jury were justified in adding punitive damages").

There is no evidence in the record of Ms. Gleason's financial circumstances. There does not have to be. *Ferrell v. Cox*, 617 A.2d 1003, 1008 (Me. 1992) ("Under Maine law, it is not essential for a plaintiff to present evidence of a defendant's financial circumstances before a jury may consider punitive damages"); *Hearts with Haiti v. Kendrick*, 141 F. Supp. 3d 99, 122 (D. Me. 2015).

Here, Mr. Filler demands the sum of $50,000 as an award of punitive damages. *Pl.'s Damages Demand* at 5. The Maine Supreme Judicial Court has written that an award of punitive damages may be issued "for the purpose of deterrence or punishment or both." *Tuttle*, 494 A.2d at 1355. The Court agrees with Mr. Filler that an award of $50,000 in punitive damages is reasonable and proper in light of Ms. Gleason's egregious conduct, the incalculable harm she caused Mr. Filler, and the need to deter and punish her conduct.

### F.     Pre- and Post-Judgment Interest

Mr. Filler demands pre- and post-judgment interest. *Pl.'s Damages Demand* at 6. The First Circuit has written that "[i]t is well established that prejudgment interest is a substantive remedy governed by state law when state-law claims are

brought in federal court, while post-judgment interest, even on state-law claims, is governed by federal law." *Tobin v. Liberty Mut. Ins. Co.*, 553 F.3d 121, 146 (1st Cir. 2009) (citations omitted). In *Hearts with Haiti*, the Court discussed the law on pre- and post-judgment interest. 141 F. Supp. 3d at 116-20. In brief, pre-judgment interest is governed by 14 M.R.S. § 1602-B(3). Contrary to Mr. Filler's assertion, however, post-judgment interest is not controlled by Maine statutory law. It is controlled by 28 U.S.C. § 1961(a).

### G.    Summary

From April 21, 2007 to April 24, 2015, Mr. Filler endured a living nightmare. Falsely accused by his then-wife and her friend of committing heinous crimes, he was wrongfully charged, tried, and convicted of those charges, and it took him eight years to be fully exonerated. Mr. Filler's experience is no one's idea of justice in this state or country. To arrive at a just result, the justice system depends upon the willingness of critical witnesses to tell the truth, the investigative objectivity of law enforcement, and the honesty of prosecutors. When one fails, for example when a critical witness lies, the fairness and thoroughness of the law enforcement investigation, the professionalism of the prosecutor, when combined with the advocacy of the defense attorney, the impartiality of the judge, and the common sense of the jury, tend to act as safeguards and correct the lie. Here, much of the system failed and as a direct consequence Mr. Filler suffered.

At the close of Mr. Filler's testimony, the Court compared Mr. Filler's horrendous experience with the criminal justice system in Maine to THE TRIAL by

Franz Kafka. *See Partial Tr. of Proceedings* 2:13-19 (ECF No. 121) (citing Franz Kafka, THE TRIAL (1925)). Within this tragic story, it is important to point out that not all systems failed. The defense lawyers who represented Mr. Filler, the state of Maine Department of Health and Human Services (MDHHS) and the state judiciary performed admirably. The defense lawyers persisted, the MDHHS granted Mr. Filler custody of their two sons in the middle of this onslaught, and even though it took time, the state judiciary reached the right result, because a Superior Court Justice granted Mr. Filler a new trial in the face of prosecutorial misconduct and because the Maine Supreme Judicial Court affirmed his order. This allowed a new trial, an acquittal on all but one charge, and in the end, a new prosecutor stepped up and dismissed this last charge. Finally, a civil lawyer took up the challenge of proving the case against the government and individual defendants and securing Mr. Filler a measure of what he lost.

Even though a number of people who should have done the right thing deliberately chose to do the wrong thing, the Court views Ms. Gleason as extremely culpable. She encouraged Ms. Arguetta to file the false charges, she abetted her false statements to the police, she testified falsely twice, and she buttressed her testimony by disguising her lies in medical terminology. She had no obvious motive to lie for Ms. Arguetta and presumably this enhanced her credibility. Finally, if she had come clean at any point, Mr. Filler's nightmare would have been over, and the fact is, she has not come clean even to this day.

The Court awards Vladek Filler the following damages against Linda Gleason:

(1) Compensatory damages: $1,000,000;

(2) Economic damages: $1,094,354; and

(3) Punitive damages: $50,000.

This total damage award must be reduced by $375,000 for a net award of $1,769,354.

## V. CONCLUSION

The Court issues judgment in favor of Vladek Filler and against Linda Gleason in the total amount of $1,769,354, plus interest and costs.

SO ORDERED.

/s/ John A. Woodcock, Jr.
JOHN A. WOODCOCK, JR.
UNITED STATES DISTRICT JUDGE

Dated this 12th day of March, 2019.